**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| LLOYD GEORGE MORGAN | : | PRISONER |
| | | 3:01cv1107(CFD) |
| v. | : | |
| | | |
| JOHN J. ARMSTRONG | : | AUGUST 19, 2005 |

<u>**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR**</u>
<u>**SUMMARY JUDGMENT**</u>

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, the defendants in the above-captioned matter move for summary judgment in their favor as there is no genuine issue of material fact and the Court can find as a matter of law that the defendants did not exhibit deliberate indifference, did not violate the plaintiff's right to privacy, and that all defendants are entitled to qualified immunity. The plaintiff's claim for a declaratory judgment is moot.

**I.     <u>FACTS</u>**

**A.     <u>Plaintiff's Allegations</u>**

The operative complaint sues nine defendants: former Commissioner of Correction John Armstrong, former Deputy Commissioner of Correction Peter Matos, former Warden of Northern Larry Myers, three former majors at Northern, Thomas Coates, Christine Whidden, and Michael Lajoie, and three mental health professionals, Dr. Paul Chaplin, Dr. Ronald Hensley and Thomas Lateer. The plaintiff seeks a declaratory judgment as well as compensatory and punitive damages pursuant to 42 U.S.C. § 1983.

The plaintiff alleges two causes of action, claiming first that the defendants exhibited deliberate indifference by virtue of their policy of having inmates in the Administrative Segregation program at Northern Correctional Institution (hereinafter "Northern") exercise,

during Phase I of the program, in restraints.  This cause of action regarding the restraint policy actually contains two claims, one that in general this denied the plaintiff the right to exercise, and also that on May 4, 2001, the plaintiff injured himself while exercising in restraints because his handcuffs were applied too tightly.

The plaintiff's second allegation is that during one of the times he was incarcerated at Northern, from March 20, 2001 until November 7, 2003, his right to privacy was violated as the entire "system of providing mental health treatment to inmates at Northern consisted of mental health workers making rounds to discuss inmates' mental health issues with them at the doors of their cells."  S. Amnd. Com. ¶ 54.

          1.     <u>Recreation Claims</u>

The plaintiff claims to be overweight and to suffer from high blood pressure and diabetes. S. Amnd. Com. ¶ 18.  He alleges, without stating the reason, that on March 30, 2001, he was transferred from another correctional facility to Northern to the Administrative Segregation (hereinafter "AS") program there.  S. Amnd. Com. ¶ 19.  The plaintiff alleges that Northern is a "Level 5 "Supermax'" prison with he most restrictive form of confinement within Connecticut's correctional system.  S. Amnd. Com. ¶ 20.  The plaintiff claims that he was initially placed in Phase I of the program and remained there for approximately two years.  S. Amnd. Com. ¶ 22.

The plaintiff alleges that in Phase I of the AS program, inmates are confined for 24 hours a day, except for five one-hour recreation periods each week.  S. Amnd. Com. ¶ 23.  He further alleges that "during his recreation periods in Phase One, he was handcuffed behind his back and his ankles were shackled."  S. Amnd. Com. ¶ 23.  He further alleges that the hand and ankle

restraints are connected "by a heavy metal tether chain with a heavy padlock." S. Amnd. Com. ¶ 24.

Without noting that recreation was voluntary, the plaintiff alleges that he was locked in a "cage" in the prison's recreation yard. S. Amnd. Com. ¶ 25. The plaintiff notes that sometimes he was locked in the recreation area with his cellmate. S. Amnd. Com. ¶ 25. The plaintiff alleges that he remained fully restrained while recreating. S. Amnd. Com. ¶ 26. It is the plaintiff's allegation that this system of recreating in restraints deprived him of the right to meaningful exercise altogether. S. Amnd. Com. ¶¶ 27-28. He claims that this inability to exercise "exacerbated" his health problems. S. Amnd. Com. ¶ 30.

The plaintiff claims that "sometimes" his handcuffs and ankle shackles were "applied too tightly increasing the … risk of circulatory problems." S. Amnd. Com. ¶ 32. The plaintiff does not allege that he ever complained or even mentioned the fact to any of the named defendants that his handcuffs were "sometimes" applied too tightly, nor does he allege that any of the named defendants had any notice that his handcuffs were applied too tightly.

The plaintiff then alleges that on May 4, 2001, his handcuffs were "applied too tightly." S. Amnd. Com. ¶ 33. He then alleges that "While in the recreation cage on that day, the plaintiff decided to sit down in an attempt to relieve the pressure on his wrists caused by the heavy restraints." S. Amnd. Com. ¶ 34. He then alleges, "While moving to the sitting position or while attempting to stand up, the plaintiff became light-headed and lost his balance. The restraints left him powerless to break his fall." S. Amnd. Com. ¶ 36. The plaintiff alleges that the fall resulted in injuries to his "head, right shoulder and right knee." S. Amnd. Com. ¶ 36. The plaintiff

alleges that, after his fall, a nurse noted that the plaintiff was at "high risk for injury."  S. Amnd. Com. ¶ 36.

The plaintiff is suing the custodial defendants, Armstrong, Matos, Myers, Coates, LaJoie and Whidden for the policy of requiring inmates in Phase I at Northern to recreate in restraints. S. Amnd. Com. ¶¶ 38-39.

The plaintiff alleges that he had complained three days before the alleged fall about recreating in restraints, and alleges that he received a reply three days after the alleged fall from Major Coates who stated that "Northern CI has established recreation policies to address security concerns and meet the statutory requirements."  S. Amnd. Com. ¶ 41.  The plaintiff claims that he appealed Coates' response to Warden Myers, who replied that Coates' response was appropriate.  S. Amnd. Com. ¶ 42.  The plaintiff finally alleges that the defendants "knew or should have known that the plaintiff's obesity, high blood pressure, diabetes, circulatory problems and other medical problems exposed him to a high risk of injury."  S. Amnd. Com. ¶ 48.  The plaintiff does not state any reason that the defendants would or should have known of the plaintiff's confidential medical issues.  The plaintiff does not claim that he ever made the defendants aware of his health issues or that he ever complained about his health issues.

2.    Privacy Claims

The plaintiff claims mental health problems.  S. Amnd. Com. ¶¶ 50-53.  As noted above, the plaintiff claims that the "system" of providing mental health treatment to Northern inmates consisted of nothing more than "mental health workers making rounds to discuss inmates' mental health issues with them at the doors of their cells."  S. Amnd. Com. ¶ 54.  The plaintiff then claims, that in order to request mental health treatment during the entire time he was at

Northern the only way for him to request mental health treatment was to discuss personal and confidential mental health issues with the three mental health defendants at his cell door within earshot of other inmates.  S. Amnd. Com. ¶ 55-56.  The plaintiff claims that this violated his right to privacy.  S. Amnd. Com. ¶ 59.

Without attaching any grievances or stating the manner in which he did so, the plaintiff alleges that he has exhausted all available administrative remedies.

B.      **Defendants' Factual Presentation**

1.      **Plaintiff's Institutional History**

The plaintiff has been in and out of the custody of the Department of Correction (hereinafter "DOC") for many years.  **Ex. A DOC RT 60 Screen.**  The plaintiff first entered prison in 1983 and began increasingly longer periods of incarceration thereafter.  **Ex. A.**  In the year 2000, the plaintiff began serving a twenty year sentence with a release date of January 4, 2020.  **Exs. A; B Administrative Segregation package.**  Since 1999, Morgan has continuously been in the custody of the Connecticut Commissioner of Correction.  **Ex. A.**

In 1996, the plaintiff was transferred to what was then the special management unit at the Walker facility, and was subsequently transferred to Northern Correctional Institution (hereinafter "Northern"), where he resided from August 1996 until October 1997.  **Ex. A.**  In October of 1997, the plaintiff was discharged until April of 1999, at which time he was placed in together with the general inmate population.  **Ex. A.**

To say that the plaintiff has been a management problem for DOC officials would be an understatement.  The plaintiff has received 60 Disciplinary Reports during his incarceration.  **Exs. C, RT 67; A; G Shea Affidavit.**  The plaintiff's disciplinary history includes being found

guilty by the Department of Correction of Assault on a DOC employee preceding his initial placement at Northern, six charges of Assault, giving false information, and fighting, among others. **Exs. C; G**.

On March 30, 2001, inmate Morgan assaulted his cellmate at the facility then known as MacDougall Correctional Institution. **Exs. B p. 3; G.** He threw hot water and baby oil onto the victim's face, cut his face with a razor and struck him in the head with an electrical adaptor swung inside a sock. **Exs. G; B p. 3.** Outside charges were brought by the victim. **Exs. B p. 3; G.** Based on this behavior, the plaintiff was once again returned to Northern on March 30, 2001. **Ex. B.**

Eleven days after his placement in Phase I of the Administrative Segregation program at Northern, the plaintiff received a Disciplinary Report for Threats. **Exs. C**, **RT 67; G.** In the incident leading to this Disciplinary Report on April 10, 2001, the plaintiff stated several times to a Correctional Officer, "I have AIDS and I'm going to bite you and spit in your face." **Exs. D, portions of inmate master file; G.** A month later, the plaintiff received another Disciplinary Report for Interfering with Safety and Security. **Exs. C; G.**

The following December, the plaintiff was convicted of another infraction, security tampering, and the following month he was convicted of Threats for telling an officer "I know someone who will meet you in the parking lot and she'll break your f***ing face   test me!". **Exs. C; D; G.** Inmate Morgan continued to receive Disciplinary Reports through 2002. **Exs. C; G.**

The combination of all of these repeated disciplinary problems resulted in the plaintiff's continued confinement in Phase I of the Administrative Segregation program at Northern from

March 30, 2001 until April 18, 2003.   **Exs. G; H, housing cards.**  While the plaintiff claims he remained in Phase I through November 7, 2003, his housing card indicates that he was release to Phase II on April 18, 2003.  **Exs. G; H.**

## 2.    Administrative Segregation Program at Northern

Northern was at the time in question and is now the designated restrictive housing facility for the Connecticut Department of Correction, managing those inmates who have demonstrated a serious inability to adjust to confinement in prison and pose a serious threat to the safety and security of a correctional facility.  **Exs. D Northern website description; G.**   Placement in the Administrative Segregation Program at Northern both in 1999 and since then comes after a hearing, and the decision of the Hearing Officer may be appealed.  **Exs. E, Administrative Segregation description; G.**

Since 1999, the Administrative Segregation Program has consisted of a three phase program.  **Exs. E AS description; G.**  The Administrative Segregation Program "operates on the basic assumption that inmates who engage in aggressive, violent, disruptive behavior, or who pose an imminent risk … require a highly structured and secure environment."  **Exs. E; F; G**.  In Phase I, which at the time lasted for at least six months if an inmate was discipline free, or longer if not, inmates are allowed very little time out of their cells.  **Exs. E; F; G**.  Meals are eaten in the cells; inmates are restricted to three showers and five hours of recreation per week.  **Exs. E; F; G**.  Phase I inmates are precluded from any work assignments.  **Exs. E; F; G**.

While he was housed in Phase I of the Administrative Segregation program at Northern, the plaintiff was housed in Units One West and One East.  **Exs. G; H.**  While in Phase I, the plaintiff shared a cell with another inmate.  **Ex. G.**  The size of the double cell that the plaintiff

shared while in Phase I was approximately 8 by 10 feet, containing nearly 80 square feet.  **Ex. G.**  The cell contained two narrow beds one over the other, and a toilet.  **Ex. G.**

Recreation in Phase I was and is provided for one hour per day five days per week, but is entirely voluntary.  **Ex. G.**  It was the policy at Northern up until April of 2003 that inmates in Phase I of the Administrative Segregation program, no matter the length of time they had been in Phase I, were required to participate recreation in full restraints for the entire duration of their stay in Phase I.  **Ex. G.**  This is still the policy for inmates who have initially been placed in Phase I of the Administrative Segregation program at Northern, although the policy has been changed so that the rule regarding recreating in restraints *may* be relaxed after 30 days under certain conditions.  **Ex. G.**

For his one hour of recreation five days per week, a Phase I inmate is escorted in full restraints into an outdoor recreation area surrounded by a chain link fence.  **Ex. G.**  The inmate remained in full restraints for the duration of the hour, and then was escorted back to his cell.  **Ex. G.**  The inmate is free to walk and move about the recreation area in the fresh air, and inmates recreating in this manner usually spend most of the time walking around.  **Ex. G.**  The recreation yard is approximately 20 by 20 feet.  **Ex. G.**

Full restraints within the Connecticut Department of Correction includes handcuffs behind the back, leg irons, and a tether chain from the leg irons to the handcuffs.  **Ex. G.**  While the restricted conditions of recreation for a Phase I Administrative Segregation inmate are a far cry from the basketball, television, volleyball and other indoor and outdoor recreational activities available to Connecticut's general population inmates at the time and currently, these measures

were considered necessary due to the security threat posed by Phase I inmates given their behavior resulting in placement in Phase I.  **Ex. G.**

Inmates who have shown a propensity for violence against correctional staff or other inmates within a correctional setting have been can be ingenious in their destructiveness.  **Ex. G.** They can hold trap doors open while unrestrained, they can swing handcuffs around after the first one is applied to one hand, and they refuse to re-cuff, among other things, all of which can disrupt the daily routine of a facility.  **Ex. G.**

Thus, the defendants do not dispute that during the time period in question, inmates in Phase I of the Administrative Segregation were required to recreate in restraints for reasons of safety and security.  **Ex. G.**  Inmates in Phase I Administrative Segregation both now and during the time in question are not, however, restrained during the time that they spend inside their cell. **Ex. G.**

The cells at Northern are large enough to accommodate calisthenics such as sit-ups, push-ups, jumping and running in place.  **Ex. G.**   The policy of recreating Phase I Administrative Segregation inmates at Northern in restraints while they could do more intensive calisthenics in their cell accommodated both the inmates' needs for fresh air, walking, and time out of their cell while allowing the inmates' needs for more vigorous exercise, if they chose to engage in it, to be accomplished within the confines of their cell.  **Ex. G.**

### 3.     Incident on May 4, 2001

The plaintiff alleges that he fell in the recreation unit on May 4, 2001, two months after he vigorously assaulted his cellmate with a razor and an adaptor in a sock, causing the cellmate serious damage.  **Ex. B.**.   There is no indication that any custodial staff witnessed this event, as

9

no incident report was prepared. **Ex. G.** Whenever an inmate hurts himself, has a health

episode, or falls or there is any similar incident, custodial staff are required by Administrative

Directive to report the incident in writing to a supervisor. **Ex. G.** Staff at Northern have searched

the Incident Reports on file for the months of April and May 2001 and found no incident report

related to the plaintiff's claims of an injury in the recreation yard. **Ex. G.**

There is a Medical Incident Report and a nurse's note for the plaintiff for that date

completed by Nurse Hill in the medical unit. **Ex. J, Health Records, p. 1163; Ex. K Hill Aff.**

The Medical Incident Report has a version of events that differs from the plaintiff's allegations

in his complaint. **Ex. J 1163.** The incident report does not indicate that the plaintiff fell, but

rather states, "Reports feeling light-headed—had to sit down bumped head hurt R [right]

shoulder and R knee. Hx [history] NIDDM [non-insulin dependent diabetes] Hx [history] HTN

[hypertension]—I/M [inmate] out a REC yard." **Exs. J 1163; K, Nurse Hill Affidavit.** He also

claims he slid down the wall and hurt the right side of his body trying to get up. **Exs. J 1162; K.**

While the diagnosis on the Medical Incident Report states, "High Risk for Injury" this diagnosis

was made *after* the plaintiff presented with a bump on his head and as a non-insulin dependent

diabetic, and in no way meant that custodial staff or anyone else within the Department should

have prevented the plaintiff from injuring himself or attending recreation. **Ex. J 1163; K.** This

was Nurse Hill's professional nursing diagnosis and it meant that the plaintiff's blood pressure

was elevated and that his blood sugar should be checked. **Ex. K.** The phrase "high risk for

injury" did not mean anything about the fact that plaintiff now claims to have fallen in the

recreation yard. **Ex. K.** Nurse Hills's medical plan based on the diagnosis was for the plaintiff

to be assessed by A.P.R.N. for front-cuff status to address the plaintiff's claims that he should be cuffed in front. **Exs. K; 1162.**

There is no indication whatsoever that any of the named defendants or any correctional staff at all had any notice that the plaintiff was at high risk for injury prior to his fall. Indeed, as noted above, recreation is voluntary, and the plaintiff could have stated without any repercussions that he did not wish to participate in recreation that day if he were feeling ill. **Ex. G.** There is no indication in the Medical Incident Report that the plaintiff complained that his handcuffs were too tight and that he was sitting down in the recreation yard in an effort to ease pressure on his wrists. **Ex. J 1163.** Had the plaintiff complained of soreness to his wrists, Nurse Hill would have indicated that in the Medical Incident Report. **Ex. K.**

There is no indication that the plaintiff complained of pain or pressure or anything having to do his wrists. **Ex. J 1163; K.** The plaintiff received ice and was told that he would have to sign-up for sick call for any further treatment. **Ex. J 1163; K.** Nurse Hill tested the plaintiff's blood sugar and at this time it was within normal limits. **Ex. J 1163; K.** At this time, Nurse Hill, the nurse on duty, indicated that the plaintiff would be followed up through a doctor or APRN visit as the plaintiff was at this point indicating that he thought he should be hand-cuffed in the front for his recreation periods. **Ex. J 1216; K.**

Four days later the plaintiff claimed to have a dizzy episode requiring an Emergency Sick Call visit again with Nurse Hill. **Ex. J 1161; K.** Nurse Hill noted at this time that the plaintiff had "No S/S [signs or symptoms] of hypoglycemia [low blood sugar]." **Ex. J 1161; K.** The nurse on duty further noted that the patient would not allow a "FS" [full screening secondary] to an officer in the screening room and that the plaintiff was "insisting on discussing other medical

issues at this time." **Ex. J 1161; K.** Nurse Hill instructed the plaintiff that "E.S.C. [emergency sick call] was for emergent reasons only." **Ex. J 1161; K.** The nurse did not refuse the plaintiff all one-to-one interface with medical staff, but rather, noted that the plan discussed with the inmate was "I/M [inmate] to use regular RN sick call procedure for nurse/pt [patient] 1:1 consult R/T [related to] health issues/concerns." **Ex. J 1161; K.** On this date the plaintiff refused to have his blood sugar monitored. **Ex. J 1161; K.** On May 8, 2004, the plaintiff also claimed he had chest pains, but I reviewed his history and it was clear the plaintiff had recently had a normal E.K.G. and reported that his chest pains stopped when medical staff was present. **Ex. J 1162; K.**

About a month later, the plaintiff was seen in the medical unit by Dr. Germain Bianchi and his request for hand-cuffing in the front was considered. **Exs. J 1156; I Dr. Blanchette Affidavit.** On June 14, 2001, Dr. Bianchi noted that the plaintiff's reported symptom was that he "fell down last month … since then pain R shoulder and R knee." **Exs. J 1156; I.** Dr. Bianchi then stated, "*Mr. Morgan has <u>no obvious interest</u> in diagnostic work-up or treatment for these injuries. He only requests special permission to be handcuffed in front instead of in back at recreation.*" **Exs. J 1156 (underline by doctor); I.** Dr. Bianchi also noted, "He also states he has back pain on + off. He has no interest in workup but only requests 'proper mattress'". **Exs. J 1153; I.** As for the plaintiff's reported shoulder pain, the doctor noted that the "pt [patient] appears comfortable c/ [with] palpated shoulder." **Exs. J 1153; I.**

As for the right knee, the doctor again noted the plaintiff to be overstating his condition, stating, "<u>N</u>o swelling full ROM full extension full flexion no obvious pathology." **Exs. J 1153; I.** The doctor's diagnosis of all of plaintiff's complaints on June 14, 2001 was a common and unrelated diagnosis supported by an objective x-ray, "mild degenerative disease in low back."

