UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| LLOYD GEORGE MORGAN | : | PRISONER<br>3:01CV1107(CFD) |
| v. | : | |
| JOHN J. ARMSTRONG | : | AUGUST 17, 2005 |

### AFFIDAVIT OF CAPTAIN JAMES M. SHEA

The affiant hereby swears and avers:

1. I am over the age of 18 and understand and believe in the obligations of an oath.

2. I am currently a Correctional Captain at Northern Correctional Institution (hereinafter "Northern"). I have held this position since October, 1999. Before that, I was a Correctional Lieutenant and a Correctional Officer. Altogether, I have 19 and one half years of correctional experience. As such, I am familiar with the facts of this case.

3. Inmate Morgan has been and continues to be within the custody of the Commissioner of Correction. To say that the plaintiff has been a management problem for DOC officials would be an understatement. The plaintiff has received 60 Disciplinary Reports during his incarceration. Exs. C, RT 67; A.

4. The plaintiff's disciplinary history includes being found guilty by the Department of Correction of Assault on a DOC employee preceding his initial placement at Northern, six charges of Assault, giving false information, and fighting, among others.

5. On March 30, 2001, inmate Morgan assaulted his cellmate at the facility then known as MacDougall Correctional Institution. Ex. B p. 3. He threw hot water and baby oil onto the victim's face, cut his face with a razor and struck him in the head with an electrical

adaptor swung inside a sock. **Ex. B p. 3.** Outside charges were brought by the victim. **Ex. B p. 3.**

6. Eleven days after his placement in Phase I of the Administrative Segregation program at Northern, the plaintiff received a Disciplinary Report for Threats. **Ex. C, RT 67.** In the incident leading to this Disciplinary Report on April 10, 2001, the plaintiff stated several times to a Correctional Officer, "I have AIDS and I'm going to bite you and spit in your face." **Ex. D, portions of inmate master file.**

7. The following December, the plaintiff was convicted of another infraction, security tampering, and the following month he was convicted of Threats for telling an officer "I know someone who will meet you in the parking lot and she'll break your f***ing face  test me!". **Exs. C; D.** Inmate Morgan continued to receive Disciplinary Reports through 2002. **Ex. C.**

8. The combination of all of these repeated disciplinary problems resulted in the plaintiff's continued confinement in Phase I of the Administrative Segregation program at Northern from March 30, 2001 until April 18, 2003. **Ex. H, housing cards.** While the plaintiff claims he remained in Phase I through November 7, 2003, his housing card indicates that he was released to Phase II on April 18, 2003. **Ex. H, housing cards.**

9. Northern was at the time in question and is now the designated restrictive housing facility for the Connecticut Department of Correction, managing those inmates who have demonstrated a serious inability to adjust to confinement in prison and pose a serious threat to the safety and security of a correctional facility. **Ex. D Northern website description.**

10. Placement in the Administrative Segregation Program at Northern both in 1999 and since then comes after a hearing, and the decision of the Hearing Officer may be appealed. **Ex. E, Administrative Segregation description.**

11. Since 1999, the Administrative Segregation Program has consisted of a three phase program. **Exs. E AS description.** The Administrative Segregation Program "operates on the basic assumption that inmates who engage in aggressive, violent, disruptive behavior, or who pose an imminent risk ... require a highly structured and secure environment." **Exs. E; F.**

12. In Phase I, which at the time lasted for at least six months if an inmate was discipline free, or longer if not, inmates are allowed very little time out of their cells. **Exs. E; F.** Meals are eaten in the cells; inmates are restricted to three showers and five hours of recreation per week. **Exs. E; F.** Phase I inmates are precluded from any work assignments. **Exs. E; F.**

13. While he was housed in Phase I of the Administrative Segregation program at Northern, the plaintiff was housed in One West and One East units. **Ex. H housing cards.** While in Phase I, the plaintiff shared a cell with another inmate. The size of the double cell that the plaintiff shared while in Phase I was approximately 8 by 10 feet, containing over 79 square feet. The cell contained two narrow beds one over the other, and a toilet.

14. Recreation in Phase I was and is provided for one hour per day five days per week, but is entirely voluntary. It was the policy at Northern up until April of 2003 that inmates in Phase I of the Administrative Segregation program, no matter the length of time they had been in Phase I, were required to participate recreation in full restraints for the entire duration of their stay in Phase I.

15. This is still the policy for inmates who have initially been placed in Phase I of the Administrative Segregation program at Northern, although the policy has been changed so that the rule regarding recreating in restraints *may* be relaxed after 30 days under certain conditions.

16. For his one hour of recreation five days per week, a Phase 1 inmate is escorted in full restraints into an outdoor recreation area surrounded by a chain link fence. The inmate remained in full restraints for the duration of the hour, and then was escorted back to his cell.

17. The inmate is free to walk and move about the recreation area in the fresh air, and inmates recreating in this manner usually spend most of the time walking around. The recreation area for such an inmate is 20 by 20 feet.

18. Full restraints within the Connecticut Department of Correction includes handcuffs behind the back, leg irons, and a tether chain from the leg irons to the handcuffs.

19. While this is a far cry from the basketball, television, volleyball and other indoor and outdoor recreational activities available to Connecticut's general population inmates at the time and currently, these measures were considered necessary due to the security threat posed by Phase I inmates given their behavior resulting in placement in Phase I.

20. Inmates who have shown a propensity for violence against correctional staff or other inmates within a correctional setting have been can be ingenious in their destructiveness.

21. They can hold trap doors open while unrestrained, they can swing handcuffs around after the first one is applied to one hand, and they refuse to re-cuff, among other things, all of which can disrupt the daily routine of a facility.

22. Thus, the defendants do not dispute that during the time period in Amendment, inmates, in Phase I of Administrative Segregation were required to recreate in restraints for reasons of safety and security.

23. Inmates in Phase I Administrative Segregation both now and during the time in question are not, however, restrained in any way during the time that they spend inside their cell.

24. The cells at Northern are large enough to accommodate calisthenics such as sit-ups, push-ups, jumping and running in place.

25. The policy of recreating Phase I Administrative Segregation inmates at Northern in restraints while they could do more intensive calisthenics in the cells accommodated both the inmates' need for fresh air, walking, and time out of their cells while allowing the inmates' needs for more vigorous exercise, if they chose to engage in it, to be accomplished within the confines of their cell.

26. The plaintiff alleges that he fell in the recreation unit on May 4, 2001, two months after he vigorously assaulted his cellmate with a razor and an adaptor in a sock, causing the cellmate serious damage.

27. There is no indication that any custodial staff witnessed this event, as no incident report was prepared. Whenever an inmate hurts himself, has a health episode, or falls or there is any similar incident, custodial staff are required by Administrative Directive to report the incident in writing to a supervisor.

28. Staff at Northern have searched the Incident Reports on file for the months of April and May 2001 and found no incident report related to the plaintiff's claims of an injury in the recreation yard.

29. At any time while he was housed in Phase I at Northern, inmate Morgan could have declined recreation if he did not feel well with no repercussions whatsoever.

I solemnly swear and affirm that the foregoing is true and accurate to the best of my knowledge and belief.

James M. Shea

Subscribed and sworn to before me this 17th day of August, 2005.

Notary Public, My Commission expires 08/17/2005

MARK R. SUSE
NOTARY PUBLIC
MY COMMISSION EXPIRES 03/31/2007