UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| LLOYD GEORGE MORGAN | : PRISONER<br>CIVIL NO. 3:01CV1107(CFD) |
| v. | : |
| JOHN ROWLAND, ET AL. | : JULY 16, 2005 |

### AFFIDAVIT OF MARTIN PAUL CHAPLIN PH.D.

I, MARTIN PAUL CHAPLIN, PH.D., being first duly sworn, hereby depose and say:

1. I received a B.S. degree in Psychology from Wayne State University in Detroit, Michigan, in 1978. I subsequently earned my Master's Degree (1984) and Ph.D. (1987) from the University of Missouri - St. Louis.

2. I have held various positions with the Connecticut Department of Correction ("DOC") since 1988 and more recently with the University of Connecticut Correctional Managed Health Care Program. I am currently the Supervising Psychologist providing clinical and administrative supervision for the mental health unit at the Northern Correctional Institution ("NCI") in Somers, Connecticut. I have held this position since November 1999. I am licensed by the State of Connecticut to practice psychology. As such, I am duly familiar with the facts set forth below.

3. Dr. Hensley was the psychiatrist assigned to NCI between 2001 and 2003. In addition, during that time period, we had several social workers on staff, who regularly addressed the mental health needs of inmates.

4. As the licensed clinical psychologist, I saw Administrative Segregation phase 1 inmates about every 90 days.

5. I stopped by Mr. Morgan's cell regularly during the time period at issue in his complaint, from March 30, 2001 through November 7, 2003.

6. All inmates admitted to NCI were screened and evaluated by mental health staff within 24 hours. For those inmates in need of mental health services, a treatment plan was promptly developed and put into place. Here, Mr. Morgan was seen on March 30, 2001, the day of his arrival at NCI, by a psychiatric social worker, who developed a treatment plan for him within two weeks of his arrival.

7. For some inmates, the mental health evaluation made clear that the treatment plan should include regular one-on-one counseling, and for such inmates such care is available and regularly provided.

8. All the units in NCI were toured once a day and then later twice a day either by a mental health social worker, nurse clinician, psychiatric nurse, or psychologist. In addition, the inmates at NCI on medication are seen monthly. The purpose of the tour is to determine if there are any acute mental health needs not otherwise being addressed.

9. When I was touring the units, if an inmate came to his door and stated that he needed to speak with me, I would do a visual assessment to see if the inmate was crying or otherwise looked despondent. I would check to see if his hygiene was appropriate, if his eye contact was good, if his speech was coherent and good. If all of these looked appropriate, I would ask the inmate, generally, why he needed to speak to me. If he indicated he did not want to say on the tier, I would tell the inmate, he could either slip me a note through the crack in his door or send me an inmate request.

10. Indeed, Mr. Morgan himself understood and followed this procedure. More specifically, on January 29, 2003, Mr. Morgan sent me the attached inmate request form stating that he needed a single cell and transfer to Garner.

11. During my tours I would also look at the overall condition of an inmate's cell to see if he was using personal property such as magazines, paper and pens, a chess set, a walkman, anything indicating that his mind was active. If an inmate's cell was completely disordered, I would be concerned that he could possibly be in psychiatric distress. I would monitor such an inmate closely, checking on the inmate daily and attempting to speak with him. If his cell suddenly appeared disordered or remained disordered, I would probably arrange quickly for a one on one meeting with the inmate out of his cell.

12. I did not immediately pull inmates out of their cells to discuss mental health issues, every time they approached their cell doors during one of my tours. If I did so, at best, this would have been an extremely poor use of limited psychology time. At worst, this would have endangered other inmate lives.

13. More specifically, I would have never been able to complete a tour of the entire facility and thus not been able to check in on other inmates who may have been having a mental health crisis or issues.

14. Moreover, many times, when inmates refused to tell me why they needed to speak with me, either generally, or in writing, and looked fine, if I would pull the inmate out of his cell the inmate would then complain to me about institutional issues such as showers, commissary, visiting, disciplinary reports, that were more appropriately

addressed to the custody staff. This took time away from other inmates, who had mental health concerns or issues that needed my help.

15. In addition, periodically, I would stop in front of each inmate's cell and ask them how they were doing. Most of the time, an inmate would tell me that he was fine. I would attempt to engage the inmate in general conversation that had nothing to do with their mental health issues to evaluate whether they were delusional, psychotic or depressed. If the inmate refused to converse with me, I would watch them in their dealings with other staff or other inmates. If, either in a conversation with me, staff, or another inmate, an inmate was unable to maintain eye contact, carry on a conversation and/or were stating things that did not make sense or going off on tangents, I would pull the inmate out of his cell for a more in depth evaluation.

