UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| LLOYD GEORGE MORGAN | : | PRISONER<br>CIVIL NO. 3:01CV1107(CFD) |
| v. | : | |
| JOHN ROWLAND, ET AL. | : | AUGUST 17, 2005 |

### AFFIDAVIT OF RONALD HENSLEY M.D.

I, RONALD HENSLEY, M.D., being first duly sworn, hereby depose and say:

1. I am currently licensed to practice psychiatry in the State of Connecticut. I have held this license since 1967. I attended medical school at the University of Texas and completed my residency in psychiatry at the Institute of Living in Hartford CT.

2. I have held various positions with the Connecticut Department of Correction ("DOC") since 1972 and more recently with the University of Connecticut Correctional Managed Health Care Program. I was the Supervising Psychiatrist providing psychiatric services at the Northern Correctional Institution ("NCI") in Somers, Connecticut at the time at issue in this case, March 30, 2001 to November 7, 2003. As such, I am duly familiar with the facts of this case.

3. Typically, in institutional settings, psychiatrists see patients when medication needs to be prescribed. A psychiatrist typically monitors a patient's condition through the case manager's and psychologist's notes and discussions as well as through the psychiatrist's own physical observations during tours.

4. All the units in NCI were toured twice a day either by a social worker, nurse clinician, psychiatric nurse, or psychologist. These clinicians

would refer inmates to me as they saw fit and I would then see the inmate. Often times the clinicians referred inmates to me who did not have any active psychiatric issues. The clinicians erred on the side of referring inmates to me that did not need my help.

5. When the clinicians referred an inmate to me, I would first review the inmate's health services record. I would also discuss the inmate with his case manager who was most times a psychiatric social worker. Then I would have the inmate brought to the medical unit and see him. I would do a visual assessment as the inmate was being brought in the unit to see if the inmate looked despondent. I would check to see if his hygiene was appropriate, if his eye contact was good, if his speech was coherent and good. I would then speak with the inmate with his case manager present.

6. As of 2001, I had worked with psychiatric social worker Tom Lateer for approximately 3 years. It was my opinion then and continues to be my opinion now that Mr. Lateer has a superior ability in assessing patients.

7. On April 24, 2001 I noted that Mr. Morgan requested that I see him. I reviewed his past psychiatric history, and discussed him with psychiatric social worker Tom Lateer. I noted that Mr. Morgan's symptoms appeared to be consistent with a character pathology previously noted. I also noted that Mr. Morgan had not been on medication for at least two years and that his request did not appear to require immediate attention. I indicated that I would see him for a non-emergency appointment when the schedule would allow.

8. Mr. Morgan's file indicated that he most probably had a character disorder known as an antisocial personality disorder. People with such disorders are colloquially referred to as sociopaths.

9. Ordinarily medication is not indicated for individuals with character disorders unless an individual's behavior is out of control or otherwise problematic.

10. Indeed, it is accepted within the psychiatric community that medication or conventional psychotherapy are not effective treatments for those with an antisocial personality disorder. Rather, behavioral management and medication are used on an as necessary basis to control impulsivity and temper outbursts. There are times when because of behavioral outbursts medication or hospitalization may be warranted. For the most part, however, Mr. Morgan's file indicated that he was not having problems in April 2001 with impulsivity and behavioral outbursts.

11. On August 16, 2001 I discussed Mr. Morgan with Mr. Lateer. I noted that Mr. Morgan had settled into NCI comfortably. I noted that he was not a candidate for transfer to Virginia as he had pending charges. However, aside from this, I opined that he was not a candidate for transfer as he could quickly enough resort to presenting himself as a serious mental health case if he was unhappy with his situation.

12. On September 26, 2001, I saw Mr. Morgan in the medical examining room with his case manager Tom Lateer. Mr. Morgan demanded that his case manager leave the room and called me "master" in a sarcastic tone. I

terminated the session shortly after Mr. Morgan called me a racist. A review of Mr. Morgan's treatment notes and my personal interview of him confirmed my diagnosis that he had a character pathology for which no medication was necessary. I indicated that for the present time, Mr. Morgan's mental health score would remain a 3 out of 5, with 5 being for inmates with the greatest mental health needs.

13. Because Mr. Morgan's behavior was not out of control and his desire to see me appeared only to gain a single cell and not to control his personality disorder, he was, in my opinion, not a candidate for medication.

14. On December 26, 2001, I lowered Mr. Morgan's mental health classification score from a Mental Health 3 to a Mental Health 2 noting that Mr. Morgan's occasional suicide threat did not even rise to the level of malingering as he disavowed attempting suicide so quickly. Moreover, it was my opinion, that Mr. Morgan's behavior continued to be under control. Although he had an irritable outburst with his new case manager, on December 12, 2001 where he cursed at him, this did not suggest to me that Mr. Morgan's behavior was out of control.

Ronald Hensley, M.D.

Subscribed to and sworn to before me this 19th day of ~~July 2005~~ August, 2005

Commissioner of Superior Court / Notary Public

SHARON L. HANNAN
NOTARY PUBLIC
COMMISSION EXPIRES MAR. 2008

4