UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| LLOYD GEORGE MORGAN | : | PRISONER CIVIL NO. 3:01CV1107(CFD) |
| v. | : | |
| JOHN ROWLAND, ET AL. | : | AUGUST 17, 2005 |

**AFFIDAVIT OF TOM LATEER**

I, **TOM LATEER**, being first duly sworn, hereby depose and say:

1. I am currently employed as a psychiatric social worker at Northern Correctional Institution ("NCI") in Somers.

2. I was a psychiatric social worker at NCI at the time at issue in this case, March 30, 2001 to November 7, 2003 and worked a minimum of eight hours a day, five days a week. As such, I am duly familiar with the facts of this case.

3. All the units in NCI were toured twice a day either by a social worker, nurse clinician, psychiatric nurse, or psychologist. I toured the housing units a minimum of once a day when I was working.

4. As a psychiatric social worker, I routinely oriented inmates to mental health services upon an inmate's admission to NCI. I advised inmates that if they needed mental health services they were to write a request to the mental health staff and they would be scheduled to be seen based upon the nature of their request. I also told the inmates that if they had any thoughts of self harm or a reaction to medication, they should immediately advise staff that they had a mental health emergency. As discussed below, I oriented Mr. Morgan to mental

health services at NCI on March 30, 2001 when he was admitted. Thus, I would have had this discussion with him then.

5. When I was touring the units, I would do a visual assessment of the inmates as I was slowly walking through the unit to see if any inmate exhibited any overt signs of psychiatric distress. By this I mean, I would check to see if an inmate's hygiene was appropriate, if his eye contact was good, if his speech was coherent and good and if his energy level was appropriate. I would also look at the overall condition of an inmate's cell to see if he was using personal property such as magazines, paper and pens, a chess set, a walkman, anything indicating that his mind was active. If an inmate's cell was completely disordered, I would be concerned that he could possibly be in psychiatric distress. I would monitor such an inmate closely, checking on the inmate daily and attempting to speak with him. If his cell suddenly appeared disordered or remained disordered, I would probably arrange quickly for a one on one meeting with the inmate out of his cell, if he was on my case load. If the inmate was not on my case load, I would notify the inmate's case manager that said inmate might possibly be in psychiatric distress.

6. If an inmate approached his cell door during one of my tours and stated that he had a mental health emergency and did not want to discuss the issue on the tier, I would ask him to slip me a note through the crack between the door and the wall so I could assess his level of need.

7. If during one of my tours, an inmate asked to speak with me but did not appear to be in any sort of distress, and did not say that he needed to meet

with me immediately, or did not say that he had an urgent mental health need or mental health emergency, I would tell him to file a written mental health request and that mental health staff would respond to him.

8.  I did not immediately pull inmates out of their cells to discuss mental health issues, every time they approached their cell doors during one of my tours. If I did so, at best, this would have been an extremely poor use of psychiatric social worker time. At worst, this would have endangered other inmate lives.

9.  More specifically, I would have never been able to complete a tour of the entire facility and thus not been able to check in on other inmates who were on mental health medication and/or review mental health medication issues.

10. At NCI, inmates were and are evaluated by mental health staff within 24 hours of admission. This evaluation was done one on one, meaning it was not done at cell front but rather in a private room, typically in the admissions and processing area.

11. On March 30, 2001, the day of Mr. Morgan's arrival to NCI, I took a mental health history from Mr. Morgan, noting that according to Mr. Morgan, he was in Whiting Forensic Institute in 1982, and received psychiatric treatment in the Hartford Community from 1988-1990. I also noted that Mr. Morgan was not on any psychotropic medication and denied the need for mental health services. Nonetheless, I indicated that given the voluminous health services record I intended on meeting one on one with him to gain clarification of his mental health treatment needs and to monitor his adjustment to NCI.

12. I reviewed Mr. Morgan's history over the next fourteen days and noted that while his chart was voluminous, he had not been on medication since February 1995, when it was discontinued at his request. I also noted that he had an assault on DOC employee DR in 1996, that early in his prison experience received several disciplinary reports for assault or fighting but now received mostly threats disciplinary reports. I noted there was a recent, alleged assault on a cellmate prior to his transfer to NCI. Thus, it was my opinion based upon my review of his chart that Mr. Morgan probably had a character pathology of antisocial personality disorder but his behavior was, for the most part, under control.

13. On April 15, 2001, I believe that I again reviewed Mr. Morgan's health services record, specifically focusing on his history of suicide attempts. I noted that according to his file, he had two brief hunger strikes in 1996 and 1 incident of suicidal ideation in May 1996 after he received a disciplinary report but later denied feeling suicidal. I noted that at present he seemed primarily an anti-social personality with borderline traits who got paranoid when stressed. I completed his treatment plan which primarily provided that mental health staff would monitor Mr. Morgan during daily rounds and would see him one to one when the need arises. A treatment plan for an inmate with mental health needs was and is also standard procedure at Northern. The provision of mental health services at Northern is professional and complex and involves far more than cell door visits.