**Exs. J 1153; I.**  The doctor denied the plaintiff his request for a pass to wear handcuffs in the front.  **Exs. J 1153; I.**

The medical records for the time period in question show that the plaintiff was seen in the medical unit nearly weekly, all without any adverse consequences to his health from recreating in restraints or otherwise.  **Ex. K.**   When Nurse Hill toured the units at Northern, she noted several times that the plaintiff was often eating junk food containing high fat and high sugar content purchased at commissary.  **Ex. K.**  She would verbally instruct him to stop eating such foods.  **Ex. K.**

The plaintiff behavior was non-compliant with regard to controlling his health issues, and his blood sugar extremely high on several occasions in 1999, before his admission to Northern in March of 2000.  **Exs. J 1123; K.**

### 4.     Plaintiff's General Health Issues

Prior to his transfer to Northern on March 30, 2001, the plaintiff was seen by Walter J. Pawlowski, Ph.D., Supervising Psychologist.  **Exs. J 1180; I.**  Dr. Pawlowski noted that the plaintiff "[a]ppears to be manipulative at present."  **Exs. J 1180; I.**  Dr. Pawlowski further noted that the plaintiff exhibited no overt psychotic behavior.  **Exs. J 1180; I.**  He further noted that the plaintiff made no request for psychotropic medication and had no apparent need for it.  **Exs. J 1180; I.**  Dr. Hensley concluded that the plaintiff was antisocial and manipulative.  **Exs. J 1180; I.**

The plaintiff alleges in his complaint that the fact that he needed to recreate in restraints at Northern "exacerbated" his numerous health problems, including his obesity, high blood

13

pressure, diabetes and other problems.  There is no objective information contained in the plaintiff's health record, however, to support this claim.  **Ex. I.**  To the contrary, medical records indicate that the plaintiff lost 16 pounds between March of 2002 and April of 2002, during the time period in question.  **Ex. J 362.**

The plaintiff has a long history of chronic obesity which did not get worse during the time he was at Northern in Phase I of Administrative Segregation.  For example, on January 7, 2000, over a year before entering Northern, the plaintiff's weight was 230 pounds.  **Ex. J  941.** One month later, the plaintiff was the same weight he was at Northern, 247 pounds.  **Ex. J 940.**

The plaintiff had previously complained of an injury to his right shoulder in October of 1999.  **Ex. J 954, 946.**  The plaintiff claimed that his cuffs were too tight, and that he injured his right shoulder when his shoulder hit a steel door in a truck.  **Ex. J 954, 946.**  At this point, plaintiff claimed, "The sheriffs put the cuffs on too tight and I hurt my shoulder in the van on the way."  **Ex. J 954, 946.**  The plaintiff did not mention this previous injury when he arrived at Northern and claimed to be hurt in the recreation yard in an incident no one witnessed.  **Exs J; K.**

Moreover, there is sufficient room in an 8 by 10 foot double cell with narrow beds over each other to perform exercises or calisthenics such as jumping, running in place, push-ups or sit-ups.  **Ex. I.**  In addition to in-cell exercise, the plaintiff was allowed to walk about, albeit in leg-irons, for 5 hours per week.  **Ex. G.**

### 5.    Plaintiff's Mental Health Issues

a.    Mental Health Care at Northern Generally

Despite the plaintiff's allegations, the provision of mental health services at Northern is professional and complex and involves far more than cell door visits.  **Exs. N; L; M.**  All inmates admitted to Northern were at the time in question are screened and evaluated by mental health staff within 24 hours. **Exs. L; M; N.**  For those inmates in need of mental health services, a treatment plan is and was at the time promptly developed and put into place.  **Exs. L; M; N.**  When necessary as part of a treatment plan or for an acute need, one-on-one visits with a mental health professional are provided.  **Exs. L; M; N.**

Inmates arriving at Northern were and are routinely oriented to Northern's mental health services upon admission to Northern.  **Ex. N.**  Inmates were and are advised that if they need mental health services they are to write a request to the mental health staff and they would be scheduled to be seen based upon the nature of their request.  **Ex. N.**   Inmates are also advised that if they had any thoughts of self harm or a reaction to medication, they should immediately advise staff that they had a mental health emergency.  **Ex. N.**  In addition, the Northern Correctional Institution Inmate Handbook in effect at the time explained Northern's system for the provision of mental health care, noting that one-on-one counseling was available and noting how inmates could access mental health services.  **Ex. O, Portions of Inmate Handbook.**

Typically, in institutional settings, psychiatrists such as the defendant Dr. Hensley see patients when medication needs to be prescribed.  **Ex. M.**  A psychiatrist typically monitors a patient's condition through the case manager's and psychologist's notes and discussions as well as through the psychiatrist's own physical observations during tours.  **Ex. M.**

Clinicians at Northern, such as psychologists and Psychiatric Social Workers, frequently refer inmates to the Supervising Psychiatrist, Dr. Hensley, even when the patient does not have any active psychiatric issues.  **Ex. M.**  These clinicians, such as the defendants Dr. Chaplin and Mr. Lateer, err on the side of referring inmates to the Supervising Psychiatrist even if the inmate may not need his help.  **Ex. M.**

All the units in NCI were toured once a day and then later during the time period in question and currently are toured twice a day either by a mental health social worker, nurse clinician, psychiatric nurse, or psychologist.  **Exs. L; M; N.**  In addition, the inmates at Northern on medication for mental health reasons are seen monthly.  **Exs. L; M; N.**  The purpose of the tour is to determine if there are any acute mental health needs not otherwise being addressed.  **Exs. L; M; N.**  During the time period in question, Northern had several social workers on staff, who regularly addressed the mental health needs of inmates.  **Ex. L.**

When such as a psychologist or a mental health professional acting as a clinician refer an inmate to the Supervising Psychiatrist, Dr. Hensley, he first reviews the inmate's health services record.  **Ex. M.**   He then discusses the inmate with the inmate's case manager who is most times a psychiatric social worker.  **Ex. M.**  Then the Supervising Psychiatrist, Dr. Hensley, has the inmate brought to the medical unit for a visit.  **Ex. M.**  Dr. Hensley does a visual assessment as the inmate is being brought in the unit to see if the inmate looks despondent.  **Ex. M.**  Dr. Hensley checks to see if the inmate's hygiene is appropriate, if his eye contact is good, and whether his speech is coherent.  **Ex. M.**   Dr. Hensley then speaks with the inmate with his case manager present, as happened with the plaintiff in this case, as set forth below.  **Ex. M.**

As of 2001, Dr. Hensley had worked with Psychiatric Social Worker Tom Lateer for approximately 3 years.  **Ex. M.**  Psychiatric Social Worker Tom Lateer worked directly with inmate Morgan during the time in question.  **Ex. N.**  It is and was Dr. Hensley's opinion that Mr. Lateer has a superior ability in assessing patients.  **Ex. M.**

When the defendants Dr. Chaplin and Psychiatric Social Worker Lateer toured the housing units at Northern during the time in question, if an inmate came to his door and stated that he needed to speak with them, they would do a visual assessment to see if the inmate was crying or otherwise looked despondent.  **Exs. L; N.**  They would check to see if the inmate's hygiene was appropriate, if his eye contact was good, and whether his speech was coherent.  **Exs. L; N.**  If all of these looked appropriate, they would ask the inmate, generally, why he needed to speak to them.  **Exs. L; N.**  If the inmate indicated he did not want to say what his issue was on the tier, defendants Dr. Chaplin or Mr. Lateer would tell the inmate he could either slip them a note through the door or send them an inmate request.  **Exs. L; N.**

During their tours they would also look at the overall condition of an inmate's cell to see if he was using personal property such as magazines, paper and pens, a chess set, a walkman, or anything indicating that his mind was active.  **Exs. L; N.**  If an inmate's cell was completely disordered, they would be concerned that the inmate could possibly be in psychiatric distress and would take appropriate action.  **Exs. L; N.**  They would monitor such an inmate closely, checking on the inmate daily and attempting to speak with him.  **Exs. L; N.**  If an inmate's cell suddenly appeared disordered or remained disordered, they would in all likelihood arrange quickly for a one on one meeting with the inmate out of his cell.  **Exs. L; N.**

Lateer and Chaplin did not immediately pull inmates out of their cells to discuss mental health issues every time they approached their cell doors during their tours.  **Exs. L; N.**  If they did this it would have been an extremely poor use of limited psychology time and could have even have endangered other inmate lives.  **Exs. L; N.**  As importantly, they would have been unable to complete their tour of the entire facility and would have been hampered in their ability to check in on other inmates who may have been having a mental health crisis or issue.  **Exs. L; N.**  In addition, many times when inmates refused to tell Dr. Chaplin or Mr. Lateer why they needed to speak with me, either generally, or in writing, and looked fine, the inmate would often use the individual time to complain about institutional issues such as showers, commissary, visiting, disciplinary reports, or other issues more appropriately addressed to the custody staff.  **Exs. L; N.**  This would take time away from other inmates who had mental health concerns or issues that needed their help.  **Exs. L; N.**

In addition, periodically, Dr. Chaplin and Psychiatric Social Worker Lateer would both stop in front of each inmate's cell and ask them how they were doing.  **Exs. L; N.**  Most of the time, an inmate would indicate that he was fine.  **Exs. L; N.**  Chaplin and Lateer would attempt to engage the inmate in general conversation that had nothing to do with their mental health issues to evaluate whether they were delusional, psychotic or depressed.  **Exs. L; N.**  If the inmate refused to converse when approached in this way, Chaplin and Lateer would monitor the inmate's dealings with other staff or other inmates.  **Exs. L; N.**  If, either in a conversation with Chaplin, Lateer, staff, or another inmate, an inmate was unable to maintain eye contact, carry on a conversation and/or stated things that did not make sense were inappropriate, Chaplin and/or Lateer would pull the inmate out of his cell for a more in depth evaluation.  **Exs. L; N.**  In the

18

professional opinions of Dr. Chaplin and Mr. Lateer, there is no reason to pull an inmate out of his cell when his affect is good, he has good eye contact, and is in no distress.  **Exs. L; N.**

          b.      Plaintiff's Mental Health Care at Northern

Mr. Morgan was seen on the day of his arrival at Northern, on March 30, 2001 by a psychiatric social worker who developed a mental health treatment plan for him within two weeks of his arrival.  **Exs. L; M; N.**  Based on his history and current care and medication status, it was determined that the mental health treatment plan for the plaintiff need not include regularly scheduled one-on-one counseling sessions, but that the plaintiff would be regularly monitored by mental health staff within the facility through tours and cell door visits and seen on an "as needed" basis. **Exs. L; M; N.**

Mr. Morgan exhibited that he understood the procedure explained to all inmates for seeking mental health care.  **Exs. L; M; N.  O**n January 29, 2003, Mr. Morgan sent Dr. Chaplin an inmate request form stating that he needed a single cell and transfer to Garner.  **Ex. L.**

In accordance with their general practice of checking in with inmates, both Dr. Chaplin and Psychiatric Social Worker Lateer stopped in front of Mr. Morgan's cell regularly to see how he was doing.  **Exs. L; N.**  They observed Mr. Morgan in his cell and had general discussions with him in front of his cell.  **Exs. L; N.**  If Mr. Morgan had ever looked distressed, if his speech pattern changed significantly, if his speech was incoherent, if his thoughts were not connected or otherwise disturbed, if he was tearful, unkempt, dirty, or if his otherwise neat and orderly cell suddenly became disorganized, both Dr. Chaplin and Psychiatric Social Worker Lateer would not have hesitated to have seen Mr. Morgan one-on-one  or made sure someone saw him one on one as soon as possible.  **Exs. L; N.**

On July 26, 2001, Dr. Chaplin evaluated Mr. Morgan and noted that his hygiene was okay, his mood was normal, his affect was appropriate, his speech was normal, his attention and concentration was normal, his memory was grossly intact, his thought processes were normal, he had no hallucinations, no obsessions, no compulsions, no phobias, had no suicidal ideation, no homicidal ideation, and was not currently on psychiatric medication.  **Ex. L.**  Dr. Chaplin also noted that Mr. Morgan looked fine and stated that he was okay.  **Ex. L.**

On August 17, 2001, Dr. Chaplin saw Mr. Morgan who asked to be evaluated  by Dr. Hensley, but Morgan reported no change in his symptoms.  **Ex. L.**  Mr. Morgan did not look depressed and denied suicidal ideation strongly and credibly.  **Ex. L.**  In addition, Dr. Chaplin noted that Mr. Morgan was not psychotic, not paranoid and his cognitive function was within acceptable limits.  **Ex. L.**

On August 31, 2001, Dr. Chaplin evaluated Mr. Morgan and noted that his hygiene was okay, his mood was normal, his affect was appropriate, his speech was normal, his attention and concentration were normal, his memory was grossly intact, his thought processes were normal, he had no hallucinations, no obsessions, no compulsions, no phobias, had no suicidal ideation, no homicidal ideation, and was not currently on psychiatric medication.  **Ex. L.**  Dr. Chaplin noted that Mr. Morgan was doing well at Northern.  **Ex. L.**

On September 6, 2001, Psychiatric Social Worker Kevin Power saw Mr. Morgan with Nurse Badura.  **Ex. L.**.  Mr. Morgan stated that they put another inmate in his cell who he tried to help but now the inmate said Morgan was trying to rape him.  **Ex. L**.  Mr. Morgan stated that he loved the inmate like a friend but now the inmate was saying he tried to rape him.  **Ex. L.**  Mr. Power noted that Mr. Morgan had situational anxiety but denied any suicidal intent or

planning.  **Ex. L.**  Mr. Morgan agreed to call mental health and allow their intervention if he felt unsafe at any time.  **Ex. L.**

On September 24, 2001, Dr. Chaplin evaluated Mr. Morgan and noted that his hygiene was okay, his mood was normal, his affect was appropriate, his speech was normal, his attention and concentration were normal, his memory was grossly intact, his thought processes were normal, he had no hallucinations, no obsessions, no compulsions, no phobias, had no suicidal ideation, no homicidal ideation, and was not currently on psychiatric medication.  **Ex. L.**  Dr. Chaplin noted that overall Mr. Morgan seemed fine, was not depressed and not psychotic.  **Ex. L.**  Dr. Chaplin also reported that Mr. Morgan had multiple custody complaints as usual.  **Ex. L.**

On December 3, 2001, Dr. Chaplin received a call from Mr. Morgan's unit manager that he was threatening to commit suicide unless he received a different *single* cell.  **Ex. L.**  The plaintiff was on a three person tier and apparently did not like this.  **Ex. L.**  Dr. Chaplin noted that fortunately the issue was resolved when Mr. Morgan agreed to go back to his cell and denied being suicidal.  **Ex. L.**

On December 7, 2001, psychiatric nurse clinician Irene Woolven received a call that Mr. Morgan wanted mental health treatment.  **Ex. L.**  Ms. Woolven went to Mr. Morgan's cell where he reported that he was considering self harm and could not speak where others could hear him. **Ex. L.**  Ms. Woolven then met one on one with Mr. Morgan in a medical screening room where he indicated he was depressed because the other inmates and the correctional officers hated him because they believed he was a sexual predator.  **Ex. L.**  Mr. Morgan also indicated he was worried how his family would react if the rape charges went to court.  **Ex. L.**  Mr. Morgan told Ms. Woolven he just needed to vent and denied suicidal and homicidal ideations.  **Ex. L.**

On December 12, 2001, Psychiatric Social Worker Kevin Power was advised that Mr. Morgan wanted to see mental health staff.   **Ex. L.**   When Power arrived at Mr. Morgan's cell, Mr. Morgan began complaining that he needed more sheets, that custody was depriving him of his constitutional rights, that he wanted mental health to document this in his chart, and he wanted Mr. Power to provide him with the names of custody staff in his housing unit so he could add them to his lawsuit.  **Ex. L.**  Mr. Power noted that Mr. Morgan was calm and well organized, with no signs of distress.  **Ex. L.**  After Mr. Power explained to Mr. Morgan that if he had such concerns, he should speak with custody supervisors, Mr. Morgan became very hostile and verbally abusive stating, "Fuck you mother fucker.  I'm going to fuck you too!  I 'm going to sue your fucking ass off, mother fucker.  Fuck you.  Get the fuck out of here, mother fucker!"  **Ex. L.**  Mr. Morgan's concerns were clearly institutionally/litigation related, not ones that required mental health intervention.  **Ex. L.**  Mr. Power noted that Mr. Morgan's actions were consistent with antisocial traits and that there was no evidence of psychiatric disturbance.  **Ex. L.**  It was very clear that Mr. Morgan misused the mental health referral system in a manipulative, anti-social fashion for litigious reasons.  **Ex. L.**

On December 26, 2002, Dr. Chaplin evaluated Mr. Morgan and noted that his hygiene was okay, his mood was normal, his affect was appropriate, his speech was normal, his attention and concentration were normal, his memory was grossly intact, his thought processes were normal, he had no hallucinations, no obsessions, no compulsions, no phobias, had no suicidal ideation, no homicidal ideation, and was not currently on psychiatric medication.  **Ex. L.**   Dr. Chaplin noted that Mr. Morgan was polite and reading when seen.  **Ex. L.**  Dr. Chaplin further noted that he continued to present as guarded but was not overtly psychotic or depressed.  **Ex. L.**

Mr. Morgan also told Dr. Chaplin he keeps active with his Court work.   **Ex. L.**  It was Dr.

Chaplin's opinion that Mr. Morgan was doing well at NCI.   **Ex. L.**.  Dr. Chaplin also reported

that Mr. Morgan had not asked much of Mental health staff at Northern and did not need much

from the mental health staff at that time.   **Ex. L.**

On February 1, 2002, Dr. Chaplin evaluated Mr. Morgan and noted that his hygiene was

okay, his mood was normal, his affect was appropriate, his speech was normal, his attention and

concentration were normal, his memory was grossly intact, his thought processes were normal,

he had no hallucinations, no obsessions, no compulsions, no phobias, had no suicidal ideation, no

homicidal ideation, and was not currently on psychiatric medication.   **Ex. L.**  Dr. Chaplin further

noted that Mr. Morgan looked fine and stated that he was okay.   **Ex. L.**

On April 25, 2002, Dr. Chaplin evaluated Mr. Morgan and noted that his hygiene was

okay, his mood was normal, his affect was appropriate, his speech was normal, his attention and

concentration were normal, his memory was grossly intact, his thought processes were normal,

he had no hallucinations, no obsessions, no compulsions, no phobias, had no suicidal ideation, no

homicidal ideation, and was not currently on psychiatric medication.   **Ex. L.**  Dr. Chaplin also

noted that he presented with no major mental disorder and was not in psychiatric distress.   **Ex.**

**L.**

On May 14, 2002, Dr. Chaplin saw Mr. Morgan after custodial staff asked Dr. Chaplin to

see him.  **Ex. L.**  Mr. Morgan was named and identified as having a homosexual relationship

with another inmate in a newspaper article.  **Ex. L.**  Mr. Morgan told Dr. Chaplin he was okay

but was embarrassed by the article.  **Ex. L.**  Mr. Morgan stated however the he was close to his

family, would not do anything to hurt them and thus would not hurt himself.  **Ex. L.**  Mr. Morgan

did request a phone call to his family, which Dr. Chaplin passed on to the Unit Manager. **Ex. L.**
Mr. Morgan seemed quite serious but there was no major mental disorder evident. **Ex. L.**

On June 24, 2002, Dr. Chaplin evaluated Mr. Morgan and noted that his hygiene was
okay, his mood was normal, his affect was appropriate, his speech was normal, his attention and
concentration were normal, his memory was grossly intact, his thought processes were normal,
he had no hallucinations, no obsessions, no compulsions, no phobias, had no suicidal ideation, no
homicidal ideation, and was not currently on psychiatric medication. **Ex. L.**

On July 1, 2002, Dr. Chaplin evaluated Mr. Morgan and noted that his hygiene was okay,
his mood was normal, his affect was appropriate, his speech was normal, his attention and
concentration were normal, his memory was grossly intact, his thought processes were normal,
he had no hallucinations, no obsessions, no compulsions, no phobias, had no suicidal ideation, no
homicidal ideation, and was not currently on psychiatric medication. **Ex. L.** Dr. Chaplin also
noted that Mr. Morgan stated he did not want medication as he felt he was doing fine at
Northern. **Ex. L.** Dr. Chaplin wrote that Mr. Morgan adjusted well to Northern from a mental
health perspective, that he was in no psychiatric distress and wanted no mental health services.
**Ex. L.** Dr. Chaplin did note that the plaintiff came across as a bit suspicious but was not
delusional and not psychotic. **Ex. L.**

On July 26, 2002, Dr. Chaplin evaluated Mr. Morgan and noted that his hygiene was
okay, his mood was normal, his affect was appropriate, his speech was normal, his attention and
concentration were normal, his memory was grossly intact, his thought processes were normal,
he had no hallucinations, no obsessions, no compulsions, no phobias, had no suicidal ideation, no
homicidal ideation, and was not currently on psychiatric medication. **Ex. L.** Dr. Chaplin noted

that Mr. Morgan was doing well at Northern, his mental state was stable and there were no major mental disorders evident.  **Ex. L.**

On August 14, 2002, Mr. Morgan was admitted to the infirmary after he put a piece of white cloth around his neck in order to be removed from his cell.  **Ex. L.**  When the plaintiff was told that custody would use a chemical agent, Mr. Morgan removed the white cloth and cuffed up and was brought to the infirmary.  **Ex. L.**  Mr. Morgan admitted that he did not intend to hurt himself, but wanted to change his environment.  **Ex. L.**  He contracted for his safety, meaning he promised not to hurt himself and was happy to be placed on in-cell restraint status to change his environment i.e., his current cell.  **Ex. L.**  Mr. Morgan was seen in his cell the next day on August 15, 2002, was noted by mental health staff to be sleeping.  **Ex. L.**  Mental health staff also noted that he was eating his meals.   **Ex. L.**

On October 2, 2002, Dr. Chaplin evaluated Mr. Morgan and noted that his hygiene was okay, his mood was normal, his affect was appropriate, his speech was normal, his attention and concentration were normal, his memory was grossly intact, his thought processes were normal, he had no hallucinations, no obsessions, no compulsions, no phobias, had no suicidal ideation, no homicidal ideation, was not currently on psychiatric medication and did not want any such medication.  **Ex. L.**  Mr. Morgan did state that he wanted a written response to his request for a single cell, stating that he needed a written response for his lawsuit.     **Ex. L.**