16. In my professional opinion, there would be no reason to pull an inmate out of his cell, when he looked fine, had good eye contact, and was in no distress. Inmates are constantly monitored and provided care in accordance with their treatment plans, which can be updated and modified should a need arise.

17. In accordance with my general practice, of checking in with inmates, I stopped in front of Mr. Morgan's cell regularly to see how he was doing. Unless otherwise noted, my evaluations were done by observing Mr. Morgan in his cell and having general discussions with him in front of his cell. Similarly, unless otherwise noted, when I state that I saw Mr. Morgan, I mean that I observed him in his cell and had generalized discussions with him there. If Mr. Morgan had ever looked distressed, if his speech pattern changed significantly, if his speech was incoherent, if his thoughts were not connected or otherwise disturbed, if he was tearful, unkempt, dirty, if his otherwise

neat and orderly cell suddenly became disorganized, I would not have hesitated to have seen Mr. Morgan one-on-one or made sure someone saw him one on one as soon as possible.

18. On July 26, 2001, I evaluated Mr. Morgan and noted that his hygiene was okay, his mood was normal, his affect was appropriate, his speech was normal, his attention and concentration was normal, his memory was grossly intact, his thought processes were normal, he had no hallucinations, no obsessions, no compulsions, no phobias, had no suicidal ideation, no homicidal ideation, and was not currently on psychiatric medication. I also noted that Mr. Morgan looks fine and stated that he was okay.

19. On August 17, 2001, I saw Mr. Morgan who asked to be evaluated by Dr. Hensley, but he reported no change in his symptoms. Mr. Morgan did not look depressed, denied suicidal ideation strongly and credibly. In addition, I noted that Mr. Morgan was not psychotic, not paranoid and his cognitive function was okay.

20. On August 31, 2001, I evaluated Mr. Morgan and noted that his hygiene was okay, his mood was normal, his affect was appropriate, his speech was normal, his attention and concentration was normal, his memory was grossly intact, his thought processes were normal, he had no hallucinations, no obsessions, no compulsions, no phobias, had no suicidal ideation, no homicidal ideation, and was not currently on psychiatric medication. I noted that Mr. Morgan was doing well at NCI.

21. On September 6, 2001, psychiatric social worker Kevin Power saw Mr. Morgan with Nurse Badura. Mr. Morgan stated that they put another inmate in his cell who he tried to help but now the inmate said Morgan was trying to rape him. Mr.

Morgan stated that he loved the inmate like a friend but now the inmate was saying he tried to rape him. Mr. Power noted that Mr. Morgan had situational anxiety but denied any suicidal intent or planning. Mr. Morgan agreed to call mental health and allow their intervention if he felt unsafe at any time.

22. On September 24, 2001, I evaluated Mr. Morgan and noted that his hygiene was okay, his mood was normal, his affect was appropriate, his speech was normal, his attention and concentration was normal, his memory was grossly intact, his thought processes were normal, he had no hallucinations, no obsessions, no compulsions, no phobias, had no suicidal ideation, no homicidal ideation, and was not currently on psychiatric medication. I noted that overall, Mr. Morgan seemed fine, was not depressed and not psychotic. I also reported that Mr. Morgan had multiple custody complaints as usual.

23. On December 3, 2001, I received a call from Mr. Morgan's unit manager that he was threatening to threaten suicide unless he received a different single cell. He was on a three person tier and apparently did not like this. I noted that fortunately the issue was resolved when Mr. Morgan agreed to go back to his cell and denied being suicidal.

24. On December 7, 2001, psychiatric nurse clinician Irene Woolven received a call that Mr. Morgan wanted mental health. Ms. Woolven went to Mr. Morgan's cell where he reported that he was considering self harm and could not speak where others could hear him. Ms. Woolven then met one on one with Mr. Morgan in a medical screening room where he indicated he was depressed because the other inmates and the correctional officers hated him because they believed he was a sexual predator. Mr.

Morgan also indicated he was worried how his family would react if the rape charges went to court. Mr. Morgan told Ms. Woolven, he just needed to vent and denied suicidal and homicidal ideations.

25. On December 12, 2001, Kevin Power, a mental health social worker was advised that Mr. Morgan wanted to see mental health staff. When he arrived at Mr. Morgan's cell, Mr. Morgan began complaining that he needed more sheets, that custody was depriving him of his constitutional rights, that he wanted mental health to document this in his chart, and he wanted Mr. Power to provide him with the names of custody staff in his housing unit so he could add them to his lawsuit. Mr. Power noted that Mr. Morgan was calm and well organized, with no signs of distress. After Mr. Power explained to Mr. Morgan that if he had such concerns, he should speak with custody supervisors, Mr. Morgan became very hostile and verbally abusive stating, "Fuck you mother fucker. I'm going to fuck you too! I'm going to sue your fucking ass off, mother fucker. Fuck you. Get the fuck out of here, mother fucker!" Mr. Morgan's concerns were institutionally/litigation related, not ones that required mental health intervention. Mr. Power noted that Mr. Morgan's actions were consistent with antisocial traits, there was no evidence of psychiatric disturbances. It was very clear that Mr. Morgan misused the mental health referral system in a manipulative, anti-social fashion for litigious reasons.