14. I went to Mr. Morgan's cell on April 8, 2001 where I observed him playing cards with his cellmate, good personal grooming and a neat and orderly cell. I also observed that he spoke easily and coherently with intact thought pattern. Mr. Morgan denied any current distress, did not appear anxious or depressed.

15. If Mr. Morgan had ever looked distressed, if his speech pattern changed significantly, if his speech was incoherent, if his thoughts were not connected or otherwise disturbed, if he was tearful, unkempt, dirty, if his otherwise neat and orderly cell suddenly became disorganized, I would not have hesitated to have seen Mr. Morgan one-on-one as soon as possible.

16. On April 16, 2001, I went to Mr. Morgan's cell after receiving an emergency mental health request initiated by him. Upon approaching his cell, I heard Mr. Morgan in a congenial dialogue with other inmates. Upon arriving at his cell, Mr. Morgan was friendly, polite and complimentary. I noted he had a calm mood with a relaxed affect. Mr. Morgan told me he wanted mental health staff to arrange for him to get a single cell, that he had increased stress due to the outside pending charges for sexual assault. Mr. Morgan tried several themes as to why he needed a single cell, stating he needed to be alone to sort things out, that he had a history of psychiatric issues, and made vague threats of self harm. I noted that Mr. Morgan was not in any distress, was not psychotic, did not appear suspicious or paranoid. It was my opinion that Mr. Morgan was stable and merely attempting in an antisocial way to manipulate changes to his environment. I told Mr. Morgan to speak with his unit manager to arrange a cell change move.

17. On May 14, 2001, I went to Mr. Morgan's cell to see how he was doing. I noted that he was calm, stable, conversational, and was getting along with his new cellmate. I also noted that his personal grooming was good, his cell was neat and orderly. I noted that Mr. Morgan was not psychotic, no paranoia was evident, and he appeared stable.

18. On June 29, 2001, I stopped at Mr. Morgan's cell door during rounds to assess his current mental state. I noted that he was calm, had a stable affect, and a pleasant demeanor. Mr. Morgan stated that he wanted intensive mental health therapy and medication. When asked why, he stated only that he had a serious mental health history. I noted that Mr. Morgan did not have a cell mate, appeared stable, there were no signs or symptoms of psychosis, and no overt paranoia. His facial expression appropriately reflected his mood and was appropriate with his circumstances. I indicated that I would continue with Mr. Morgan's treatment plan and would monitor, and follow up as needed.

19. On July 13, 2001, I saw Mr. Morgan again. I noted that his personal hygiene was good and his cell was neat and orderly. I observed that he had no cell mate, that his mood was calm and he had full affect. Mr. Morgan asked to see Dr. Hensley but could not give me a reason. I indicated that I would discuss this with Dr. Hensley.

20. On August 14, 2001, I stopped at Mr. Morgan's cell. I noted that he had a new cellmate with whom he appeared to get along. I also noted that he had not received a disciplinary report for approximately 3 months. I observed that

his mood was calm and he had a relaxed affect. Mr. Morgan was pleasant and conversational, and did not verbalize any mental health issues.

21. On August 16, 2001, I discussed Mr. Morgan with Dr. Hensley and advised him about my observations of Mr. Morgan which are set forth above. Dr. Hensley did not believe he needed to see Mr. Morgan.

22. On September 15, 2001, I saw Mr. Morgan at his cell door and noted that he was pleasant and engaging with animated affect. Mr. Morgan requested medication to sleep but did not appear tired. I indicated that he would monitor his request for sleep medication further.

23. On September 26, 2001, I saw Mr. Morgan in the medical examining room with the psychiatrist, Dr. Hensley. Mr. Morgan demanded that I leave the room and then called Dr. Hensley "master" in a sarcastic tone. Dr. Hensley terminated the session shortly after Mr. Morgan called him a racist.

24. On September 28, 2001, I saw Mr. Morgan at his cell door. He told me that he filed a lawsuit against mental health staff a few months ago and that he named most mental health staff in it alleging that the staff won't treat him at NCI. I noted that Mr. Morgan was in no distress, his thought order was intact and goal directed. I also noted that he was not suspicious acting.

25. On November 8, 2001, I saw Morgan during one of my regular mental health tours. I noted that Mr. Morgan had good personal hygiene in a neatly ordered cell with a significant amount of personal property. I noted that Mr. Morgan was calm and relaxed with a smiling affect. Mr. Morgan told me he was okay and he appeared stable.

26. On May 4, 2003 a custody supervisor and I went to Mr. Morgan's cell to relay his family's message that his father had died. We offered to facilitate a telephone call to Mr. Morgan's sister and brother in law. I noted that Mr.


Morgan had some shock, some tears but was grieving within normal range. I noted that I would monitor and follow up as needed.

Thomas R. Lateer

Tom Lateer

Subscribed to and sworn to before me this 17th day of ~~July~~ August 2005

M R Suse

~~Commissioner of Superior Court~~
/Notary Public

MARK R. SUSE
NOTARY PUBLIC
MY COMMISSION EXPIRES 03/31/2007