On October 3, 2002 Dr. Chaplin sent Mr. Morgan a memo stating that he did not qualify for a single cell for mental health reasons.  **Ex. L.**   Dr. Chaplin indicated that fortunately the plaintiff's stable mental condition suggested that he would do well sharing a cell with another inmate.  **Ex. L.**  During the time he was at Northern from 2001-2003,  Mr. Morgan's main

concern and primary focus with mental health staff was getting a single cell for what he claimed to be mental health reasons.  **Ex. L.**  Dr. Chaplin noted that while the plaintiff was a bit suspicious, he had no evident major mental disorder that mandated that he be given a single cell. **Ex. L.**

On March 15, 2003, Mr. Morgan was seen outside of his cell by a psychiatric social worker, Mr. Power, and at that time he stated he felt he was going to have a nervous breakdown. **Ex. L.**  Mr. Morgan stated he was afraid other inmates would hurt him because they thought he was a homosexual rapist.  **Ex. L.**  Mr. Morgan thought that inmates would try to get housed with him so they could hurt him.   **Ex. L.**  Mr. Power reviewed with Mr. Morgan, the last person refused to be housed with Mr. Morgan because he stated Mr. Morgan was gay.  **Ex. L.**  The cellmate prior to that insisted on leaving the cell, stating that Mr. Morgan tried to rape him.  **Ex. L.**

Mr. Morgan told Mr. Power that he qualified for a single cell because of threats against him but refused to provide any information, including the names of the inmates who threatened him.  **Ex. L.**  Mr. Power noted that Mr. Morgan presented in a calm and rational manner, was well organized in his thoughts and well spoken at time.  **Ex. L.**  Finally, Mr. Power noted that Mr. Morgan refused to sign a release for his records from Whiting Forensic Institute stating that he wanted to check with his attorney first to see how that would affect him.   **Ex. L.**

Dr. Chaplin administered a Personality Assessment Inventory ("PAI") on March 16, 2003.  **Ex. L.**  Dr. Chaplin noted that the PAI results suggested that Mr. Morgan tended to over-report and exaggerate psychiatric symptoms and the test results could be considered invalid.  **Ex. L.**  Dr. Chaplin noted that, notwithstanding this, the interpretation of the report suggested that

Mr. Morgan had significant issues with suspiciousness, distrust, tension and failures in close relationships.  **Ex. L.**  Dr. Chaplin noted that he was not psychotic, not schizophrenic, not manic and was probably not significantly depressed.  **Ex. L.**  Dr. Chaplin did note that Mr. Morgan was somewhat socially isolated due to his mistrust of others and when under severe stress, Mr. Morgan may have brief psychotic episodes.  **Ex. L.**  Dr. Chaplin indicated that possible diagnoses include paranoid personality disorder, and antisocial personality disorder, acute stress disorder and polysubstance abuse.  **Ex. L.**

On April 9, 2003, Mr. Morgan was seen outside of his cell in a one to one session with Mr. Power who went over the results of the PAI with him.  **Ex. L.**  Mr. Morgan denied lying or exaggerating his symptoms but his primary concern continued to be paranoia, stating he always believes someone is after him.  **Ex. L.**  Mr. Morgan felt that the "gang bangers" felt he was a snitch and other inmates felt he was a homosexual rapist.  **Ex. L.**  It was noted that Mr. Morgan's fears were somewhat reality-based given that he was in prison.  **Ex. L.**

Mr. Morgan was seen by Mr Power in 1 to 1 sessions, outside of his cell on May 2, 2003 who noted that he continued to do well in phase II and still had a single cell.  **Ex. L.**  Mr. Morgan stated that he was still concerned that other inmates would try to harm him but stated that the major stated he would continue to have a single cell if at all possible.  **Ex. L.**  Mr Power noted that Mr. Morgan continued to do well, was not depressed or psychotic and there was no follow up planned.  **Ex. L.**

On May 4, 2003 psychiatric social worker Tom Lateer and a custody supervisor went to Mr. Morgan's cell to relay his family's message that his father had died.  **Ex. L.**  Mr. Lateer and the custody supervisor offered a telephone call to Mr. Morgan's sister and brother-in- law.  **Ex.**

**L.**   It was noted that Mr. Morgan had some shock, and tears but was grieving within normal range.   **Ex. L.**   Mr. Lateer noted that he would monitor and follow up as needed.   **Ex. L.**

On or about June 24, 2003, Mr. Morgan wrote a letter to Commissioner Lantz complaining that he had not received medical and mental health care at Northern.   **Ex. L.**   Dr. Bannish spoke to Mr. Morgan on July 9, 2003 and Mr. Morgan indicated he felt he needed a single cell and a transfer to Garner.   **Ex. L.**

According to Mr. Morgan's records, he was seen by a psychiatrist at Cheshire Correctional Institution on December 8, 2003 requesting a single cell for mental health reasons. **Ex. L.** The psychiatrist indicated that it was up to custody if Mr. Morgan needed a single cell but that there was no mental health reason why one was needed.   **Ex. L.**

Thomas Lateer is a Psychiatric Social Worker at Northern who worked a minimum of 40 hours per week when he was working.   **Ex. N.**   He would work a minimum of 5 days per week, and would tour all housing units a minimum of once a day during the time period in question. **Ex. N.**   On March 30, 2001, the day of Mr. Morgan's arrival at Northern,  Lateer took a mental health history from Mr. Morgan, noting that according to Mr. Morgan, he was in Whiting Forensic Institute in 1982, and received psychiatric treatment in the Hartford Community from 1988-1990.   **Ex. N.**   Lateer also noted that Mr. Morgan was not on any psychotropic medication and denied the need for mental health services.   **Ex. N.**

Lateer reviewed Mr. Morgan's history over the next fourteen days and noted that while his chart was voluminous, he had not been on medication since February 1995, when it was discontinued at his request.   **Ex. N.**   Lateer also noted that he had an assault on DOC employee DR in 1996, that early in his prison experience received several disciplinary reports for assault or

fighting but now received mostly threats disciplinary reports.  **Ex. N.**  Lateer further noted there

was a recent, alleged assault on a cellmate prior to his transfer to NCI.  **Ex. N.**  Thus it was

Lateer's opinion based upon his review of his chart that Mr. Morgan probably had a character

pathology of antisocial personality disorder but his behavior was, for the most part, under

control.  **Ex. N.**

On April 15, 2001, Latter again reviewed Mr. Morgan's health services record,

specifically focusing on his history of suicide attempts.  **Ex. N.**  Lateer noted that according to

his file, Morgan had two brief hunger strikes in 1996 and 1 incident of suicidal ideation in May

1996 after he received a disciplinary report then later denied feeling suicidal.  **Ex. N.**  Lateer

noted that at present the plaintiff's diagnosis seemed to primarily be an anti-social personality

disorder with borderline traits who got paranoid when stressed.  **Ex. N.**  Lateer completed his

treatment plan which primarily provided that mental health staff would monitor Mr. Morgan

during daily rounds and would see him one to one when the need arises.  **Ex. N.**

Lateer went to Mr. Morgan's cell on April 8, 2001 where Lateer observed him playing

cards with his cellmate, exhibiting good personal grooming and a neat and orderly cell.  **Ex. N.**

Lateer also observed that Morgan spoke easily and coherently with an intact thought pattern.  **Ex.**

**N.**  Mr. Morgan denied any current distress, did not appear anxious or depressed.  **Ex. N.**

On April 16, 2001, Lateer went to Mr. Morgan's cell after receiving an emergency

mental health request initiated by him.  **Ex. N.**  Upon approaching his cell, Lateer heard Mr.

Morgan in a congenial dialogue with other inmates.  **Ex. N.**  Upon Lateer's arrival at the

plaintiff's cell, Mr. Morgan was friendly, polite and complimentary.  **Ex. N.**  Lateer noted that

plaintiff had a calm mood with a relaxed affect.  **Ex. N.**  Mr. Morgan told Lateer he wanted

mental health staff to arrange for him to get a single cell and that he had increased stress due to the outside pending charges for sexual assault.  **Ex. N.**

On this occasion, Mr. Morgan tried several themes as to why he needed a single cell, stating he needed to be alone to sort things out, that he had a history of psychiatric issues, and made vague threats of self harm.    **Ex. N.**  Lateer noted that Mr. Morgan was not in any distress, was not psychotic, an did not appear suspicious or paranoid.  **Ex. N.**  It was Lateer's opinion that Mr. Morgan was stable and merely attempting in an antisocial way to manipulate changes to his environment.  **Ex. N.**  Lateer told Mr. Morgan to speak with his unit manager to arrange a cell change move.  **Ex. N.**

On May 14, 2001, Lateer went to Mr. Morgan's cell to see how he was doing.  **Ex. N.**  Lateer noted that he was calm, stable, conversational, and was getting along with his new cellmate.  **Ex. N.**  Lateer also noted that the plaintiff's personal grooming was good and that his cell was neat and orderly.  **Ex. N.**  Lateer noted that Mr. Morgan was not psychotic, no paranoia was evident, and he appeared stable.  **Ex. N.**

On June 29, 2001, Lateer stopped at Mr. Morgan's cell door during rounds to assess his current mental state.  **Ex. N.**  Lateer noted that plaintiff was calm, had a stable affect, and a pleasant demeanor.  **Ex. N.**   Mr. Morgan stated that he wanted intensive mental health therapy and medication.  **Ex. N.**   When asked why, he stated only that he had a serious mental health history.  **Ex. N.**  Lateer noted that Mr. Morgan did not have a cellmate, appeared stable, and that there were no signs or symptoms of psychosis, and no overt paranoia.  **Ex. N.**   His facial expression appropriately reflected his mood and was appropriate with his circumstances.  **Ex. N.**

Lateer indicated that he would continue with Mr. Morgan's treatment plan and would monitor and follow up as needed.  **Ex. N.**

On July 13, 2001, Lateer saw Mr. Morgan again.   **Ex. N.**  Lateer noted that the plaintiff's personal hygiene was good and his cell was neat and orderly.  **Ex. N.**  Lateer observed that the plaintiff had no cellmate, that his mood was calm and he had full affect.  **Ex. N.**  Mr. Morgan asked to see Dr. Hensley but could not give Lateer a reason.  **Ex. N.**  Lateer indicated that he would discuss this with Dr. Hensley.  **Ex. N.**

On August 14, 2001, Lateer stopped at Mr. Morgan's cell.  **Ex. N.**  Lateer noted that the plaintiff had a new cellmate with whom he appeared to get along.  **Ex. N.**  Lateer also noted that the plaintiff had not received a disciplinary report for approximately 3 months.  **Ex. N.**  Lateer observed that the plaintiff's mood was calm and he had a relaxed affect.  **Ex. N.**   Mr. Morgan was pleasant and conversational, and did not verbalize any mental health issues.  **Ex. N.**

On August 16, 2001, Lateer discussed Mr. Morgan with Dr. Hensley and advised Hensley about Lateer's observations of Mr. Morgan which are set forth above.  **Ex. N.**   Dr. Hensley did not believe he needed to see Mr. Morgan.   **Ex. N.**  On September 15, 2001, Lateer saw Mr. Morgan at his cell door and noted that he was pleasant and engaging with animated affect.   **Ex. N.**.  Mr. Morgan requested medication to sleep but did not appear tired.   **Ex. N.**  Lateer indicated that he would monitor his request for sleep medication further.   **Ex. N.**

On September 26, 2001, Lateer saw Mr. Morgan in the medical examining room with the psychiatrist, Dr. Hensley.   **Exs. N; M.**  Mr. Morgan demanded that Lateer leave the room and then called Dr. Hensley "master" in a sarcastic tone.  **Exs. N; M.**  Dr. Hensley terminated the session shortly after Mr. Morgan called him a racist.  **Exs. N; M.**

On September 28, 2001, Lateer saw Mr. Morgan at his cell door.  **Ex. N.**  The plaintiff told Lateer that he filed a lawsuit against mental health staff a few months ago and that he named most mental health staff in it alleging that the staff won't treat him at Northern.  **Ex. N.**  Lateer noted that Mr. Morgan was in no distress, his thought order was intact and goal directed.  **Ex. N.**  Lateer also noted that the plaintiff was not suspicious acting.  **Ex. N.**

On November 8, 2001, Lateer saw Morgan during one of his regular mental health tours.  **Ex. N.**  Lateer noted that Mr. Morgan had good personal hygiene in a neatly ordered cell with a significant amount of personal property.  **Ex. N.**  Lateer noted that Mr. Morgan was calm and relaxed with a smiling affect.  **Ex. N.**  Mr. Morgan told Lateer he was okay and appeared stable.  **Ex. N.**

On December 26, 2001, Dr. Hensley lowered Mr. Morgan's mental health classification score from a Mental Health 3 to a Mental Health 2 noting that Mr. Morgan's occasional suicide threat did not even rise to the level of malingering as he disavowed attempting suicide so quickly.  **Ex. L.**  Moreover, it was Dr. Hensley's opinion that Mr. Morgan's behavior continued to be under control.  **Ex. L.**  Although the plaintiff had an irritable outburst with his new case manager on December 12, 2001 where he cursed at him, this did not suggest to Dr. Hensley that Mr. Morgan's behavior was out of control.  **Ex. L.**

During the time period in question, and based on a review of the affidavits outlining the plaintiff's mental health records for the time period in question,  mental health staff charted over 32 assessments and/or interactions with the plaintiff which were additional to uncharted observations on tours or otherwise.  **Exs. L; M; N.**  As is evident from the facts set forth above, the plaintiff did receive appropriate mental health care despite a manipulative nature.  **Exs. L;**

**M; N.** He suffered no adverse mental health episode while at Northern, and was often reported to be doing quite well. **Exs. L; M; N.** In fact, his only psychological upsets seemed to arise situationally, and he never was suicidal, never had disturbed thought, never required medication and never was psychotic or depressed. **Exs. L; M; N.** When one-on-one counseling was warranted, it was provided, and if it had been required on a regular basis, such counseling was available at Northern. **Exs. L; M; N.** Clearly, the plaintiff's claims of inadequate mental health care are without merit.

## II.  LEGAL ARGUMENT

### A.  Standard of Review

In a motion for summary judgment, the burden is on the moving parties to establish that there are no genuine issues of material fact in dispute and that they are entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986); *White v. ABCO Engineering Corp.,* 221 F.3d 293, 300 (2d Cir. 2000), Fed. R. Civ. P. 56(c). A court must grant summary judgment "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with Affidavits, if any, show that there is no genuine issue as to any *material* fact.'" *Miner v. Glen Falls,* 999 F.2d 655, 661 (2d Cir. 1993) (emphasis added) (citation omitted).

A dispute regarding a material fact is genuine "'if the evidence is such that a *reasonable* jury could return a verdict for the nonmoving party.'" *Aldrich v. Randolph Cent. Sch. Dist.,* 963 F.2d 520, 523 (2d Cir. 1992) (emphasis added) (quoting *Anderson,* 477 U.S. at 248, *cert. denied,* 506 U.S. 965 (1992). After discovery, if the nonmoving party "has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof," then summary judgment is appropriate. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

When a Motion for Summary Judgment is supported by documentary evidence and sworn Affidavits, the nonmoving party must present "significant probative evidence tending to support the complaint." *Anderson,* 477 U.S. at 256 (*quoting First Nat. Bank of Ariz. V. Cities Serv. Co.,* 391 U.S. 253, 290 (1968). A nonmoving party may not rely "on mere speculation or conjecture as to the true nature of the facts to overcome a Motion for Summary Judgment." *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 12 (2d Cir. 1986), *cert. denied*, 480 U.S. 932 (1987).

A party may not create a genuine issue of fact by presenting contradictory or unsupported statements. *See Securities & Exchange Comm'n. v. Research Automation Corp.,* 585 F.2d 31, 33 (2d Cir. 1978). Nor may he rest on the "mere allegations or denials" contained in his pleadings. *Goenaga v. March of Dimes Birth Defects Found,* 51 F.3d 14, 18 (2d Cir. 1995); *see also Ying Jing Gan v. City of New York,* 996 F.2d 522, 532 (2d Cir. 1993) (holding that party may not rely on conclusory statements or an argument that the Affidavits in support of the motion for summary judgment are not credible). A self-serving Affidavit which reiterates the conclusory allegations of the complaint in Affidavit form is insufficient to preclude summary judgment. *See Lujan v. National Wildlife Fed'n.,* 497 U.S. 871, 888 (1990).

### B.    The Defendants Are Not Liable for Violating the Plaintiff's Eighth Amendment Rights by Requiring Him to Wear Full Restraints During Out-of-Cell Recreation

#### 1.    No Constitutional Violation

The plaintiff claims that the policy requiring him to recreate in restraints while in Phase I of the Administrative Segregation program at Northern violated his constitutional rights. The defendants respectfully submit that the plaintiff's claim regarding recreation in restraints fails to allege unconstitutional conditions of confinement tantamount to a violation of the Eighth

Amendment.  In *Farmer v. Brennan*, 511 U.S. 825 (1994), the Supreme Court defined the

applicable standard as follows:

> We hold instead that a prison official cannot be found liable under the Eighth
> Amendment for denying an inmate humane conditions of confinement unless the
> official knows of and disregards an excessive risk to inmate health or safety; the
> official must both be aware of facts from which the inference could be drawn that
> a substantial risk of serious harm exist, and he must also draw the inference.

*Id.* at 1979.  In order for prison conditions to rise to the level of an Eighth Amendment violation

there must be a situation involving "unnecessary and wanton infliction of pain" which deprives

inmates of the minimal necessities of life.  *Rhodes v. Chapman*, 452 U.S. 337, 346-47 (1981).

The defendants respectfully submit that the conditions in Phase I Administrative

Segregation at Northern did not involve the unnecessary or wanton infliction of pain or

punishment, but, rather, that the extremely poor, violent, and often creative institutional behavior

of inmates housed in Northern's Phase I Administrative Segregation unit rendered the recreation

in restraints policy well within the bounds of the Constitution.

The United States Supreme Court has made clear that in an Eighth Amendment case, it

must be considered whether any given condition is justified by "any safety concern" in a prison.

*Hope v. Pelzer*, 536 U.S. 730 (2002).  This case is no exception to the rule that "prison

administrators should be accorded wide-ranging deference in the adoption and execution of

policies and practices that in their judgment are needed to preserve internal order and discipline

and to maintain institutional security."  *Bell v. Wolfish,* 441 U.S. 520, 547 (1979).

> . . . the Court also took into account – as one would do in an excessive force
> [case] – whether the punishment was justified by "any safety concern" in the
> prison. . . . this case occasions no exception to the rule that "prison administrators
> should be accorded wide-ranging deference in the adoption and execution of
> policies and practices that in their judgment are needed to preserve internal order
> and discipline and to maintain institutional security."  *Bell v. Wolfish,* 441 U.S.

> 520, 547 (1979). . . . [W]e consider whether the Order was reasonably calculated to restore prison discipline and security and, in that purposive context, whether the officials were deliberately indifferent to [plaintiff]'s health and safety.

*Hope v. Pelzer*, 536 U.S. 730 (2002), stating:

> Indeed, the United States Supreme Court has recognized that running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. . . . ***To respect these imperatives, courts must exercise restraint in supervising the minutiae of prison life.***" *McKune v. Lile,* 536 U.S. 24, 39-40 (2002) (emphasis added).  In *Procunier v. Martinez,* the Court stated:

> Prison administrators are responsible for maintaining internal order and discipline, for securing their institutions against unauthorized access or escape, and for rehabilitating, to the extent that human nature and inadequate resources allow, the inmates placed in their custody.  The Herculean obstacles to effective discharge of these duties are too apparent to warrant explication.  Suffice it to say that the problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree.

416 U.S. 396, 404-405 (1974).

The defendants concede that exercise is one of the basic human needs protected by the Eighth Amendment.  *See Williams v. Greifinger,* 97 F.3d 699, 704 (2d Cir. 1996); *Anderson v. Coughlin,* 757 F.2d 33, 35 (2d Cir. 1985).  Likewise, courts have recognized that inmates are entitled under the Constitution to spend a certain amount of time outside of their cells.  *See, e.g., Delaney v. Detella,* 123 F. Supp.2d 429, 435-440 (a useful summary of caselaw). The defendants submit that the plaintiff in this case received both 5 hours per week of outdoor recreation in restraints, giving him access to fresh air and time to walk about outside of his cell, and was also unrestrained in his cell, thus affording him the opportunity and space for more vigorous exercise within his cell.  **See Ex. I, Blanchette Aff.**  The combination of these factors, along with the

36

security threat posed by the plaintiff and other Phase I inmates, renders the plaintiff's claim deficient. The defendants note that this case is distinguishable from a large number of cases in which there is no outdoor recreation and/or no ability to exercise whatsoever, while the attached Affidavits demonstrate that the plaintiff in this case had both.[1] Moreover, this case has the element of inmates who have been given the opportunity for a variety of recreational and exercise activities in general population and have only lost those activities after notice and an opportunity to be heard regarding their own destructive behavior.