26. On December 26, 2001, I evaluated Mr. Morgan and noted that his hygiene was okay, his mood was normal, his affect was appropriate, his speech was normal, his attention and concentration was normal, his memory was grossly intact, his thought processes were normal, he had no hallucinations, no obsessions, no compulsions,

no phobias, had no suicidal ideation, no homicidal ideation, and was not currently on psychiatric medication. I noted that Mr. Morgan was polite and reading when seen. I noted that he continued to present as guarded but was not overtly psychotic or depressed. Mr. Morgan also told me he keeps active with his Court work. It was my opinion that Mr. Morgan was doing well at NCI. I also reported that Mr. Morgan had not asked much of Mental health staff at NCI and did not need much from the mental health staff at that time.

27. On February 1, 2002, I evaluated Mr. Morgan and noted that his hygiene was okay, his mood was normal, his affect was appropriate, his speech was normal, his attention and concentration was normal, his memory was grossly intact, his thought processes were normal, he had no hallucinations, no obsessions, no compulsions, no phobias, had no suicidal ideation, no homicidal ideation, and was not currently on psychiatric medication. I noted that Mr. Morgan looked fine and stated that he was okay.

28. On April 25, 2002, I evaluated Mr. Morgan and noted that his hygiene was okay, his mood was normal, his affect was appropriate, his speech was normal, his attention and concentration was normal, his memory was grossly intact, his thought processes were normal, he had no hallucinations, no obsessions, no compulsions, no phobias, had no suicidal ideation, no homicidal ideation, and was not currently on psychiatric medication. I also noted that he presented with no major mental disorder and was not in psychiatric distress.

29. On May 14, 2002, I saw Mr. Morgan after custody asked me to see him. Mr. Morgan was named and identified as having a homosexual relationship with another

inmate in a newspaper article. Mr. Morgan told me he was okay but was embarrassed by the article. Mr. Morgan stated however the he was close to his family, would not do anything to hurt them and thus would not hurt himself. Mr. Morgan did request a phone call to his family, which I passed on to the Unit Manager. Mr. Morgan seemed quite serious but there was no major mental disorder evident.

30. On June 24, 2002, I evaluated Mr. Morgan and noted that his hygiene was okay, his mood was normal, his affect was appropriate, his speech was normal, his attention and concentration was normal, his memory was grossly intact, his thought processes were normal, he had no hallucinations, no obsessions, no compulsions, no phobias, had no suicidal ideation, no homicidal ideation, and was not currently on psychiatric medication.

31. On July 1, 2002, I evaluated Mr. Morgan and noted that his hygiene was okay, his mood was normal, his affect was appropriate, his speech was normal, his attention and concentration was normal, his memory was grossly intact, his thought processes were normal, he had no hallucinations, no obsessions, no compulsions, no phobias, had no suicidal ideation, no homicidal ideation, and was not currently on psychiatric medication. I also noted that Mr. Morgan stated he did not want medication as he felt he was doing fine at NCI. I wrote that Mr. Morgan adjusted well to NCI from a mental health perspective, that he was in no psychiatric distress and wanted no mental health services. I did note that he came across as a bit suspicious but was not delusional and not psychotic.

32. On July 26, 2002, I evaluated Mr. Morgan and noted that his hygiene was okay, his mood was normal, his affect was appropriate, his speech was normal, his

attention and concentration was normal, his memory was grossly intact, his thought processes were normal, he had no hallucinations, no obsessions, no compulsions, no phobias, had no suicidal ideation, no homicidal ideation, and was not currently on psychiatric medication. I noted that Mr. Morgan was doing well at NCI, his mental state was stable and there were no major mental disorders evident.

33. On August 14, 2002, Mr. Morgan was admitted to the infirmary after he put a piece of white cloth around his neck to be removed from his cell. When he was told that custody would use a chemical agent, Mr. Morgan removed the white cloth and cuffed up and was brought to the infirmary. Mr. Morgan admitted that he did not intend to hurt himself, but wanted to change his environment. He contracted for his safety, meaning he promised not to hurt himself and was happy to be placed on in cell restraints to change his environment.

34. Mr. Morgan was seen in his cell on August 15, 2002, was noted by mental health staff to be sleeping. Mental health staff also noted that he was eating his meals.