In *Branham v. Meachum,* 77 F.3d 626, 630-31 (2d Cir. 1996), the Second Circuit held that denying an inmate *all* outdoor recreation and requiring him to wear restraints whenever out of his cell for a period of over 7 weeks did not constitute an Eighth Amendment violation. The Court upheld the trial court's granting of a Motion to Dismiss, stating, "[T]he deprivation alleged by the prisoner must be in objective terms 'sufficiently serious' such that the deprivation 'denied the minimal civilized measure of life's necessities.'" *Id.*

In *Sostre v. McGinnis,* 442 F.2d 178, 186 (2d Cir. 1971), the Second Circuit opined that for an inmate in Segregated Confinement, "[a]n hour of exercise with four or five other prisoners in a small, enclosed yard, open to the sky" was acceptable under the Eighth Amendment. *Sostre* also "implicitly established an important limitation on the Eighth Amendment's exercise guarantee" which the Second Circuit in *Greifinger* called the "safety exception". *Greifinger, supra,* 97 F.3d at 704, citing *Sostre,* 442 F.2d at 186.

---

[1]    In the following case, the plaintiff was not able to exercise within a cell *and* to recreate in restraints for five hours per week as was the plaintiff in this case: *Williams v. Greifinger,* 97 F.3d 699 (2d Cir. 1996); *Perkins v. Kansas Department of Corrections,* 165 F.3d 803 (10th Cir. 1999); *Antonelli v. Sheahan,* 81 F.3d 1422, 1432 (7th Cir. 1995); *Mitchell v. Rice,* 954 F.2d 187 (4th Cir. 1992); *Spain v. Procunier,* 600 F.2d 189, 199 (9th Cir. 1979).

Courts outside the Second Circuit considering various exercise policies in correctional settings have recognized that "when reviewing Eight Amendment claims, courts must consider the totality of the circumstances" including the penological justification for any given policy. *See, e.g., Mitchell v. Rice,* 954 F.2d 187, 191 (4th Cir. 1992). Courts have also frequently "concede[d] that penological considerations may, in certain circumstances, justify restrictions" on an inmate's ability to exercise freely out of doors. *Id.*, citing *Patterson v. Mintzes,* 717 F.2d 284, 289 (6th Cir. 1983).

It is the defendants' penological justification which distinguishes this case from *Williams v. Greifinger,* 97 F.3d 699 (2d Cir. 1996). In *Greifinger,* the Second Circuit held that New York's "medical keeplock" policy which denied out-of-cell exercise to a non-violent inmate who declined a tuberculosis test was unconstitutional. This case involves a different sort of inmate, however, one who was not a generalized medical safety concern but one who had proven a violent capacity towards another inmate in a general population setting.

The *Turner v. Safley* test provides a useful framework for analyzing the policy at issue. 482 U.S. 78 (1987). Of course, in *Turner,* the Court listed four factors relevant to a determination of whether a correctional policy is reasonable:

(1)     whether there exists a valid, rational connection between the prison policy or regulation and the asserted government interest, and whether that interest is legitimate and neutral;

(2)     whether alternative means of exercising the denied constitutional right remain open to the inmate;

(3)     the impact accommodating the asserted constitutional right will have on staff, other inmates and prison resources; and

(4)     whether alternative means of regulating inmate behavior are readily available.

*Id.*

Applying these four factors supports the constitutionality of the policy. Obviously, a valid, rational and legitimate government interest, and indeed obligation, exists for the defendants to maintain order given Phase I Administrative Segregation inmates' demonstrated history of violence. Alternative means of exercising exist, as the inmate can exercise within his cell and still receive fresh air and out-of-cell time. The impact of accommodating the asserted right would vary depending on the resulting incidents of abuse by Phase I inmates, which is difficult to determine, but the potential for violence and craftiness always exists in Phase I. The last factor, alternative means of regulating inmate behavior, is difficult to apply—alternative means of regulating violent behavior, the threat of Disciplinary Reports and or Administrative Segregation, have already failed with these inmates. Taking all four factors together, clearly no constitutional violation can be found in the policy at issue.

### 2.     Qualified Immunity Applies

Even were this Court to find that the former policy of recreating in restraints is unconstitutional, the defendants respectfully submit that they are entitled to qualified immunity on this issue.

The doctrine of qualified immunity protects government officials from civil suits arising from the performance of their discretionary functions when that performance "does not violate clearly established statutory or constitutional rights of which a reasonable person would have

known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Lennon v. Miller*, 66 F.3d 416, 420-21 (2d Cir. 1995); *Oliviera v. Mayer,* 23 F.3d 642, 649 (2d Cir. 1994), *cert. denied,* 513 U.S. 1076 (1995). This doctrine evolved as an accommodation between the need to provide private redress when government officials abuse their position of public trust and the need to shield officials who responsibly perform their duties from the costs of defending an action. *Anderson v. Creighton,* 483 U.S. 635, 638-39 (1987); *Harlow v. Fitzgerald,* 457 U.S. at 814. Assertion of the privilege should be upheld unless the "contours of the right" were "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 438 U.S. at 640. The doctrine of qualified immunity for government officials serves not only as a defense from liability, but also to dismiss an action when the plaintiff has failed to claim the violation of clearly established law or to allege the clear violation of a constitutional right. *Behrens v. Pelletier,* 516 U.S. 299, 306-307 (1996) ; *Jermosen v. Smith,* 945 F.2d 547, 553 (2d Cir. 1991), *cert. denied,* 503 U.S. 962 (1992).

In this case, the law was not so clearly established that Northern's policy regarding Phase I Administrative Segregation inmates recreating in restraints. Indeed, if any reasonable correctional officials in the defendants' position at the time could have believed that the policy was reasonable, then the defendants are entitled to qualified immunity. *Lennon v. Miller,* 66 at 422 (2d Cir. 1995). Not only might it be possible that reasonable correctional officials could differ as to the constitutionality of the policy, but several Connecticut courts have explicitly held the policy to be constitutional, thus it is incontrovertible that the defendants are entitled to qualified immunity on this point.

In *Caballero v. Warden,* the court as recently as 2003 held that requiring inmates to wear restraints during outside-of-cell recreation does not violate the plaintiff's Eighth Amendment right to be free from cruel and unusual punishment. *Caballero v. Warden*, 2003 Conn. Super. LEXIS 5, 2003 WL 139524 (Conn. Super. 2003) attached. In *Caballero*, the court held that "[t]he use of full restraints during the recreation period is, in this court's conclusion, reasonable force applied in a good faith effort to maintain discipline surrounding the petitioner, an individual who has proven his tendency to resort to violent behavior toward correction staff and other inmates." *Id.* at 3; *See also Tillman v. Warden*, 2003 Conn. Super Lexis 530 (February 26, 2003), attached ("The application of varying degrees of restraint, depending on the A.S. level, does not involve the unnecessary and wanton infliction of pain, is not grossly disproportionate to the severity of the crime and is not excessive use of physical force against inmates."); *Cousineau v. Armstrong*, Ruling on Defendants' Motion for Summary Judgment, 3:95CV1084(AVC) (D. Conn. September 23, 1998) (holding that requiring inmates to wear restraints when outside their cells for showers and recreation "served the legitimate security function of maintaining prison order and preventing violence and therefore did not violate the plaintiff's Eighth Amendment rights.").

 These recent cases cloak the defendants with qualified immunity with regard to the recreation policy at issue.

### B.   The Defendants Are Not Liable for Violating the Plaintiff's Right to Privacy

Neither the facts nor the law bear out plaintiff's claim for violating his right to privacy. First, none of the three mental health care providers are alleged to have personally disclosed any confidential medical or mental health information regarding the plaintiff to any other inmates.

Second, the health records of the plaintiff as well as his own Second Amended Complaint make clear that the plaintiff was able to seek mental health care in a variety of ways, and that his true goal was to obtain a more desirable single cell. S. Amnd. Com. ¶ 53.

Moreover, while inmates do generally retain their right to privacy, there is not any established caselaw which supports the plaintiff's claim in this case. The Second Circuit has held that inmates do not shed their right to privacy merely because they are in prison. *Powell v. Schriver,* 175 F.3d 107 (2d Cir. 1999), citing *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir. 1994). In *Powell,* the Second Circuit held that disclosure of an inmate's transsexualism, similar to releasing an inmate's positive HIV status, could both violate an inmate's right to privacy as well as violate an inmate's rights under the Eighth Amendment. *Id.*

In this case, however, the defendants are not accused of disclosing anything, and a review of the record and the plaintiff's allegations make clear that the inmate himself was never required to disclose any confidential information. Moreover, "while prisoners do have a constitutional right that information about the status of their health be kept private, this right *is not absolute."* *Rush v. Artuz,* 2004 U.S. Dist. LEXIS 15333 (S.D.N.Y. 2004) (emphasis added), attached. There is simply no decisional supportive of plaintiff's claims that the comprehensive system of providing mental health care at Northern at the time in question violated the Constitution.

C.    **Assuming Arguendo a Privacy Claim, Defendants Have Qualified Immunity**

Even assuming arguendo that the plaintiff has asserted a new constitutional claim for violation of his privacy, the defendants are entitled to qualified immunity as the law is certainly not clearly established at this point in time.

D.    **No Claim for Unconstitutional Mental Health Care**

Even construing plaintiff's privacy claim as one for inadequate mental health care under the Eighth Amendment, his claim fails. The Eighth Amendment protects inmates from deliberate indifference by prison officials to their serious medical needs. *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). To prevail on such a claim, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Id.* at 106. A prisoner must show intent to either deny or unreasonably delay access to needed medical care or the wanton infliction of unnecessary pain by prison personnel. *See id.* at 104-105. Mere negligence will not support a section 1983 claim; the conduct of complained of must "shock the conscience" or constitute a "barbarous act". *McCloud v. Delaney,* 677 F. Supp. 230, 232 (S.D.N.Y. 1988), *citing United States ex rel. Hyde v. McGinnis,* 429 F.2d 864 (2d Cir. 1970). A defendant will be liable under the Eighth only if his conduct is "repugnant to the conscience of mankind." *Tomarkin v. Ward,* 534 F. Supp. 1224, 1230 (S.D.N.Y. 1982) *quoting Estelle,* 429 U.S. at 105-06.

The civil rights statute was not meant to redress medical malpractice claims that can be adequately resolved under state tort law. *Tomarkin,* 534 F. Supp. at 1230-31.[2] Thus, a claim of misdiagnosis, faulty judgment, or malpractice, without more to indicate deliberate indifference, is not cognizable under section 1983. *See McNabe v. Nassau County Medical Center,* 453 F.2d 698, 704 (2d Cir. 1971); *Tomarkin,* 534 F. Supp. at 1230. In addition, mere disagreement with prison officials about what constitutes appropriate medical care does not state a claim cognizable under the Eighth Amendment. *See Hyde v. McGinnis,* 429 F.2d 864, 868 (2d Cir. 1970); *Corby v. Conboy,* 457 F.2d 251, 254 (2d Cir. 1972); *Ross v. Kelly,* 784 F. Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.), *cert. denied,* 506 U.S. 1040 (1992).

---

[2]     It is the position of defendants that this cause of action would be insufficient even under a negligence standard in state court, as the facts described above make clear.

There are both subjective and objective components to the deliberate indifference standard. *See Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir. 1994), *cert. denied sub nom., Foote v. Hathaway,* 513 U.S. 1154 (1995). The alleged deprivation must be "sufficiently serious" in objective terms. *Wilson v. Seiter,* 501 U.S. 294, 298 (1991). *See also Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir. 1990) (Pratt, *J.*, dissenting: "'[The] serious medical need' requirement contemplates a condition of urgency, one that may produce death, degeneration, or extreme pain."). The Second Circuit has identified several factors that are highly relevant to the inquiry into the seriousness of a medical condition: "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment of treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir. 1998)(citation & internal quotations omitted). In addition, where the denial of treatment causes plaintiff to suffer a permanent loss or life-long handicap, the medical need is considered serious. *See Harrison v. Barkley,* 219 F.3d 132, 136 (2d Cir. 2000).

In addition to demonstrating a serious medical need to satisfy the objective component of the deliberate indifference standard, an inmate also must present evidence that, subjectively, the charged prison official acted with "a sufficiently culpable state of mind." *Hathaway*, 37 F.3d at 66 (citation omitted). "[A] prison official does not act in a deliberately indifferent manner unless that official *'knows of* and disregards an excessive risk to inmate health of safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Id.* (emphasis added) *(quoting Farmer v. Brennan,* 511 U.S. 825, 837 (1994)).

In this case, neither the objective nor the subjective tests are met.  The record is replete that the plaintiff received more than adequate mental health care and suffered no adverse result from the care that he did receive at Northern.

      **E.**      **No Personal Involvement in Causing Plaintiff's Injury at Recreation**

To the extent the plaintiff makes a claim for an injury to his shoulder during a recreation period, he does not have a sufficient case that any of the defendants were aware that he was subject to injury or had any personal involvement in his injury, and thus none of them can be held liable for it.

Section 1983 imposes liability for "conduct which 'subjects, or causes to be subjected,' the complainant to a deprivation of rights secured by the Constitution and laws."  *Rizzo v. Goode* 423 U.S. 362, 370-71 (1976), *quoting* 42 U.S.C. §1983.  Where damages are sought in a §1983 action, the defendant(s) must be responsible for the alleged constitutional deprivation.  Thus, an allegation of personal involvement is a necessary prerequisite for a valid cause of action under §1983.  *See, e.g., Gill v. Mooney*, 824 F.2d 192, 196 (2d Cir. 1987); *Johnson v. Glick,* 481 F.2d 1028, 1034 (2d Cir.), *cert. denied,* 414 U.S. 1033 (1973), *rev'd on other grounds, Graham v. Connor*, 490 U.S. 386 (1989); *McKinnon v. Patterson*, 568 F.2d 930 (2d Cir. 1977), *cert. denied,* 434 U.S. 1087 (1978).  Consistent with the requirement that personal involvement is required for a claim under §1983, the Supreme Court has ruled that the general doctrine of *respondeat superior* does not suffice to state a claim under §1983.  *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 692-95 (1978).  Thus, in order to state a cognizable claim, the plaintiff must allege, and ultimately prove, "personal involvement of [the defendants] sufficient to

45

support their liability for wrongful acts," not merely their "linkage in the chain of command." *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir. 1985).

Supervisory responsibility alone is not enough to confer exposure to liability. *Williams v. Smith*, 781 F.2d 313, 323 (2d Cir. 1986); *Williams v. Vincent,* 508 F.2d 541, 546 (2d Cir. 1974). A supervisory official may only be liable if it is alleged that he or she learned of the violation and failed to remedy the wrong, if he created or permitted the policy or wisdom under which the unconstitutional practices occurred, or if he was grossly negligent in managing subordinates who caused the violation. *Williams v. Smith,* 781 F.2d at 323-24; *Meriwether v. Coughlin,* 879 F.2d 1037 (2d Cir. 1989). "A plaintiff must thus allege a tangible connection between the acts of the defendants and the injuries suffered." *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir. 1986). An official cannot be held liable merely because he or she occupies a high position in the prison hierarchy. *Colon v. Coughlin*, 58 F.3d 865, 874 (2d Cir. 1995).

E.  **Mootness Deprives the Court of Subject Matter Jurisdiction Over Non-monetary Claims**

As the plaintiff is no longer at Northern, as is clear from the docket sheet, his claim for a declaratory judgment is moot. The United States Supreme Court has ruled that there must be a "substantial controversy" between parties in order for a court to maintain jurisdiction over a matter. *Golden v. Zwickler*, 394 U.S. 103, 108 (1969). "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the District Court lacks the statutory or constitutional power to adjudicate it." *Luckett v. Bure,* 290 F.3d 493, 497 (2d Cir. 2002), *quoting, Makarova v. United States,* 201 F.3d 110, 113 (2d Cir. 2000). A matter that has become moot presents no actual case or controversy. *Altman v. Bedford Central School District,* 245 F.3d 49, 70-71 (2d Cir. 2001). The federal courts "do[] not sit to decide arguments after

events have put them to rest." *Doremus v. Board of Ed.,* 342 U.S. 429 (1952); *see also Golden v. Zwickler,* 394 U.S. 103, 108 (1969). The plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of evidence that it exits. *Malik v. Meissner,* 82 F.3d 560, 562 (2d Cir. 1996).

"[W]hen a question of the District Court's jurisdiction is raised, either by a party or by the Court on its own motion, Fed. R. Civ. P. 12(b), the Court may inquire, by affidavits or otherwise, into the facts as they exist." *Scherer v. The Equitablelife Assurance Society of the United States,* 347 F.3d 394, 401 (2d Cir 2003), *quoting Land v. Dollar,* 330 U.S. 731 n. 4 (1947) (citations omitted), *overruled on other grounds, Larson v. Domestic and Foreign Commerce Corp.,* 337 U.S. 682 (1949). "A District Court may consult evidence to decide a Rule 12(b)(1) motion. It must do so if resolution of a proffered factual issue may result in the dismissal of the complaint for want of jurisdiction." *Id.* at 401-02 (internal cites, quotes omitted); *see also Antares Aircraft v. Federal Republic of Nigeria,* 948 F.2d 90, 96 (2d Cir. 1991), *vacated on other grounds,* 505 U.S. 1215 (1992).

When an inmate is discharged, or when he is transferred to a different facility than the one where the defendants are employed, his claims for injunctive relief are generally mooted. *Thompson v. Carter,* 284 F.3d 411, 415 (2d Cir. 2002), *citing, Prins v. Coughlin,* 76 F.3d 504 (2d Cir. 1996) (*per curiam*). "This result flows logically from the more generalized proposition that 'an actual controversy must be extant at all stages of the case, not just at the time the complaint is filed." *Id.*, *citing, Beyah v. Coughlin,* 789 F.2d 986, 988 (2d Cir. 1986). The Second Circuit has long held that an inmate's request for declaratory and injunctive relief against

correctional staff becomes moot when the inmate is discharged or transferred to a different correctional institution. *Mawhinney v. Henderson,* 542 F.2d 1, 2 (2d Cir. 1976).[3]

**<u>CONCLUSION</u>**

For all the foregoing reasons, the defendants respectfully move for summary judgment in their favor as to all claims of the plaintiff.

DEFENDANTS

RICHARD BLUMENTHAL
ATTORNEY GENERAL

BY:    ___/s/_____
Lynn D. Wittenbrink
Assistant Attorney General
110 Sherman Street
Hartford, CT  06105
Federal Bar #ct08575
lynn.wittenbrink@po.state.ct.us
Tel: (860) 808-5450
Fax: (860) 808-5591

---

[3]    The *Nicholson* decision cites three other Circuit courts for this proposition as well: *McAlpine v. Thomson,* 187 F.3d 1213, 1215 (10th Cir. 1999), *infra;  Lavado v. Keohane,* 992 F.2d 601, 605 (6th Cir. 1993) (holding inmate's suit for declaratory judgment as to whether Correctional Officers violated his constitutional rights by opening his privileged mail was rendered moot by inmate's release from prison);  *Martin v. Sargent,* 780 F.2d 1334, 1337 (8th Cir. 1985).

## **CERTIFICATION**

I hereby certify that a copy of the foregoing was mailed to the following on this 19th day

of August 2005:

Lloyd George Morgan, # 117796
Cheshire Correctional Institution
900 Highland Ave.
Cheshire CT
06410

Annette M. Lamoreaux
CCLU
32 Grand St.
Hartford CT 06106

___/s/_____
Lynn D. Wittenbrink
Assistant Attorney General

Angel Caballero v. Warden

CV003178

SUPERIOR COURT OF CONNECTICUT, JUDICIAL DISTRICT OF TOLLAND

2003 Conn. Super. LEXIS 5

January 2, 2003, Decided
January 2, 2003, Filed

NOTICE:    [*1]  THIS DECISION IS UNREPORTED AND MAY BE SUBJECT TO FURTHER
APPELLATE REVIEW. COUNSEL IS CAUTIONED TO MAKE AN INDEPENDENT DETERMINATION OF
THE STATUS OF THIS CASE.

CASE SUMMARY

PROCEDURAL POSTURE:  Petitioner sought a writ of habeas corpus alleging that
respondent warden was violating the inmate's Eight Amendment right to be free
from cruel and unusual punishment.

OVERVIEW:  Petitioner alleged that his confinement at the correctional
institution was illegal because conditions in the prison were inhumane and
dangerous to him. Petitioner alleged that he had been denied recreation since
being placed at the institution due to the institution's policy of keeping
inmates held in administrative segregation, phase one, in full restrains during
the recreation period. Petitioner was kept in restraints during this period due
to his assaultive behavior toward guards and other inmates. In denying the
petition, the superior court found no evidence that petitioner had been
subjected to physical force that was repugnant to the conscience of mankind, nor
was there evidence of unnecessary and wanton infliction of pain. The court
concluded that the use of full restraints during the recreation period was
reasonable force applied in a good faith effort to maintain discipline
surrounding petitioner, an individual who had proven his tendency to resort to
violent behavior toward correction staff and other inmates. Thus, petitioner
failed to show that the use of the restraints violated the constitutional
prohibition against cruel and unusual punishment.