35. On October 2, 2002, I evaluated Mr. Morgan and noted that his hygiene was okay, his mood was normal, his affect was appropriate, his speech was normal, his attention and concentration was normal, his memory was grossly intact, his thought processes were normal, he had no hallucinations, no obsessions, no compulsions, no phobias, had no suicidal ideation, no homicidal ideation, was not currently on psychiatric medication and did not want any such medication. Mr. Morgan did state that he wanted a written response to his request for a single cell, stating that he needed a written response for his lawsuit.

36. On October 3, 2002 I sent Mr. Morgan the attached memo stating that he did not qualify for a single cell for mental health reasons. I indicated that fortunately his stable mental condition suggested that he would do well sharing a cell with another inmate.

37. During the time he was at Northern from 2001-2003, Mr. Morgan's main concern and primary focus with mental health staff was getting a single cell for mental health reasons. I noted that while he was a bit suspicious, he had no evident major mental disorder that mandated that he be given a single cell.

38. On March 15, 2003, Mr. Morgan was seen outside of his cell with a psychiatric social worker, Mr. Power, stating he felt he was going to have a nervous breakdown. Mr. Morgan stated he was afraid other inmates would hurt him because they thought he was a homosexual rapist. Mr. Morgan thought that inmates would try to get housed with him so they could hurt him. Mr. Power reviewed with Mr. Morgan, the last person refused to be housed with Mr. Morgan because Mr. Morgan was gay. The cell mate prior to that insisted on leaving the cell, stating that Mr. Morgan tried to rape him.

39. Mr. Morgan told Mr. Power that he qualified for a single cell because of threats against him but refused to provide any information, including the names of the inmates who threatened him. Mr. Power noted that Mr. Morgan presented in a calm and rational manner, was well organized in his thoughts and well spoken at time. Finally, Mr. Power noted that Mr. Morgan refused to sign a release for his records from Whiting Forensic Institute stating that he wanted to check with his attorney first to see how that would affect him.

40. I administered a Personality Assessment Inventory ("PAI") on March 16, 2003. I noted that the PAI results suggested that Mr. Morgan tended to over report and exaggerate psychiatric symptoms and the test results could be considered invalid. I noted that notwithstanding this, the interpretation of the report suggested that Mr. Morgan had significant issues with suspiciousness, distrust, tension and failures in close relationships. I noted that he was not psychotic, not schizophrenic, not manic and was probably not significantly depressed. I did note that Mr. Morgan was somewhat socially isolated due to his mistrust of others and when under severe stress, Mr. Morgan may have brief psychotic episodes. I indicated that possible diagnoses include paranoid personality disorder, and antisocial personality disorder, acute stress disorder and polysubstance abuse.

41. On April 9, 2003, Mr. Morgan was seen outside of his cell in a one to one session with Mr. Power who went over the results of the PAI with him. Mr. Morgan denied lying or exaggerating his symptoms but his primary concern continued to be paranoia, stating he always believes someone is after him. Mr. Morgan felt that the "gang bangers" felt he was a snitch and other inmates felt he was a homo sexual rapist. It was noted that Mr. Morgan's fears were somewhat reality based given that he was in prison.

42. Mr. Morgan was seen by Mr Power in 1 to 1 sessions, outside of his cell on May 2, 2003 who noted that he continued to do well in phase II and still had a single cell. Mr. Morgan stated that he was still concerned that other inmates would try to harm him but stated that the major stated he would continue to have a single cell if at all

possible. Mr Power noted that Mr. Morgan continued to do well, was not depressed or psychotic and there was no follow up planned.

43.   On May 4, 2003 psychiatric social worker Tom Lateer and a custody supervisor went to Mr. Morgan's cell to relay his family's message that his father had died. Mr. Lateer and the custody supervisor offered a telephone call to Mr. Morgan's sister and brother in law. It was noted that Mr. Morgan had some shock, some tears but was grieving within normal range. Mr. Lateer noted that he would monitor and follow up as needed.

44.   On or about June 24, 2003, Mr. Morgan wrote a letter to Commissioner Lantz complaining that he had not received medical and mental health care at Northern. Dr. Bannish spoke to Mr. Morgan on July 9, 2003 and Mr. Morgan indicated he felt he needed a single cell and a transfer to Garner.

45.   According to Mr. Morgan's records, he was seen by a psychiatrist at Cheshire Correctional Institution on December 8, 2003 requesting a single cell for mental health reasons. The psychiatrist indicated that it was up to custody if Mr. Morgan needed a single cell, there was no mental health reason why one was needed. The psychiatrist indicated that staff should try to rule out if plaintiff was paranoid and/or had antisocial personality.

_____
Dr. Paul Chaplin

Subscribed to and sworn to before me this 18th day of ~~July~~ August 2005

_____
Commissioner of Superior Court
/Notary Public

MARK R. SUSE
NOTARY PUBLIC
MY COMMISSION EXPIRES 03/31/2007