OUTCOME:  The petition for a writ of habeas corpus was denied.

CORE TERMS:  inmate, recreation, prison, cruel, cruel and unusual punishment,
administrative segregation, phase, doors, handcuffs, infliction of pain,
physical force, discipline, quotation, wanton, Eighth Amendment, handcuffed,
inhumane, cage, conditions of confinement, restrictive, deprivation, conscience,
subjected, repugnant, excessive, prisoner, offenders, mankind, harsh, writ of
habeas corpus

LexisNexis(R) Headnotes  Hide Headnotes

Constitutional Law: Cruel & Unusual Punishment

[HN1] The United States Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones, and the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment. In its prohibition of cruel and unusual punishments, the Eighth Amendment places restraints on prison officials, who may not, for example, use excessive physical force against prisoners. The Eighth Amendment also imposes duties on these officials, who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates.

Constitutional Law: Cruel & Unusual Punishment

[HN2] If a writ seeks to vindicate rights under the Eighth Amendment to the United States Constitution, the petitioner must establish, preferably by objective evidence, that his detention has subjected him to cruel and unusual punishment resulting from the unnecessary and wanton infliction of pain. But conditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional. To the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society.

Constitutional Law: Cruel & Unusual Punishment

[HN3] The Eighth Amendment to the United States Constitution, which is applicable to the states through the Fourteenth Amendment, precludes the imposition of cruel and unusual punishment on an individual convicted of a crime. Cruel and unusual punishment encompasses more than barbarous physical punishment. It also includes punishments which involve the unnecessary and wanton infliction of pain and those which are grossly disproportionate to the severity of the crime.

Constitutional Law: Cruel & Unusual Punishment

[HN4] The test for determining whether a given set of conditions of confinement violates the Eighth Amendment is not static. It is determined by the evolving standards of decency that mark the progress of a maturing society. These standards are established not by the opinion of experts as to desirable prison conditions, nor by the subjective views of judges, but rather by objective factors to the maximum extent possible. Unquestioned and serious deprivations of basic human needs and deprivation of the minimal civilized measure of life's necessities are obvious cases of Eighth Amendment violations. But conditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional. To the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society.

Constitutional Law: Cruel & Unusual Punishment

[HN5] Whenever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is whether force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.

Constitutional Law: Cruel & Unusual Punishment

[HN6] he Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition de minimis uses of force, provided that the use of force is not of a sort repugnant to the conscience of mankind.

JUDGES: S.T. FUGER, JR., JUDGE.

OPINIONBY: S Fuger

OPINION: MEMORANDUM OF DECISION

On May 24, 2000, the petitioner filed a petition for a writ of habeas corpus alleging that the respondent warden is violating the petitioner's Eighth Amendment right under the United States Constitution to be free from cruel and unusual punishment. More specifically, the petitioner alleges that "his confinement at [the correctional] institution is illegal because specific conditions in the prison are inhumane and dangerous to [the] petitioner." Am. Pet., at 2.

In support of his petition, the petitioner attached a statement of facts that, in relevant part, states: "That the petitioner has been denied recreation since being placed at the Northern Correctional Institution [hereinafter 'NCI'] due to the institution's policy of keeping inmates in full restraints during the one-hour per day recreation period. That inmates are handcuffed behind the back, shackled at the ankles, and these two restraints are connected by a heavy tether chain with a lock. [*2] That inmates are then led out to a cage, commonly referred to [as] 'the kennel' because it so closely resembles a small dog's cage. That inmates remain in full restraints while in the kennel. That in full restraints, in a cage, within a recreation yard which is also caged at the top of its four cement walls, inmates receive absolutely no opportunity to recreate." Id., at 5-6. The respondent denies the petitioner's allegation that these measures violate the petitioner's right to be free from cruel and unusual punishment. For the reasons set forth more fully below, the petition shall be denied.

This matter came before the court for trial on October 4, 2002. The petitioner and Department of Correction Major Thomas Coates testified at the trial. Additionally, the court received into evidence two exhibits: copies of the petitioner's request forms and grievances filed with the Department of

Correction regarding the claim raised in the present petition, as well as a copy of the Department of Correction Administrative Directive 9.4 (hereinafter "A.D. 9.4"). The court has reviewed all of the testimony and evidence and makes the following findings of fact.

FINDINGS OF FACT

1. The[*3] petitioner was in the custody of the Commissioner of Correction at the time he filed the present petition and has remained incarcerated.

2. The petitioner is being held in administrative segregation, phase one, due to his past assaultive behavior towards guards and other inmates.

3. Administrative segregation is not an additional punishment imposed upon an inmate, but instead allows for the safe management of violent inmates who, because of violent behavior or management factors pose a threat to the security of the facility or a risk to the safety of staff or other inmates, can no longer be safely managed in general population.

4. The petitioner is afforded, in accordance with A.D. 9.4, one hour of exercise in a recreation area that is approximately 25' by 30,' surrounded by 30' wall and caged at the top. There are two doors into this recreation facility. The respondent does not consider the recreation facility to be a secure area due to the size of the space, the presence of the two doors and problems with the complete security of the doors.

5. A.D. 9.4 requires that inmates in administrative segregation, phase one, shall, prior to release from a cell, be handcuffed behind the[*4] back except when making a phone call, at which time the inmates be handcuffed in front before leaving the cell. Handcuffs may be removed when an inmate is in a secure shower or secure individual recreation area.

6. Inmates in administrative segregation, phase one, are permitted recreation one (1) hour per day, five (5) days a week in a controlled area, excluding holidays. Restraints (handcuffs) are required unless in a secure individual recreation area. Inmates on restraint status shall not receive recreation with an inmate not on restraint status.

DISCUSSION OF LAW

[HN1] "The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment. In its prohibition of cruel and unusual punishments, the Eighth Amendment places restraints on prison officials, who may not, for example, use excessive physical force against prisoners. The Amendment also imposes duties on these officials, who must provide humane

conditions of confinement, prison officials must ensure that inmates receive
adequate food, [*5] clothing, shelter, and medical care, and must take
reasonable measures to guarantee the safety of the inmates." (Internal citations
and quotation marks omitted.) Farmer v. Brennan, 511 U.S. 825, 832, 128 L.
Ed. 2d 811, 114 S. Ct. 1970 (1994).

   "In Arey v. Warden, 187 Conn. 324 [328-29], 445 A.2d 916 (1982),
that court held that,        [HN2] if a writ seeks to vindicate rights under
the eighth amendment to the United States constitution, the petitioner must
establish, preferably by objective evidence, that his detention has subjected
him to cruel and unusual punishment resulting from the unnecessary and wanton
infliction of pain. But conditions that cannot be said to be cruel and unusual
under contemporary standards are not unconstitutional. To the extent that such
conditions are restrictive and even harsh, they are part of the penalty that
criminal offenders pay for their offenses against society. (Internal quotation
marks omitted.) Hunnicutt v. Commissioner of Correction, 67 Conn.App. 65,
69, 787 A.2d 22 (2001).

        [HN3] "The eighth amendment to the United States constitution, which
is applicable to the states through the fourteenth amendment, precludes[*6] the
imposition of cruel and unusual punishment on an individual convicted of
a crime. Cruel and unusual punishment encompasses more than barbarous physical
punishment. It also includes punishments which involve the unnecessary and
wanton infliction of pain and those which are grossly disproportionate to the
severity of the crime.

        [HN4] "The test for determining whether a given set of conditions of
confinement violates the eighth amendment is not static. It is determined by the
evolving standards of decency that mark the progress of a maturing society.
These standards are established not by the opinion of experts as to desirable
prison conditions, nor by the subjective views of judges, but rather by
objective factors to the maximum extent possible. Unquestioned and serious
deprivations of basic human needs and deprivation of the minimal civilized
measure of life's necessities are obvious cases of eighth amendment violations .
. . But conditions that cannot be said to be cruel and unusual under
contemporary standards are not unconstitutional. To the extent that such
conditions are restrictive and even harsh, they are part of the penalty that
criminal offenders pay for their offenses against[*7] society." (Internal
citations and quotation marks omitted.) Arey v. Warden, supra, 187 Conn. at
328-29.

   In Hudson v. McMillian, 503 U.S. 1, 6-7, 117 L. Ed. 2d 156, 112 S. Ct.
995 (1992), the United States Supreme Court held "that,        [HN5] whenever
prison officials stand accused of using excessive physical force in violation of
the Cruel and Unusual Punishments Clause, the core judicial inquiry is . . .
whether force was applied in a good faith effort to maintain or restore

discipline, or maliciously and sadistically to cause harm."        [HN6] "The
Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily
excludes from constitutional recognition de minimis uses of force, provided that
the use of force is not of a sort repugnant to the conscience of mankind."
Id. at 10-11.

    While the petitioner alleges that his confinement is illegal because specific
conditions in the prison are inhumane and dangerous, there is no evidence to
show that the petitioner has been subjected to physical force that is repugnant
to the conscience of mankind. Nor is there evidence of unnecessary and wanton
infliction of pain. The petitioner was placed[*8] in administrative segregation,
phase one, because of assaultive behavior toward guards and other inmates. A.D.
9.4 requires that inmates in administrative segregation, phase one, be
restrained during the recreational period. While A.D. 9.4 gives the respondent
the discretion to remove handcuffs when an inmate is in a secure individual
recreation area, there is no requirement that the handcuffs must be removed in a
secure recreation area. Stated differently, the applicable directives allow, but
do not require, the removal of restraints when the inmate is in a secure area,
and the respondent is under no mandate to remove the petitioner's restraints.

    The respondent, who is responsible for maintaining internal order and
discipline, as well as securing correctional institutions against unauthorized
access or escape, does not consider the recreational facility in which the
petitioner exercises to be a secure area due to the size of the space, the
presence of the two doors and problems with the complete security of the doors.
Such a determination is entirely in the province of the respondent, and courts,
who are ill equipped to deal with the problems of prison administration, should
[*9]abstain from attempting to resolve prison problems by decree.
Washington v. Meachum, 238 Conn. 692, 732-33, 680 A.2d 262 (1996). The use of
full restraints during the recreation period is, in this court's conclusion,
reasonable force applied in a good faith effort to maintain discipline
surrounding the petitioner, an individual who has proven his tendency to resort
to violent behavior toward correction staff and other inmates.

    Based on the foregoing, this court concludes that the petitioner has failed
to show that the restraints applied by the respondent to the petitioner during
his recreation violate the constitutional prohibition against cruel and unusual
punishment.

    Accordingly, the petition for a writ of habeas corpus is denied.

    S.T. FUGER, JR., JUDGE

James C. Tillman v. Warden, State Prison

CV023659

SUPERIOR COURT OF CONNECTICUT, JUDICIAL DISTRICT OF TOLLAND,
GEOGRAPHICAL AREA 19 AT ROCKVILLE

2003 Conn. Super. LEXIS 530

February 26, 2003, Decided
February 26, 2003, Filed

NOTICE: [*1]  THIS DECISION IS UNREPORTED AND MAY BE SUBJECT TO FURTHER
APPELLATE REVIEW. COUNSEL IS CAUTIONED TO MAKE AN INDEPENDENT DETERMINATION OF
THE STATUS OF THIS CASE.

DISPOSITION: Respondent's motion for summary judgment granted and petition for
writ of habeas corpus dismissed.

CASE SUMMARY

PROCEDURAL POSTURE:  Respondent warden filed a motion for summary judgment,
where petitioner inmate filed a petition for a writ of habeas corpus alleging
that his conditions of confinement constituted cruel and unusual punishment in
violation of Conn. Const. art. I, a 8, and U.S. Const. amend. VIII.

OVERVIEW:  The inmate was confined in the administrative segregation program.
This was a three-phase program designed for prisoners who presented significant
behavioral problems. The inmate was in phase one of the program. Inmates in
phase one were to be reviewed after six months to determine their eligibility
for phase two, in which only handcuffs were used when inmates exited their
cells. All prisoners in phase one were required to be in full restraints
a chain tether going from the shackles to the handcuffs. The inmate was placed
in a room and given one hour for recreation and exercise. The restraints made
exercise difficult, if not impossible. The inmate's claim failed. There was no
claim that the restraints adversely affected or jeopardized the inmate's health.
Because the administrative segregation was designed for prisoners who presented
significant behavioral problems, the application of these restraints was not an
excessive use of force.

OUTCOME:  The warden's motion for summary judgment was granted, and the petition for writ of habeas corpus was dismissed.

CORE TERMS:  prison, inmate, prisoner, phase, recreation, cruel, staff, summary judgment, handcuffs, cruel and unusual punishment, conditions of confinement, infliction of pain, quotation, wanton, administrative segregation, cell, grossly disproportionate, writ of habeas corpus, constitutional rights, unusual punishment, restrictive, severity, shackles, incarcerated, genuine issue of material fact, adversely affected, sentence imposed, physical force, wide range, cause pain

LexisNexis(R) Headnotes  Hide Headnotes

Civil Procedure: Trials: Judgment as Matter of Law
Civil Procedure: Summary Judgment: Summary Judgment Standard
   [HN1] A directed verdict may be rendered only where, on the evidence viewed in the light most favorable to a nonmovant, the trier of fact could not reasonably reach any other conclusion than that embodied in the verdict as directed. The genuine issue aspect of summary judgment procedure requires the parties to bring forward before trial evidentiary facts, or substantial evidence outside the pleadings, from which the material facts alleged in the pleadings can warrantably be inferred. Although the party seeking summary judgment has the burden of showing the nonexistence of material fact, a party opposing summary judgment must substantiate its adverse claim by showing that there is a genuine issue of material fact together with the evidence disclosing the existence of such a dispute issue.

Constitutional Law: Cruel & Unusual Punishment
   [HN2] The Eighth Amendment to the United States Constitution, which is applicable to the states through the Fourteenth Amendment, precludes the imposition of cruel and unusual punishment on an individual convicted of a crime. Cruel and unusual punishment encompasses more than barbarous physical punishment. It also includes punishments which involve the unnecessary and wanton infliction of pain, and those which are grossly disproportionate to the severity of the crime. The test for determining whether a given set of conditions of confinement violates the Eighth Amendment is not static. It is determined by the evolving standards of decency that mark the progress of a maturing society. These standards are established not by the opinion of experts as to desirable prison conditions, nor by the subjective views of judges, but rather by objective factors to the maximum extent possible. Unquestioned and serious deprivations of basic human needs and deprivation of the minimal civilized measure of life's necessities are obvious cases of Eighth Amendment violations. But conditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional. To the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society.

Constitutional Law: Cruel & Unusual Punishment

[HN3] In the context of whether punishment constitutes cruel and unusual punishment, the punishment of incarcerated prisoners effectuates prison management and prisoner rehabilitative goals. Admittedly, prisoners do not shed all constitutional rights at the prison gate, but lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying the penal system. Discipline by prison officials in response to a wide range of misconduct falls within the expected perimeters of the sentence imposed by a court of law. A broad range of choices that might infringe constitutional rights in free society fall within the expected conditions of confinement of those who have suffered a lawful conviction. The limitation on prisoners' privileges and rights also follows from the need to grant necessary authority and capacity to federal and state officials to administer the prisons. Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. To respect these imperatives, courts must exercise restraint in supervising the minutiae of prison life.

Constitutional Law: Cruel & Unusual Punishment

[HN4] In the context of cruel and unusual punishment, a convicted felon's life in prison differs from that of an ordinary citizen. In the context of a legitimate rehabilitation program for prisoners, those same considerations are relevant to a court's analysis. The compulsion inquiry must consider the significant restraints already inherent in prison life and the State's own vital interests in rehabilitation goals and procedures within the prison system.

Constitutional Law: Cruel & Unusual Punishment

[HN5] Cruel and unusual punishment refers to punishment that involves the unnecessary and wanton infliction of pain or is grossly disproportionate to the severity of the crime. In its prohibition of cruel and unusual punishments, the Eighth Amendment places restraints on prison officials, who may not, for example, use excessive physical force against prisoners. The Eighth Amendment also imposes duties on these officials, who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates.

Constitutional Law: Cruel & Unusual Punishment
Criminal Law & Procedure: Habeas Corpus: Cognizable Issues

[HN6] Although a writ of habeas corpus properly might challenge the legality of an inmate's detention, the scope of such a writ is limited to the vindication of an inmate's constitutional rights. If a writ seeks to vindicate rights under the Eighth Amendment to the United States Constitution, a petitioner must establish, preferably by objective evidence, that his detention

has subjected him to cruel and unusual punishment resulting from the unnecessary and wanton infliction of pain. But conditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional. To the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society.

Criminal Law & Procedure: Postconviction Proceedings: Imprisonment & Prisoner Rights

[HN7] Conn. Code Penal Disc. Admin. Directive 9.4 defines administrative segregation as placement of an inmate on a restrictive housing status that results in segregation of the inmate whose behavior, while incarcerated, poses a threat to the security of the facility or a risk to the safety of staff or other inmates, and that the inmate can no longer be safely managed in general population. Once placed in administrative segregation, an inmate's classification status is subject to periodic review. Administrative segregation is a level five confinement, which is reserved for inmates who are assessed to have violent tendencies and who pose a safety threat to other inmates and to prison staff. Inmates assigned to administrative segregation are given a handbook providing information on the rules and procedures applicable to their confinement.

Criminal Law & Procedure: Postconviction Proceedings: Imprisonment & Prisoner Rights

[HN8] Discipline by prison officials in response to a wide range of misconduct falls within the expected perimeters of the sentence imposed by a court of law.

JUDGES: S. T. Fuger, Jr., Judge.

OPINIONBY: S. T. Fuger , Jr.

OPINION: MEMORANDUM OF DECISION ON RESPONDENT'S MOTION FOR SUMMARY JUDGMENT AND JUDGMENT OF DISMISSAL

On May 28, 2002, the petitioner filed a petition for a writ of habeas corpus alleging that the conditions of confinement constitute cruel and unusual punishment in violation of both Article First, Section 8 of the Connecticut Constitution and the Eighth Amendment to the United States Constitution. More specifically, the petitioner alleges that restraints such as shackles, cuffs and tethers applied during a one-hour recreation period cause pain and prevent him from exercising in a vigorous manner and thus are cruel and unusual punishment. The petitioner seeks a permanent court order against the respondent requiring restraint-free recreation and requests that the order extend to all those similarly situated in the custody of the respondent. The respondent has filed a motion[*2] for summary judgment because there are no genuine issues of material fact. For the reasons set forth more fully below, the motion shall be

granted and the petition shall be dismissed.

FINDINGS OF FACT

1. The petitioner was in the custody of the Commissioner of Correction serving a forty-five year sentence at the time he filed the present petition and has remained incarcerated.

2. The petitioner is currently confined in the Administrative Segregation (A.S.) program at Northern Correctional Institution. A.S. is a three-phase program designed for prisoners who have presented significant behavioral problems.

3. All prisoners in Phase I of the A.S. program are required to be in full restraints whenever they exit their cell, to include out-of-cell recreation.

4. Prisoners assigned to Phase I are reviewed for progression to Phase II after six months. Phase I prisoners who have not successfully completed Phase I will remain in Phase I. Upon progression to Phase II, prisoners are required to wear only handcuffs upon exiting their cell, for the first thirty days. After that, prisoners are allowed out of their cells to recreate without restraints.

5. The petitioner is taken out[*3] of his cell handcuffed behind his back with shackles on his feet and a chain tether going from the shackles to the handcuffs. The petitioner is then placed in a room and given one hour for recreation and exercise. All restraints stay on for the one-hour period. The restraints allow for limited movement and make exercise difficult, if not impossible.

6. The handcuffs do not fit right, cause pain to the petitioner's shoulders and prevent him from exercising in the manner in which he wants to exercise. The petitioner can address the physical problems arising from use of the handcuffs via a medical visit.

DISCUSSION OF LAW

[HN1] "A directed verdict may be rendered only where, on the evidence viewed in the light most favorable to the nonmovant, the trier of fact could not reasonably reach any other conclusion than that embodied in the verdict as directed." (Emphasis in original.) Miller v. United Technologies Corp., 233 Conn. 732, 752, 660 A.2d 810 (1995), "The genuine issue aspect of summary judgment procedure requires the parties to bring forward before trial evidentiary facts, or substantial evidence outside the pleadings, from which the material facts alleged[*4] in the pleadings can warrantably be inferred." United Oil Co. v. Urban Development Commission, 158 Conn. 364, 378-79, 260 A.2d 596 (1969), "Although the party seeking summary judgment has the burden of showing the nonexistence of material fact, . . . a party opposing summary

judgment must substantiate its adverse claim by showing that there is a genuine
issue of material fact together with the evidence disclosing the existence of
such a dispute issue." Maffucci v. Royal Park Ltd. Partnership, 243 Conn.
552, 554, 707 A.2d 15 (1998).

     [HN2] "The eighth amendment to the United States constitution,
which is applicable to the states through the fourteenth amendment, precludes
the imposition of cruel and unusual punishment on an individual convicted of a
crime. Cruel and unusual punishment encompasses more than barbarous physical
punishment. It also includes punishments which involve the unnecessary and
wanton infliction of pain, and those which are grossly disproportionate to the
severity of the crime.

     "The test for determining whether a given set of conditions of confinement
violates the eighth amendment is not static. It is determined by the evolving
standards of decency[*5] that mark the progress of a maturing society. These
standards are established not by the opinion of experts as to desirable prison
conditions, nor by the subjective views of judges, but rather by objective
factors to the maximum extent possible. Unquestioned and serious deprivations of
basic human needs and deprivation of the minimal civilized measure of life's
necessities are obvious cases of eighth amendment violations . . . But
conditions that cannot be said to be cruel and unusual under contemporary
standards are not unconstitutional. To the extent that such conditions are
restrictive and even harsh, they are part of the penalty that criminal offenders
pay for their offenses against society." (Internal citations and quotation marks
omitted." Arey v. Warden, 187 Conn. 324, 328-29, 445 A.2d 916 (1982).

     [HN3] "The punishment of incarcerated prisoners . . . effectuates
prison management and prisoner rehabilitative goals. Admittedly, prisoners do
not shed all constitutional rights at the prison gate, but lawful incarceration
brings about the necessary withdrawal or limitation of many privileges and
rights, a retraction justified by the considerations underlying our penal[*6]
system. Discipline by prison officials in response to a wide range of
misconduct falls within the expected perimeters of the sentence imposed by a
court of law." Sandin v. Conner, 515 U.S. 472, 485, 132 L. Ed. 2d 418, 115
S. Ct. 2293 (1995).

     "A broad range of choices that might infringe constitutional rights in free
society fall within the expected conditions of confinement of those who have
suffered a lawful conviction . . .

     "The limitation on prisoners' privileges and rights also follows from the
need to grant necessary authority and capacity to federal and state officials to
administer the prisons. Running a prison is an inordinately difficult
undertaking that requires expertise, planning, and the commitment of resources,
all of which are peculiarly within the province of the legislative and executive

branches of government. To respect these imperatives, courts must exercise restraint in supervising the minutiae of prison life . . .

". . . Sandin and its counterparts underscore the axiom that        [HN4] a convicted felon's life in prison differs from that of an ordinary citizen. In the context of a legitimate rehabilitation program for prisoners, those same considerations[*7] are relevant to our analysis. The compulsion inquiry must consider the significant restraints already inherent in prison life and the State's own vital interests in rehabilitation goals and procedures within the prison system." (Internal citations and quotation marks omitted.) McKune v. Lile , (2002).

[HN5] "Cruel and unusual punishment refers to punishment that involves the unnecessary and wanton infliction of pain or is grossly disproportionate to the severity of the crime. In its prohibition of cruel and unusual punishments, the Eighth Amendment places restraints on prison officials, who may not, for example, use excessive physical force against prisoners. The Amendment also imposes duties on these officials, who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter and medical care, and must take reasonable measures to guarantee the safety of the inmates." (Internal citations and quotations omitted.)  Santiago v. Commissioner of Correction, 39 Conn.App. 674, 683, 667 A.2d 304 (1995).

"In  Sanchez v. Warden, 214 Conn. 23, 570 A.2d 673 (1990), our Supreme Court concluded that, [*8]        [HN6] although a writ of habeas corpus properly might challenge the legality of an inmate's detention, the scope of such a writ was limited to the vindication of an inmate's constitutional rights. In Arey v. Warden, [supra,] that court held that, if a writ seeks to vindicate rights under the eighth amendment to the United States constitution, the petitioner must establish, preferably by objective evidence, that his detention has subjected him to cruel and unusual punishment resulting from the unnecessary and wanton infliction of pain. But conditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional. To the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society." (Internal citations and quotation marks omitted.)  Hunnicutt v. Commissioner of Correction, 67 Conn.App. 65, 69, 787 A.2d 22 (2001).

[HN7] "Administrative Directive 9.4 defines administrative segregation as 'placement of an inmate on a Restrictive Housing Status that results in segregation of the inmate whose behavior, while incarcerated, poses a threat[*9] to the security of the facility or a risk to the safety of staff or other inmates, and that the inmate can no longer be safely managed in general population. Once placed in administrative segregation, an inmate's classification status is subject to periodic review."  Beasley v.

Commissioner of Correction, 50 Conn.App. 421, 425, 718 A.2d 487 (1998), aff'd.,
249 Conn. 499, 733 A.2d 833 (1999), "Administrative segregation is a
level five confinement, which is reserved for inmates who are assessed to have
violent tendencies and who pose a safety threat to other inmates and to prison
staff. Inmates assigned to administrative segregation are given a handbook
providing information on the rules and procedures applicable to their
confinement." Beasley v. Commissioner of Correction, supra, 50 Conn.App.
at 423 n.3.

In Arey, the Supreme Court noted that "whether or not one hour of outside
recreation five days a week is sufficient [to support the conclusion of cruel
and unusual punishment], there was no claim and no evidence to support a claim
that the plaintiff's health has been jeopardized or adversely affected by the
claimed inadequacy of[*10] the recreation activity. Absent such evidence, what
may be desirable is not necessarily constitutionally mandated." Arey v.
Warden, supra, 187 Conn. at 330. In the present matter, while the petitioner
does claim that he suffers pain from application of the handcuffs and that his
ability to exercise freely is inhibited, there is no claim that the petitioner's
health has been jeopardized or adversely affected by the use of restraints
during the recreational period.

The conditions commensurate with A.S. are restrictive. The A.S. program is,
however, designed for prisoners who have presented significant behavioral
problems, have violent tendencies and pose a safety threat to other inmates and
prison staff. The application of varying degrees of restraint, depending on the
A.S. phase level, does not involve the unnecessary and wanton infliction of
pain, is not grossly disproportionate to the severity of the crime and is not
excessive use of physical force against inmates.    [HN8] "Discipline by
prison officials in response to a wide range of misconduct falls within the
expected perimeters of the sentence imposed by a court of law." Sandin v.
Conner, supra, 515 U.S. at 485. [*11]

In fact, the Eighth Amendment imposes a duty on prison officials to
take reasonable measures to guarantee the safety of inmates and prison staff.
Santiago v. Commissioner of Correction, supra, 39 Conn.App. at 683.
Inmates such as the petitioner have demonstrated their danger to the safety of
other inmates or the prison staff, and the respondent, were the respondent to
not administer programs such as A.S., would likely run afoul of the Eighth
Amendment. Tampering by the court with programs such as A.S., which have a
clearly defined penological justification and utility, is tantamount to meddling
in the minutiae of prison life and the administration of prison facilities.

When the petitioner's claims and evidence are viewed in the light most
favorable to the petitioner, no other conclusion can reasonably be reached than
that there is no genuine issue of material fact to be tried.

Accordingly, the respondent's motion for summary judgment shall be granted

and the petition for a writ of habeas corpus shall be dismissed.

S. T. Fuger, Jr., Judge

BASHEEN RUSH, Plaintiff, v. CHRISTOPHER ARTUZ, CHARLES

ZIMMERMAN, ARVIND K. WADHWA, JOSEPH DIMINO, CARL
KOENIGSMANN, BYRON RODAS, WILLIAM SOHNG AND THOMAS MILLER,
Defendants.

OO Civ. 3436 (LMM)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

2004 U.S. Dist. LEXIS 15333

August 5, 2004, Decided
August 6, 2004, Filed

PRIOR HISTORY: Rush v. Artuz, 2003 U.S. Dist. LEXIS 6786 (S.D.N.Y., Apr. 22, 2003)

DISPOSITION: [*1] Defendants' motions for summary judgment granted in part and denied in part.

CASE SUMMARY

PROCEDURAL POSTURE:  In plaintiff inmate's 42 U.S.C.S. a 1983 action alleging that defendants, prison directors, a prison doctor, and a correctional officer, were deliberately indifferent to his serious medical needs in violation of his rights under U.S. Const. amend. VIII, defendants moved for summary judgment under Fed. R. Civ. P. 56(c).

OVERVIEW:  The inmate sued defendants, alleging that they violated his constitutional rights by delaying for three years wrist surgery, by failing to appropriately addressing his hernia, and by failing to order a urine test to diagnose a urinary tract infection. The court denied two directors summary judgment, holding that there remained a question of fact as to whether their numerous decisions to deny surgery was reasonable and whether the treatment given was adequate. The record showed that the directors issued at least four denials for recommended surgery over a three-year period despite strong recommendations from both an outside orthopedic surgeon and the inmate's prison treating physician, and that the only treatment the inmate received was the use of a wrist splint. However, the court granted a prison doctor summary judgment on the inmate's claim concerning his failure to order a urine test because there was no indication in the medical records that the inmate complained of pain while urinating. The court also granted a corrections officer summary judgment, holding that his tossing the inmate's medical request in the garbage did not rise to the level of a constitutional violation.

OUTCOME:  Defendants' motion for summary judgment was denied as to the two

directors of the prison's medical services. Defendants' motion was otherwise granted in the inmate's a 1983 action.

CORE TERMS:  surgery, wrist, deliberate indifference, prisoner, sick call, pain, summary judgment, prison, recommended, stomach, medical staff, constitutional right to privacy, confidentiality, constitutional rights, urine test, cell, medical condition, right to privacy, involvement, inmate, medical treatment, recommendation, deliberately, splint, arthroscopic surgery, indifferent, medication, doctor, prong, constitutional violation

LexisNexis(R) Headnotes  Hide Headnotes

Civil Procedure: Summary Judgment: Burdens of Production & Proof
Civil Procedure: Summary Judgment: Summary Judgment Standard
    [HN1] Summary judgment is properly granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The Federal Rules of Civil Procedure mandate the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. When deciding a summary judgment motion the court must assess the evidence in the light most favorable to the party opposing the motion, and resolve ambiguities and draw reasonable inferences against the moving party. However, to defeat such a motion, the non-moving party must affirmatively set forth facts showing that there is a genuine issue of fact for trial. A dispute is not genuine unless the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Furthermore, because plaintiff is proceeding pro se his submissions should be judged on a more lenient standard than that accorded to formal pleadings by lawyers. However, proceeding pro se does not otherwise relieve a defendant from the usual requirements to survive a motion for summary judgment.

Constitutional Law: Civil Rights Enforcement: Civil Rights Act of 1871: Coverage

    [HN2] See 42 U.S.C.S. a 1983.

Constitutional Law: Cruel & Unusual Punishment
Constitutional Law: Civil Rights Enforcement: Prisoners: Medical Treatment
    [HN3] The Eighth Amendment prohibits the infliction of "cruel and unusual punishment" on those convicted of crimes, which includes punishments that involve the unnecessary and wanton infliction of pain. The United States Supreme Court has held that deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain, proscribed by the Eighth Amendment and states a cause of action under 42 U.S.C.S. a 1983. This is true whether the indifference is manifested by prison

doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care, or intentionally interfering with the treatment once prescribed. The United States Court of Appeals for the Second Circuit has interpreted the deliberate indifference standard to consist of both an objective and subjective prong.

Constitutional Law: Cruel & Unusual Punishment
Constitutional Law: Civil Rights Enforcement: Prisoners: Medical Treatment

[HN4] Under the objective prong of the deliberate indifference standard, the alleged deprivation must be sufficiently serious, a condition of urgency, that may result in degeneration or extreme pain. A serious medical condition can exists when the failure to treat a prisoner's condition results in further injury or in the unnecessary and wanton infliction of pain. Some factors that the United States Court of Appeals for the Second Circuit has considered when determining whether a prisoner suffers from a serious medical condition include: the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain. These factors are only a few of the many factors that can be considered in making the determination of seriousness.

Constitutional Law: Cruel & Unusual Punishment
Constitutional Law: Civil Rights Enforcement: Prisoners: Medical Treatment

[HN5] Under the subjective prong of the deliberate indifference standard, an official must act with a sufficiently culpable state of mind in depriving the prisoner of adequate medical treatment. An official acts with the requisite deliberate indifference when that official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. Therefore, the subjective element of deliberate indifference entails something more than mere negligence but something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.

Constitutional Law: Cruel & Unusual Punishment
Constitutional Law: Civil Rights Enforcement: Prisoners: Medical Treatment

[HN6] Mere disagreement over the proper course of treatment does not create a constitutional claim so long as the treatment given is adequate. Thus, the fact that a prisoner might prefer a different course of treatment does not give rise to an Eighth Amendment violation. However, allegations that prison officials denied or delayed recommended treatment by medical professionals may be sufficient to satisfy the deliberate indifference standard. It has been determined that whether a course of treatment was a product of sound medical judgment, negligence or deliberate indifference depends on the facts of the case.

Constitutional Law: Civil Rights Enforcement: Prisoners: Medical Treatment
Constitutional Law: Civil Rights Enforcement: Prisoners: Confinement Conditions

[HN7] The United States Supreme Court has recognized that there exists in the United States Constitution a right to privacy protecting the individual interest in avoiding disclosure of personal matters. This right to privacy has been characterized as a right to "confidentiality" and includes a right to keep private the status of one's health. This constitutional right to privacy extends to prisoners as well.

Constitutional Law: Civil Rights Enforcement: Prisoners: Medical Treatment
Constitutional Law: Civil Rights Enforcement: Prisoners: Confinement Conditions

[HN8] While prisoners do have a constitutional right that information about the status of their health be kept private, this right is not absolute. For example, prisoners cannot expect their constitutional right to privacy to protect them against the disclosure of medical information that had already previously been disclosed to the public.

Constitutional Law: Civil Rights Enforcement: Prisoners: Medical Treatment
Constitutional Law: Civil Rights Enforcement: Prisoners: Confinement Conditions

[HN9] Constitutional violations have been recognized in situations where prison officials revealed medical information of a sensitive nature, such as transexualism and HIV status.

Constitutional Law: Civil Rights Enforcement: Civil Rights Act of 1871: State Action: State Officers

[HN10] To state a claim under 42 U.S.C.S. a 1983, a plaintiff must allege the personal involvement of each defendant in the alleged constitutional violation. Personal liability cannot be imposed on a state official on the basis of respondeat superior. Similarly, proof of linkage in the prison chain of command is insufficient to support a a 1983 action. Therefore, the plaintiff must show that the defendant in question had direct involvement in or responsibility for the alleged misconduct.

Constitutional Law: Civil Rights Enforcement: Civil Rights Act of 1871: State Action: State Officers

[HN11] A supervisory official may be personally involved in a 42 U.S.C.S. a 1983 violation where: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Civil Procedure: Summary Judgment: Burdens of Production & Proof

[HN12] Conclusory allegations alone are insufficient to survive a motion for summary judgment.

Constitutional Law: Civil Rights Enforcement: Immunity: Public Officials

[HN13] Qualified immunity shields public officials from liability for their discretionary acts that do not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Therefore, summary judgment is appropriate if it was objectively reasonable for the defendants to believe that their conduct did not violate an established federally protected right. Three factors have been considered to determine if qualified immunity applies (1) whether the right was defined with reasonable specificity, (2) whether the decisional law of the United States Supreme Court and the applicable circuit court supports its existence, and (3) whether, under pre-existing law, a defendant official would have reasonably understood that his acts were unlawful.

Constitutional Law: Cruel & Unusual Punishment
Constitutional Law: Civil Rights Enforcement: Prisoners: Medical Treatment

[HN14] The unnecessary denial or delay of adequate medical care and a doctor's prescribed medical treatment for a prisoner's serious medical condition violates a prisoner's Eighth Amendment rights and states a claim under 42 U.S.C.S. a 1983.

COUNSEL: Basheen Rush, Plaintiff, Pro se, Stormville, NY.

For C. Artuz, Greenhaven Correctional Facility, C.J. Koenigsmann, Health Services Director, Green Haven Correctional Facility, B. Rodas, of Green Haven Correctional Facility, Dr. Sohng, of Green Haven Correctional Facility, T. Miller, of Green Haven Correctional Facility, Defendants: Jeffrey E. Hurd, Phelan, Burke & Scolamiero, LLP, Albany, NY. Lee Alan Adlerstein, Eliot Spitzer, Attorney General of the State of NY, New York, NY. Marie Flynn Danek, Phelan, BUrke & Scolamiero, LLP, albany, NY.

For O. McClean, of Green Haven Correctional Facility, Charles Zimmerman, Director of CPS, Defendants: Jeffrey E. Hurd, Phelan, Burke & Scolamiero, LLP, Albany, NY.

JUDGES: Lawrence M. McKenna, U.S.D.J.

OPINIONBY: Lawrence M. McKenna

OPINION: MEMORANDUM AND ORDER

McKENNA, D.J.

Basheen Rush ("plaintiff") an inmate at Green Haven Correctional Facility ("Green Haven"), brings this pro se civil rights action pursuant to 42 U.S.C. a 1983 against Christopher[*2] Artuz (Superintendent, Green Haven), Charles Zimmerman (Director of Operations, Corporation Contractor Medical Consultant Service for Green Haven), Arvind K. Wadhwa (Correctional Physician Services, Regional Medical Director), Joseph Dimino (Correctional Physician Services, Medical Director of UR Department), Carl Koenigsmann (Medical Director, Green Haven), Bryon Rodas (Physician Assistant, Green Haven), William Sohng (Green Haven) and Thomas Miller (Correctional Officer, Green Haven) (collectively "defendants") for reckless and deliberate indifference to his serious medical needs in violation of his constitutional rights under the Eighth Amendment. In addition, plaintiff claims that certain defendants also knowingly and willingly violated his constitutional right to privacy and medical confidentiality. Plaintiff seeks injunctive relief as well as compensatory and punitive damages from each of the named defendants.

Defendants filed motions for summary judgment pursuant to Federal Rule of Civil Procedure 56(c) asserting that: (1) plaintiff has failed to demonstrate that he suffered from an objectively serious medical condition, (2) plaintiff[*3] has failed to establish a claim of deliberate indifference based on the decisions not to approve the arthroscopic surgery to his right wrist, (3) plaintiff's constitutional right to privacy was not violated and plaintiff has failed to sue the correct party for an injunction, (4) the injunctive relief issue is moot or should be a matter for the state courts, (5) plaintiff has failed to show the personal involvement of defendants Artuz, Koenigsmann, Rodas, Sohng and Miller, and (6) defendants are entitled to qualified immunity. For the reasons set forth below defendants motions are granted in part and denied in part.

BACKGROUND

I. Deliberate Indifference to Plaintiff's Serious Medical Needs

A. Plaintiff's Wrist Injury

In 1995, plaintiff suffered an injury to his right fifth finger while playing basketball in Wende Correctional Facility. (August 28, 2001 Deposition of Basheen Rush ("Rush Dep. I") at 60.) Surgery on plaintiff's finger was performed by Dr. Richard Magill, an outside orthopedic surgeon at Macy Pavillon, Westchester Medical Center in June of 1997. (Am. Comp. at 11.) n1 After surgery, Dr. Magill discovered a possible ligament tear to plaintiff's[*4] right wrist and on December 22, 1997, recommended an MRI be taken. (Id.) On January 5, 1998, Dr. Jerome Fein, plaintiff's treating physician at Green Haven, upon the recommendation of Dr. Magill, submitted a consult to Correctional Physician Services, Inc. ("CPS") requesting MRI testing of plaintiff's right wrist. (Id. at 11-12.) This request was granted and on February 16, 1998, an MRI of plaintiff's right wrist was performed at Mid Hudson Radiology. (Affidavit of

Marie Flynn Danek, Esq. ("Danek Aff.") Ex. I.) According to Dr. C.S. McDonald, the radiologist at Mid Hudson Radiology who reviewed the MRI results, the MRI indicated "an area of increased signal within the central portion of the triangular fiber cartilage complex ("TFCC")," and although no obvious complete tear was apparent, Dr. McDonald recommended that plaintiff have a wrist arthrogram. (Id.; see also Am. Comp. at 12.) Dr. Magill concurred with Dr. McDonald's recommendation that plaintiff should receive arthroscopic surgery on his right wrist. (Defendant Charles Zimmerman, Joseph Dimino, and Arvind K. Wadhwa's Statement of Material Facts ("Def. 56.1 Stmt.") P8 (citing Danek Aff. Ex. I).) After receiving the[*5] MRI results from Mid Hudson Radiology, Dr. Magill concluded that it was possible for degenerative changes to occur, and that perforation was a concern if the injury went untreated. (Am. Comp. at 12.) Based on these findings and an examination of the plaintiff, Dr. Fein supported Dr. Magill's recommendation for surgery in his request for approval to CPS. (Id.) In addition, Dr. Fein recommended that plaintiff wear a splint to reduce the pain in his wrist until surgery could be performed. (Id.) Plaintiff received a wrist splint on February 27, 1998. (Id.)

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

    n1 The cites to plaintiff's Amended Complaint are to page numbers because the paragraphs are numbered incorrectly.

- - - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

    Plaintiff claims that he was originally scheduled for arthroscopic surgery at St. Agnes Hospital on April 15, 1998. (Affidavit of Basheen Rush in Support of Plaintiff's Response to Defendant's Motion for Summary Judgment ("Rush Resp. Aff.") P8.) According to plaintiff, on April 15, 1998, at the request of St. Agnes Hospital, defendants[*6] Zimmerman, Wadhwa and Dimino rescheduled plaintiff's surgery to May 20, 1998. (Am. Comp. at 12.) Then on May 20, 1998, defendants Zimmerman, Wadhwa and Dimino were asked to postpone plaintiff's surgery once again, this time because Green Haven was on facility lock-down. (Id.) No further surgery date was assigned at that time.

    Plaintiff alleges that after no further surgery date was scheduled, Dr. Magill and Dr. Fein submitted a request for surgery to CPS on September 3, 1998. (Id.) A committee comprised of the Department of Corrections and CPS was responsible for reviewing all such requests. (Def. 56.1 Stmt. P9 (citing Danek Aff., Exs. J-M).) The committee reviewed Dr. Magill's and Dr. Fein's recommendations and attached documentation in order to determine whether or not the requested surgery was the appropriate course of treatment. (Id.) Plaintiff claims that defendants Zimmerman, Wadhwa and Dimino denied this first request claiming that CPS had not received all the requested information from Dr. Magill after the surgery had been rescheduled the second time. n2 (Am. Comp. at 12.)

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n2 In addition to the request on September 3, 1998, plaintiff also alleges that Dr. Magill submitted two additional requests for surgery on November 23, 1998 and December 7, 1998. (Am. Comp. at 12-13.) However, the first request that defendants acknowledge was a request submitted on February 9, 1999. (See Marie Flynn Danek, Esq. Affidavit in Reply to Plaintiff's Opposition to Defendants' Motion for Summary Judgment PP10-19.) The request submitted on February 9, 1999 is also the first request for which there is actual documentation. Accordingly, while the time line of events is somewhat unclear, whether or not additional requests for surgery were made prior to February 9, 1999, would not change the outcome of the Court's decision on defendants' summary judgment motions and are therefore irrelevant at this time. If this case should proceed to trial, plaintiff should provide additional evidence to support his contention that additional requests were submitted to CPS prior to February 9, 1999.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

[*7]

On February 9, 1999, Dr. Fein submitted a request to CPS for approval of the recommended surgery to plaintiff's wrist, outlining plaintiff's medical condition, including the fact that plaintiff was in pain constantly. (Id. at 13.) Included in Dr. Fein's request for approval were the results of Dr. Magill's most recent examination. (Id.) On April 7, 1999, defendant Dr. Arvind K. Wadhwa, the CPS Regional Medical Director, wrote a letter to Dr. Magill informing him that his request for arthroscopic surgery was denied on the grounds that it was not medically necessary because information previously requested to support intervention had not yet been received. (Danek Aff., Ex. J.) In addition to the addressee Dr. Magill, Dr. Dimino, the Medical Director of the UR Department at CPS, was also sent a copy of this letter. (Id.)

On May 7, 1999, Dr. Fein once again submitted a request for surgery to CPS based on Dr. Magill's recommendation, plaintiff's constant complaints of pain and Dr. Fein's own examination of plaintiff's wrist. (Am. Comp. at 13.) In a letter dated May 24, 1999, Dr. Wadhwa again denied Dr. Magill's and Dr. Fein's request for arthroscopic surgery on the basis that[*8] the MRI findings were equivocal at best, and that improvement was not expected with the diagnostic arthroscopic treatment. (See Danek Aff., Ex. K.) Dr. Wadhwa instead recommended that plaintiff's wrist be treated conservatively and that a cast/forearm splint be used. (Id.)

In October 1999, there was yet another request for surgery made by Dr. Fein upon the recommendation of Dr. Magill, and once again, the request was denied by CPS. (Id., Ex. L.) According to defendants, this request was denied because Dr. Magill did not offer any suggestions for alternative conservative treatment, as he had been requested to do by CPS. (Id.)

On February 4, 2000, Dr. Fein filed another request with CPS pleading that CPS approve plaintiff's wrist surgery. (Am. Comp. at 14.) The consult outlined the host of doctors the plaintiff had seen over the past two years. (Id.) While CPS did question the doctors about the procedures plaintiff had been through since December 22, 1997, the request was once again denied. (Id.) On March 10, 2000, Dr. Fein again filed a request with CPS outlining plaintiff's consistent pain and requested that the plaintiff be approved for surgery. (Id.[*9] at 14-15.) In addition, Dr. Fein requested that plaintiff's splint be replaced. (Id.) The request for surgery was once again denied by CPS and plaintiff did not receive a new splint. n3 (Id. at 15; see also Danek Aff., Ex. M.)

- - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - -

n3 Plaintiff alleges this request was made by Dr. Fein on March 10, 2000, however, the letter from Dr. Wadhwa to Dr. Magill denying a request around this time period is dated March 8, 2000. Although once again the dates are somewhat unclear, it is clear that a request for surgery was made around this time period and was denied on March 8, 2000.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

In September 2001, after approximately three years of denying requests, CPS finally determined that surgery for plaintiff's wrist was medically necessary because conservative treatment had not resolved his prior symptoms. (Affidavit of Arvind K. Wadhwa ("Wadhwa Aff.") P7.) Plaintiff received arthroscopic surgery on his right wrist on November 29, 2001. (Danek Aff. P13.) Plaintiff states that his wrist improved considerably after surgery[*10] and by September 2002 the use of his wrist permitted him to move beyond regular leg exercise. (Defendants' Statement Pursuant to Local Rule 56.1 ("Def. 2d 56.1 Stmt.") P4(A).) Plaintiff had additional surgery to his right wrist in January 2002. n4

- - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - -

n4 Defendants claim that plaintiff was also provided with both physical and occupational therapy for his wrist during the three years surgery was denied. (Def. 2d 56.1 Stmt. P4(A).) However, plaintiff maintains he received therapy only after filing the instant complaint in 2000 (Rush Resp. Aff. P20) and defendants have not submitted any evidence that such treatment was actually provided.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

B. Plaintiff's Stomach Problems

1. Hernia

   In addition to problems with his wrist, plaintiff also complains that defendants acted with deliberate indifference to his serious medical needs by not appropriately addressing his various stomach problems. (Am. Comp. at 5.) Plaintiff contends that he began experiencing stomach pain in 1997, at which time he notified Green Haven's[*11] medical staff of his condition. (Id.) On July 31, 1998, a consult was filed with CPS requesting that the plaintiff be seen by a stomach doctor due to his persistent stomach pain and that he be scheduled for appropriate stomach surgery. (Id. at 15.) CPS denied this request on August 18, 1998. (Id.) Subsequently, in 2001, hernias were found in plaintiff's stomach and he was operated on. (Def. 2d 56.1 Stmt. P4(B) (quoting Rush Dep. I at 44-46, 52, 96 and September 19, 2002 Deposition of Basheen Rush ("Rush Dep. II") at 54-56).) After surgery plaintiff's stomach and digestive problems improved and became relatively quiet. n5 (Id.)

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

   n5 In his Amended Complaint plaintiff alleges that requests for treatment were made to CPS regarding problems associated with his hernia discovered and treated in 2001. However, plaintiff has not provided any allegations or evidence regarding which defendants were actually involved in allegedly denying him proper treatment for this condition.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

2. Urinary Tract Infection[*12]

   On April 20, 1998, plaintiff was seen at Green Haven Medical Clinic by the clinic provider Dr. William Sohng due to complaints of urine discoloration. (Am. Comp. at 20.) On that date plaintiff wished to have a urine test conducted, which Dr. Sohng refused to perform, claiming it was not medically necessary. (Id.) Plaintiff argues that Dr. Sohng was deliberately indifferent to his serious medical needs by failing to order the urine test in violation of plaintiff's constitutional rights. (Id. at 21.) Defendant Sohng claims he did not order a urine test because plaintiff did not complain of pain during his visit on April 20, 1998. (Affirmation of Jerome Fein ("Fein Aff.") P4, Ex. A.) Dr. Sohng's explanation is consistent with plaintiff's medical records. n6 (Id.)

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

   n6 Although plaintiff alleges that on April 20, 1998, he informed Dr. Sohng

that he was experiencing pain when urinating, the medical records show that all plaintiff complained of was that his urine was discolored. (Fein Aff, P4, Ex. A.)

- - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

After[*13] seeing defendant Sohng, plaintiff claims that he returned to his cell block and requested sick call for the following day, April 21, 1998. (Am. Comp. at 21.) This request was granted and on April 21 plaintiff was seen by Dr. Bendheim. (Id.) According to the medical records plaintiff informed Dr. Bendheim that he was experiencing pain when urinating. (Fein Aff., Ex. A.) At this time, Dr. Bendheim ordered a urine test, which revealed that the plaintiff had an urinary tract infection. (Am. Comp. at 22.) Dr. Bendheim prescribed medication and recommended plaintiff see a urologist for further testing. (Id.) On May 13, 1998, plaintiff was seen by Dr. G. Owens, a urologist who conducted a urinalysis test. (Id.) This test revealed the plaintiff did in fact have a urinary tract infection and he was prescribed medication. (Id.)

Defendants Zimmerman, Wadhwa and Dimino

Plaintiff alleges that defendants Zimmerman, Wadhwa and Dimino acted with deliberate indifference to his serious medical needs in violation of his constitutional rights when they denied recommended surgery for plaintiff's wrist on numerous occasions. (Am. Comp. at 10-11.) Plaintiff claims that these defendants[*14] knowingly and willfully denied plaintiff necessary medical treatment despite receiving at least four recommendations for wrist surgery from Dr. Fein and Dr. Magill forcing plaintiff to live in daily pain for approximately three years. (Id.) Plaintiff contends that none of these defendants ever examined the plaintiff and therefore they were not in a position to make the decision to deny plaintiff medical treatment that had been recommended by both the outside orthopedic surgeon and plaintiff's prison treating physician. (Id.) According to the record before the Court, at least four requests for surgery were made and denied by CPS, specifically by defendants Wadhwa and Dimino. (Danek Aff., Exs. J-M.)

From 1997 through 2001 defendant Zimmerman was employed by CPS and served as the director of the medical consultant services for Green Haven. (Def. 56.1 Stmt. P13.) Defendant Zimmerman contends that he is not a licensed physician and not only was he not involved in any of the decisions to approve or deny the requests for plaintiff's wrist surgery, but he was not even aware the requests were being made. (Id.; Memorandum of Law in Support of Defendants' Motion for Summary Judgment[*15] ("Def. Mem.") at 5 (citing Danek Aff., Ex. E).)

While defendants Wadhwa and Dimino were clearly involved in the decisions to deny plaintiff's recommended surgery (see Danek Aff., Exs. J-M), they claim they did not deviate from the applicable standards of care when they denied the

various requests and therefore their conduct was not deliberately indifferent to
plaintiff's serious medical needs. (Def. Mem. at 8; Wadhwa Aff P8.) Plaintiff
maintains that the numerous denials of recommended surgery caused an unnecessary
and wanton infliction of pain and amounts to cruel and unusual punishment
prohibited by the Eighth Amendment. (Am. Comp. at 15-16.)

Defendant Dr. Carl Koenigsmann

    Plaintiff alleges that Dr. Carl Koenigsmann, the medical director at Green
Haven, willfully refused to stop the unnecessary and wanton infliction of pain
that plaintiff suffered at the hands of both CPS and the Green Haven medical
staff. (Am. Comp. at 16.) Plaintiff contends that after the medical staff
refused to provide adequate medical treatment for plaintiff's continuous wrist
and stomach pain, Koenigsmann took little to no action to treat plaintiff or
provide necessary medication. (Id.[*16] at 16-17.)

    In addition, plaintiff alleges that defendant Koenigsmann knowingly allowed
his medical staff to violate plaintiff's and other prisoners' constitutional
rights to privacy and doctor-patient confidentiality by allowing sick calls to
be conducted in the Special Housing Unit ("SHU") within hearing distance of
other inmates and non-medical staff. n7 (Id. at 18.) Plaintiff alleges that on
February 24, May 1, and May 5, 2000, he wrote to defendant Koenigsmann
concerning the denial of medical treatment and the violations of his right to
privacy and doctor-patient confidentiality. (Id. at 18-19.) According to
plaintiff, defendant Koenigsmann did not respond to any of plaintiff's
complaints. (Id.) Koenigsmann's failure to correct these acts, plaintiff
contends, was an act of deliberate indifference to plaintiff's right to privacy
and medical confidentiality. (Id. at 19.)

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

    n7 When a prisoner has a medical complaint he has the right to request a
"sick call", which means a member of the medical staff comes to the prisoner's
cell or the prisoner can be sent to the infirmary. If a prisoner requests a sick
call at his cell, a clinic provider would report to the prisoner's cell block,
listen to the prisoner's medical concerns and order the necessary tests and/or
prescribed the proper medication.


- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

    [*17]

Defendant Sohng

    As explained previously, plaintiff contends that defendant Sohng was
deliberately indifferent to his serious medical needs when on April 20, 1998, he

denied plaintiff's request for a urine test despite plaintiff's complaints of discolored urine. (Id. at 20.)

Plaintiff alleges that defendant Sohng had both professional and ethical obligations to examine him prior to making any decision about whether to deny treatment. (Id. at 22.) Failure to do so, plaintiff contends, was an act of deliberate indifference to plaintiff's serious medical needs. (Id.) Plaintiff maintains that had he not followed up with his urinary tract problem the following day, the infection could have led to serious kidney problems or death. (Id.)

Defendant Miller

On March 9, 2000, at approximately 1:10 p.m., while plaintiff was housed in Green Haven SHU, plaintiff submitted a request for an emergency sick call to Corrections Officer Miller. (Id. at 23.) After receiving the request, Miller crumpled it up and threw it in the garbage. (Id.) Miller's actions were recorded on SHU video and audio tape. (Id.) Plaintiff alleges that the actions of Officer [*18] Miller delayed plaintiff's receipt of medical treatment until the following day, March 10, 2000. (Id.) Plaintiff contends that Officer Miller was not a member of the medical staff and therefore was not in a position to make a decision regarding plaintiff's medical needs. (Id. at 23-24.) Plaintiff claims that defendant Miller knowingly and willfully violated plaintiff's constitutional rights when he refused to pass along plaintiff's request to be seen by the medical staff. (Id.) Plaintiff also contends that defendant Miller violated the prison's rules and regulations, which require that all reports of inmates' illness be reported to a Lieutenant, Sergeant or a member of the medical staff. (Id.)

On March 9, 2000, plaintiff claims he filed a complaint with defendant Artuz concerning the actions of Officer Miller. (Id. at 24.) Artuz apparently forwarded the complaint to Deputy Superintendent of Security, C. Schneider, on March 14, 2000. (Id.) An investigation followed, revealing that defendant Miller did in fact throw plaintiff's request for emergency sick call in the garbage. (Id.) Defendant Miller claims he threw the request away because plaintiff had already[*19] filed a request for emergency sick call earlier that day and therefore the request in question was superfluous. (Id.) Plaintiff received a sick call the following day on March 10, 2000. (Def. 2d 56.1 Stmt. P4(B) (citing Rush Dep. II at 43).)

Defendant Artuz

Plaintiff argues that defendant Christopher Artuz, Superintendent of Green Haven, acted with deliberate indifference to plaintiff's serious medical needs by failing to correct the actions of his prison staff after being notified of various problems through prisoner grievances, including violations of plaintiff's right to privacy and doctor-patient confidentiality. (Am. Comp. at

5-10.)

In support of his contention, plaintiff alleges that on June 24, 1997, plaintiff wrote to Artuz complaining about the denial of prescribed medication. (Id. at 6-7.) After plaintiff's finger surgery on June 21, 1997, Dr. Magill prescribed plaintiff Tylenol two times a day for five days, followed by Motrin, two times a day. (Id.) Plaintiff claims that he did not receive his medication and although he filed a grievance with defendant Artuz, he received no response. (Id. at 7.)

On April 21, 1998, plaintiff claims that he wrote[*20] another letter to Artuz, regarding Sohng's failure to perform a urine test. (Id. at 7.) According to plaintiff, Artuz responded by sending the complaint to a non-medical health administrator, L. Zwillinger, who plaintiff alleges attempted to cover-up the denial of treatment by failing to address the seriousness of plaintiff's problems. (Id.) In response, plaintiff filed another complaint on May 29, 1998, claiming the investigation was not sufficient. (Id.)

On March 8 and 9, 2000, plaintiff filed additional complaints with Artuz about the manner in which the medical staff conducted sick calls in the SHU. (Id. at 7-9.) Plaintiff maintains the sick call procedures violate his constitutional right to privacy and doctor-patient confidentiality. (Id. at 8.) Plaintiff contends that Artuz refused to change the sick call procedures after he complained and thus Artuz violated plaintiff's constitutional rights. (Id.)

Finally, plaintiff also claims that he submitted a complaint to Artuz regarding the actions of Corrections Officer Miller. (Id. at 9.) In his Amended Complaint plaintiff claims that as Superintendent of Green Haven Artuz has a duty to correct employee[*21] conduct that violates a prisoner's constitutional rights and departmental rules once it is brought to his attention. (Id.) Artuz responded by forwarding plaintiff's complaint to Deputy Superintendent of Security G. Schneider, who appointed Sergeant Tierney to conduct an investigation of the complaint. (Id.) Although the investigation revealed that defendant Miller had in fact discarded plaintiff's emergency sick call request in the garbage in violation of facility procedure and departmental rules, no action was taken. (Id.)

II. Plaintiff's Constitutional Right to Privacy

Plaintiff also claims that his constitutional right to privacy and doctor-patient confidentiality was violated due to the sick call procedures conducted in the SHU. (Am. Comp. at 19.) On March 9, and May 8, 2000, defendant Byron Rodas, a physician assistant at Green Haven, responded to plaintiff's sick calls in SHU. (Id.) According to plaintiff, while conducting the sick call on March 9, 2000, Rodas stood three to four feet from his cell, requiring plaintiff to speak so loudly that other inmates and non-medical personnel could hear his complaints. (Id.) Then, on May 8, 2000, according[*22] to plaintiff, Rodas stood

approximately eight feet from plaintiff's cell again allowing others to hear
their conversation. (Id.) Plaintiff contends that these sick calls violated his
constitutional right to privacy because he was forced to disclose his personal
health concerns to others. n8 (Id. at 20.)

- - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

    n8 Plaintiff did admit during his deposition that he knew he had the option
to have his sick call in the infirmary as opposed to at his cell, a privilege
that he had utilized on previous occasions. (Def. 2d 56.1 Stmt. P4(C) (citing
Rush Dep. II at 43, 50 and Fein Aff., Ex. A).)

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

    DISCUSSION

I. Legal Standard

        [HN1] Summary judgment is properly granted "if the pleadings,
depositions, answers to interrogatories, and admissions on file, together with
the affidavits, if any, show that there is no genuine issue as to any material
fact and that the moving party is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(c). The Federal Rules of Civil Procedure[*23] mandate
the entry of summary judgment "against a party who fails to make a showing
sufficient to establish the existence of an element essential to that party's
case, and on which that party will bear the burden of proof at trial."
Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548
(1986). When deciding a summary judgment motion the Court must assess "'the
evidence in the light most favorable to the party opposing the motion, and
resolve ambiguities and draw reasonable inferences against the moving party.'"
Washington v. Rockland County Jail, No. 02 Civ. 7091, 2004 U.S. Dist. LEXIS
7595, at *4 (S.D.N.Y. Apr. 29, 2004) (quoting Frito-Lay, Inc. v. LTV Steel
Co. (In re Chateaugay Corp.), 10 F.3d 944, 957 (2d Cir. 1993)). However, to
defeat such a motion, the non-moving party must affirmatively set forth facts
showing that there is a genuine issue of fact for trial. Anderson v.
Liberty Lobby, Inc., 477 U.S. 242, 256, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)
. A dispute is not genuine unless "'the evidence is such that a reasonable jury
could return a verdict for the nonmoving party.'" Gayle v. Gonyea, 313 F.3d
677, 682 (2d Cir. 2002)[*24] (quoting Anderson, 477 U.S. at 248).
Furthermore, because plaintiff is proceeding pro se his submissions should be
judged on a more lenient standard than that accorded to formal pleadings by
lawyers. See Bussa v. Alitalia Linee Aeree Italiane, S.p.A., 02 Civ. 10296,
2004 U.S. Dist. LEXIS 13895, at *10-*11 (S.D.N.Y. July 21, 2004). However,
"proceeding pro se does not otherwise relieve a defendant from the usual
requirements to survive a motion for summary judgment." Id. 2004 U.S. Dist.
LEXIS 13895, at *11.

II. Deliberate Indifference to Plaintiff's Serious Medical Needs

    A plaintiff has a civil cause of action under Section 1983 against

    [HN2] every person who, under the color of any statute, ordinance,
regulation, custom, or usage, of any State or Territory or the District of
Columbia, subjects, or causes to be subjected, any citizen of the United States
or other person within the jurisdiction thereof to the deprivation of any
rights, privileges, or immunities secured by the Constitution and laws.

    42 U.S.C. a 1983.

    [HN3] The Eighth Amendment prohibits the infliction of "cruel
and unusual punishment" on those convicted of crimes, which[*25] includes
punishments that "involve the unnecessary and wanton infliction of pain."
Gregg v. Georgia, 428 U.S. 153, 173, 49 L. Ed. 2d 859, 96 S. Ct. 2909 (1976).
The Supreme Court has held that "deliberate indifference to serious medical
needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,'
proscribed by the Eighth Amendment" and "states a cause of action under
a 1983." Estelle v. Gamble, 429 U.S. 97, 104-105, 50 L. Ed. 2d 251,
97 S. Ct. 285 (1976) (citation omitted). "This is true whether the indifference
is manifested by prison doctors in their response to the prisoner's needs or by
prison guards in intentionally denying or delaying access to medical care, or
intentionally interfering with the treatment once prescribed." Id. (footnotes
omitted). The Second Circuit has interpreted the deliberate indifference
standard to consist of both an objective and subjective prong. See Hathaway
v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996).

A. Serious Medical Need

    [HN4] Under the objective prong of the deliberate indifference
standard, the alleged deprivation must be sufficiently serious, "'a condition of
urgency', that may result in 'degeneration' [*26] or 'extreme pain.'"
Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998) (quoting Hathaway v.
Coughlin, 37 F.3d 63, 66 (2d Cir. 1994)). A serious medical condition can
exists when the failure to treat a prisoner's condition results in further
injury or in the "unnecessary and wanton infliction of pain.'" Id. (quoting
Gutierrez v. Peters, 111 F.3d 1364, 1373 (7th Cir. 1997)). Some factors
that the Second Circuit has considered when determining whether a prisoner
suffers from a serious medical condition include: "the existence of an injury
that a reasonable doctor or patient would find important and worthy of comment
or treatment, the presence of a medical condition that significantly affects an
individual's daily activities, or the existence of chronic and substantial
pain.'" Id. (quoting McGuckin v. Smith, 974 F.2d 1050, 1059-60 (9th Cir.
1992)). These factors are only a few of the many factors that can be considered

in making the determination of seriousness. Id. at 703.

   According to the record, plaintiff's wrist injury and the numerous denials of
surgery forced the plaintiff to live in continuous pain[*27] for over three
years. In addition, because plaintiff is right handed and his injury was to his
right wrist, it can be presumed that this injury significantly affected his
daily activities. In fact, plaintiff claims that he had trouble eating, was
unable to exercise, and overall had little to no movement of his right wrist for
this entire period of time. (Rush Dep. I at 53.) Such an injury, which
significantly affects daily activities, causes substantial pain and allows for
little to no movement of plaintiff's wrist and hand, clearly amounts to a
serious medical need. See Chance, 143 F.3d at 702 (finding that because of
defendants actions, plaintiff was unable to chew his food properly, choked on
his food and was in pain for at least six months, all of which led to the
court's finding of a serious medical condition). Accordingly, plaintiff has
satisfied the objective prong of the deliberate indifference standard with
respect to his wrist injury. n9

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

   n9 Plaintiff also raises a claim of deliberate indifference with respect to
his various stomach problems. Whether or not these medical conditions constitute
"serious medical needs" in satisfaction of the objective prong of the deliberate
indifference standard will be discussed later in this memorandum in conjunction
with the analysis of the individual defendants associated with those alleged
conditions.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

   [*28]

B. Defendants' State of Mind

      [HN5] Under the subjective prong, an official must act with a
"'sufficiently culpable state of mind' in depriving the prisoner of adequate
medical treatment." Johnson v. Wright, 234 F. Supp.2d 352, 360 (S.D.N.Y.
2002) (quoting Hathaway, 99 F.3d at 553). "An official acts with the
requisite deliberate indifference when that official 'knows of and disregards an
excessive risk to inmate health or safety; the official must both be aware of
facts from which the inference could be drawn that a substantial risk of serious
harm exists, and he must also draw the inference.'" Chance, 143 F.3d at 702
 (quoting Farmer v. Brennan, 511 U.S. 825, 837, 128 L. Ed. 2d 811, 114 S.
Ct. 1970 (1994)). Therefore, "the subjective element of deliberate indifference
'entails something more than mere negligence. . . [but] something less than acts
or omissions for the very purpose of causing harm or with knowledge that harm
will result.'" Hathaway, 99 F.3d at 553 (quoting Farmer, 511 U.S. at
835).

[HN6] Mere disagreement over the proper course of treatment does not create a constitutional claim so[*29] long as the treatment given is adequate. See Dean v. Coughlin, 804 F.2d 207, 215 (2d Cir. 1986); see also Sonds v. St. Barnabas Hosp. Corr. Health Servs., 151 F. Supp.2d 303, 312 (S.D.N.Y. 2001) ("Disagreements over medications, diagnostic techniques . . . forms of treatment, or the need for specialists or the timing of their intervention, are not adequate grounds for a Section 1983 claim. These issues implicate medical judgments and, at worst, negligence amounting to medical malpractice, but not the Eighth Amendment.") (citation omitted). Thus, the fact that a prisoner might prefer a different course of treatment does not give rise to an Eighth Amendment violation. However, allegations that prison officials denied or delayed recommended treatment by medical professionals may be sufficient to satisfy the deliberate indifference standard. See Gill v. Mooney, 824 F.2d 192, 196 (2d Cir. 1987) ("Prison officials are more than merely negligent if they deliberately defy the express instructions of a prisoner's doctors."); see also Johnson, 234 F. Supp.2d at 361 ("Prison officials may not 'substitute their judgments for a[*30] medical professional's prescription.'") (quoting Zentmyer v. Kendall County, 220 F.3d 805, 812 (7th Cir. 2000)); see also Wandell v. Koenigsmann, No. 99 Civ. 8652, 2000 U.S. Dist. LEXIS 10466, at *7 (S.D.N.Y. July 21, 2000) ("Proof of deliberate indifference may be found where a prison official or employee 'intentionally denies or delay[s] access to medical care or intentionally interferes with the treatment once prescribed.'") (quoting Estelle, 429 U.S. at 104-105)). It has been determined that whether a course of treatment was a product of sound medical judgment, negligence or deliberate indifference depends on the facts of the case. Chance, 143 F.3d at 703 ("In certain instances, a physician may be deliberately indifferent if he or she consciously chooses 'an easier and less efficacious' treatment plan.") (quoting Williams v. Vincent, 508 F.2d 541, 544 (2d Cir. 1974)).

Defendants Wadhwa and Dimino

   Beginning at the very latest on April 7, 1999, defendants Wadhwa and Dimino began denying numerous requests made on plaintiff's behalf for recommended wrist surgery on the ground that it[*31] was not medically necessary. (See Danek Aff., Ex. J-M.) Defendants claim that their actions were reasonable under the circumstances because there was no conclusive documentation requiring surgery, as the MRI finding indicated only a possible tear. However, the record shows that these two defendants issued at least four denials for recommended surgery over a three year period despite strong recommendations from both plaintiff's outside orthopedic surgeon and his prison treating physician. Furthermore, the only treatment it seems plaintiff received over these three years was the use of a wrist splint. At the very least, there remains a question of fact as to whether defendants numerous decisions to deny surgery were reasonable and whether the treatment given was adequate.

Accordingly, because questions of fact exists as to whether defendants actions were reasonable or amounted to deliberate indifference to plaintiff's serious medical needs in violation of plaintiff's constitutional rights, defendants motion for summary judgment is denied as to defendants Wadhwa and Dimino. See Hernandez v. Keane, 341 F.3d 137, 146 (2d Cir. 2003) ("a prolonged delay in treatment[*32] could support an inference of deliberate indifference") (citing Hathaway, 37 F.3d at 67); see also Williams v. Fisher, No. 02 Civ. 4558, 2003 U.S. Dist. LEXIS 16442, at *25 (S.D.N.Y. Sept. 17, 2003).

Defendant Sohng

On April 20, 1998, plaintiff alleges that he visited Green Haven medical clinic as a result of stomach discomfort and discolored urine. Plaintiff was seen by Dr. Sohng and requested that a urine test be conducted. This request was refused. As mentioned previously, there is no indication in the medical records that plaintiff complained of pain while urinating until April 21, 1998, when he saw Dr. Bendheim. (Fein Aff., Ex. A.) At this time, Dr. Bendheim conducted an examination of the plaintiff and ordered a urine test. (Id.) The test revealed that plaintiff did in fact have a urinary tract infection, and medication was then prescribed.

Plaintiff alleges that defendant Sohng acted with deliberate indifference to his serious medical needs when he refused to order the proper tests on April 20, 1998. The Court finds this argument to be unpersuasive. According to the medical records, plaintiff did not complain of any pain to[*33] Dr. Sohng on April 20, 1998 and discolored urine alone, without complaints of pain, is not substantial enough to result in a serious medical condition. Furthermore, any possible injury plaintiff suffered was cured twenty eight hours later when plaintiff was seen by Dr. Bendheim and provided with medication. Accordingly, plaintiff has failed to satisfy the first prong of the deliberate indifference standard with respect to his claims against defendant Sohng. Thus, Defendant's motion for summary judgment is granted as to this defendant.

Defendant Miller

Plaintiff alleges that on March 9, 2000, at approximately 1:10 p.m., while housed in Green Haven SHU, plaintiff wrote out a request for emergency sick call which he handed to defendant Miller. After receiving the medical request, Miller tossed the request in the garbage. Officer Miller justified his behavior according to plaintiff, by claiming that plaintiff had previously filed a sick call complaint earlier that day. An investigation conducted on March 20, 2000, revealed that Miller did in fact throw plaintiff's request in the garbage. Plaintiff alleges that Miller's refusal to provide access to medical staff was deliberately[*34] indifferent to his serious medical needs.

While defendant Miller's behavior was certainly unnecessary and

inappropriate, it does not rise to the level of a constitutional violation. Furthermore, any pain plaintiff suffered due to Miller's actions was cured when the plaintiff received sick call the very next day. Accordingly, while the Court does not condone Officer Miller's behavior, because his actions do not rise to the level of a constitutional violation defendant's motion for summary judgment as to defendant Miller is granted.

III. Right to Privacy

[HN7] The Supreme Court has recognized "that there exists in the United States Constitution a right to privacy protecting 'the individual interest in avoiding disclosure of personal matters.'" Doe v. City of New York, 15 F.3d 264, 267 (2d Cir. 1994) (recognizing that plaintiff possessed a constitutional right to confidentiality under Whalen in his HIV status) (quoting Whalen v. Roe, 429 U.S. 589, 599, 51 L. Ed. 2d 64, 97 S. Ct. 869 (1977)). This right to privacy has been characterized as a right to "confidentiality" and includes a right to keep private the status of one's health. Id. ("'Information about[*35] one's body and state of health is a matter which the individual is ordinarily entitled to retain within the private enclave where he may lead a private life.'") (quoting United States v. Westinghouse Electric Corp., 638 F.2d 570, 577 (3d Cir. 1980)). This constitutional right to privacy extends to prisoners as well. See Powell v. Schriver, 175 F.3d 107, 112 (2d Cir. 1999) ("'Prison inmates do not shed all fundamental protections of the Constitution at the prison gates.'") (quoting Hernandez v. Coughlin, 18 F.3d 133, 136 (2d Cir. 1994)); see also Colon v. Arrabito, No. 97 Civ. 7146, 1998 U.S. Dist. LEXIS 8484, at *7 (S.D.N.Y. June 8, 1998) ("prison inmates retain a constitutional right to privacy concerning medical information about them"); Clarkson v. Coughlin, 898 F. Supp. 1019, 1041 (S.D.N.Y. 1995) (same).

However,      [HN8] while prisoners do have a constitutional right that information about the status of their health be kept private, this right is not absolute. See Powell, 175 F.3d at 111 (holding that "the interest in the privacy of medical information will vary with the condition"). [*36] For example, prisoners cannot expect their constitutional right to privacy to protect them against the disclosure of medical information that had already previously been disclosed to the public. See Taylor v. Macomber, 97 Civ. 4127, 1999 U.S. Dist. LEXIS 8016, at *9 (S.D.N.Y. May 25, 1999) (holding plaintiff waived his right to privacy with regards to his knee condition because he openly wore a brace and sleeve); see also Doe v. City of New York, 15 F.3d at 268 (holding that an individual cannot expect to have a constitutionally protected privacy interest in matters of public record); Doe v. Marsh, 105 F.3d 106, 110-11 (2d Cir. 1997) (holding plaintiffs waived their right to privacy regarding their HIV status because they were active in promoting AIDS prevention and had identified themselves to the public as being HIV positive).

Defendant Rodas

   Plaintiff alleges that defendant Rodas violated his right to privacy and doctor-patient confidentiality on March 9, and May 8, 2000, while conducting sick calls at plaintiff's cell in SHU. Plaintiff maintains that on each occasion Rodas stood so far from plaintiff's cell that plaintiff[*37] was required to speak loudly and others could hear his medical concerns. While        [HN9] constitutional violations have been recognized in situations where prison officials revealed medical information of a sensitive nature, such as transexualism and HIV status, see Powell, 175 F.3d at 111; see also Colon, 1998 U.S. Dist. LEXIS 8484, at *7; Doe v. City of New York, 15 F.3d at 267, plaintiff's allegations simply do not rise to this level. First, plaintiff's wrist injury and his stomach problems cannot be classified as "personal matters of a sensitive nature" and second, due to his use of a splint, plaintiff's wrist injury was clearly visible to all those around him. n10 See Taylor, 1999 U.S. Dist. LEXIS 8916, at *9; see also Doe, V. Marsh, 105 F.3d at 110-11. Thus, even if others heard the information revealed during the sick call visits on March 9 and May 8, 2000, these facts do not support the finding of a constitutional violation. Accordingly, defendant's motion for summary judgment is granted as to defendant Rodas.

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

   n10 It is unclear from plaintiff's Amended Complaint which medical complaints plaintiff was discussing with Rodas on March 9 and May 8, 2000. However, since the only medical issues plaintiff complains of in his Amended Complaint are his wrist injury and his stomach problems, the court presumes these sick call visits addressed one of these conditions.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

   [*38]

Defendants Artuz and Koenigsmann

   Plaintiff alleges that defendants Artuz and Koenigsmann violated plaintiff's constitutional right to privacy because they did not address Rodas' conduct when it was brought to their attention or reform the sick call procedures. (Am. Comp. at 8-10.) However, because the underlying facts do not support a claim for deliberate indifference of a constitutional magnitude against Rodas, a constitutional claim that a supervisor did not respond to plaintiff's complaints against this defendant cannot be sustained.

IV. Personal Involvement and a 1983

[HN10] To state a claim under Section 1983, a plaintiff must allege the personal involvement of each defendant in the alleged constitutional violation. See Gill, 824 F.2d at 196; see also Woods v. Goord, No. 01 Civ. 3255, 2002 U.S. Dist. LEXIS 7157, at *22 (S.D.N.Y. April 23, 2002). Personal liability cannot be imposed on a state official on the basis of respondeat superior. See Hernandez, 341 F.3d at 144-145; see also Al-Jundi v. Estate of Rockefeller, 885 F.2d 1060, 1065 (2d Cir. 1989). Similarly, proof of "linkage in the prison[*39] chain of command" is insufficient to support a Section 1983 action. Ayers v. Coughlin, 780 F.2d 205, 210 (2d Cir. 1985). Therefore, the plaintiff must show that the defendant in question had direct involvement in or responsibility for the alleged misconduct. See Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995)

.      [HN11] A supervisory official may be personally involved in a Section 1983 violation where:

(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.


Id.

Defendant Zimmerman

    Plaintiff alleges that defendant Zimmerman, along with defendants Wadhwa and Dimino, was deliberately[*40] indifferent to plaintiff's serious medical needs when he denied recommended surgery for plaintiff's wrist after numerous requests and despite complaints of continuing pain and suffering. However, there is no evidence in the record, other than the allegations in plaintiff's Amended Complaint, to show that defendant Zimmerman participated in any of the decisions to deny plaintiff's surgery or was involved in informing Dr. Magill of such denials. See Brock v. Wright, 315 F.3d 158, 164-66 (2d Cir. 2003) (summary judgment affirmed for Superintendent Berbary for lack of personal involvement because he had no medical training and there was no proof that he had any knowledge of DOC's policy or that the plaintiff's well being was not being protected). In fact, the only allegations plaintiff has provided with respect to defendant Zimmerman are entirely conclusory in nature and      [HN12] conclusory allegations alone are insufficient to survive a motion for summary judgment. Johnson v. Wright, 01 Civ. 2122, 2004 U.S. Dist. LEXIS 7543, at *15 (S.D.N.Y. May 3, 2004) ("'conclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of[*41] fact'")

(quoting Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998)).
Accordingly, Defendant's motion for summary judgment is granted as to defendant
Zimmerman for lack of personal involvement.

Defendant Koenigsmann

    Plaintiff alleges that defendant Koenigsmann was deliberately indifferent to
his serious medical needs because as the medical director at Green Haven he
failed to approve plaintiff's wrist surgery. However, once again the only
evidence plaintiff has provided in support of his claims against defendant
Koenigsmann is conclusory allegations in his Amended Complaint. There is no
evidence that Koenigsmann was personally involved in the denials of surgery or
that he was even aware that requests for surgery were being made. As mentioned
previously, liability cannot be imposed on a prison official on the basis of
respondeat superior. See Hernandez, 341 F.3d at 144-45. Thus, defendant's
motion for summary judgment as to defendant Koenigsmann is also granted for lack
of personal involvement.

Defendant Artuz

    Plaintiff alleges that defendant Artuz failed in his duty as superintendent
because he failed to address Plaintiff's[*42] continuous problems with Green
Haven's medical staff thus contributing to the denial of plaintiff's medical
treatment.

    Although plaintiff alleges that he filed various grievances with Artuz
concerning the denial of medication after surgery, Sohng's refusal to order a
urine test on April 20, 1998, and his problems with sick call procedures, none
of these underlying facts, as discussed previously, rise to the level of a
constitutional violation. In addition, there are no allegations in plaintiff's
complaint or any evidence in the record that plaintiff complained to Artuz about
the various denials of wrist surgery, the only claims to survive summary
judgment. Furthermore, it seems that Artuz did not simply ignore plaintiff's
various grievances, but in fact on more than one occasion, sent them to be
investigated. (See Am. Comp. at 7, 9, 24.) Therefore, because there is no
evidence that defendant Artuz had any involvement in the denial of plaintiff's
wrist surgery, the only claim to survive summary judgment, defendant's motion
for summary judgment as to defendant Artuz is also granted for lack of personal
involvement.

V. Qualified Immunity

    Finally, defendants argue that[*43] they are entitled to qualified immunity
because their actions were objectively reasonable as there is no constitutional
right to provide treatment according to a prisoner's own opinions and desires.
(Def. Mem. at 13-14.)        [HN13] Qualified immunity "shields public
officials from liability for their discretionary acts that do 'not violate

clearly established statutory or constitutional rights of which a reasonable person would have known.'" Hathaway, 37 F.3d at 67 (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 73 L. Ed. 2d 396, 102 S. Ct. 2727 (1982)). Therefore, summary judgment is appropriate if it was objectively reasonable for the defendants to believe that their conduct did not violate an established federally protected right. Robison v. Via, 821 F.2d 913, 921 (2d Cir. 1987). Three factors have been considered to determine if qualified immunity applies (1) whether the right was defined with reasonable specificity, (2) whether the decisional law of the Supreme Court and the applicable circuit court supports its existence, and (3) whether, under pre-existing law, a defendant official would have reasonably understood that his acts were unlawful. Horne v. Coughlin, 155 F.3d 26, 29 (2d Cir. 1998)[*44] (quoting Rodriguez v. Phillips, 66 F.3d 470, 476 (2d Cir. 1995)).

The only claims left in this action are the claims asserted against defendants Wadhwa and Dimino regarding the denial of wrist surgery. Both Dr. Magill, an outside orthopedic specialist and Dr. Fein, the prison's own physician, requested on at least four separate occasions that plaintiff be scheduled for arthroscopic surgery for his right wrist. Each time these two defendants opted instead for "conservative treatment" which entailed the use of a wrist splint. The law is clear and has been clear for some time that [HN14] the unnecessary denial or delay of adequate medical care and a doctor's prescribed medical treatment for a prisoner's serious medical condition violates a prisoner's Eighth Amendment rights and states a claim under Section 1983. See Hernandez, 341 F.3d at 146. Therefore, qualified immunity will not shield Wadhwa and Dimino from liability. n11

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n11 Because the court has found that the "sick call" procedures at Green Haven did not violate plaintiff's constitutional right to privacy and because plaintiff has now received the necessary wrist surgery, his requests for injunctive relief are moot. Accordingly, defendants' arguments that plaintiff has failed to sue the correct party for an injunction and that injunctive relief is a matter for the state courts will not be addressed.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

[*45]

CONCLUSION

For the reasons set forth above, defendants' motions for summary judgment are granted as to defendants Artuz, Zimmerman, Koenigsmann, Rodas, Sohng and Miller and denied as to defendants Wadhwa and Dimino.

SO ORDERED.

Dated: August 5, 2004

New York, New York

Lawrence M. McKenna

U.S.D.J.