**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

LLOYD GEORGE MORGAN, JR.　　　　　:　　PRISONER
　　　　　　　　　　　　　　　　　　　　　3:01cv1107(CFD)
　　　　　　v.　　　　　　　　　　　　:

GOVERNOR JOHN G. ROWLAND, ET AL.　　:　　AUGUST 19, 2005

## LOCAL RULE 56(a)(1) STATEMENT OF UNDISPUTED FACTS

1.　　The plaintiff has been in and out of the custody of the Department of Correction (hereinafter "DOC") for many years.  **Ex. A DOC RT 60 Screen.**　The plaintiff first entered prison in 1983 and began increasingly longer periods of incarceration thereafter.  **Ex. A.**

2.　　In the year 2000, the plaintiff began serving a twenty year sentence with a release date of January 4, 2020.  **Exs. A; B Administrative Segregation package.**　Since 1999, Morgan has continuously been in the custody of the Connecticut Commissioner of Correction.  **Ex. A.**

3.　　In 1996, the plaintiff was transferred to what was then the special management unit at the Walker facility, and was subsequently transferred to Northern Correctional Institution (hereinafter "Northern"), where he resided from August 1996 until October 1997.  **Ex. A.**

4.　　In October of 1997, the plaintiff was discharged until April of 1999, at which time he was placed in together with the general inmate population.  **Ex. A.**

5.　　To say that the plaintiff has been a management problem for DOC officials would be an understatement.  The plaintiff has received 60 Disciplinary Reports during his incarceration.  **Exs. C, RT 67; A; G Shea Affidavit.**

6.　　The plaintiff's disciplinary history includes being found guilty by the Department of Correction of Assault on a DOC employee preceding his initial placement at Northern, six charges of Assault, giving false information, and fighting, among others.  **Exs. C; G.**

7.      On March 30, 2001, inmate Morgan assaulted his cellmate at the facility then known as MacDougall Correctional Institution.  **Exs. B p. 3; G.**  He threw hot water and baby oil onto the victim's face, cut his face with a razor and struck him in the head with an electrical adaptor swung inside a sock.  **Exs. G; B p. 3.**

8.      Outside charges were brought by the victim.  **Exs. B p. 3; G.**  Based on this behavior, the plaintiff was once again returned to Northern on March 30, 2001.  **Ex. B.**

9.      Eleven days after his placement in Phase I of the Administrative Segregation program at Northern, the plaintiff received a Disciplinary Report for Threats.  **Exs. C**, **RT 67; G.**

10.      In the incident leading to this Disciplinary Report on April 10, 2001, the plaintiff stated several times to a Correctional Officer, "I have AIDS and I'm going to bite you and spit in your face."  **Exs. D, portions of inmate master file; G.**  A month later, the plaintiff received another Disciplinary Report for Interfering with Safety and Security.  **Exs. C; G**.

11.      The following December, the plaintiff was convicted of another infraction, security tampering, and the following month he was convicted of Threats for telling an officer "I know someone who will meet you in the parking lot and she'll break your f***ing face   test me!".  **Exs. C; D; G.**   Inmate Morgan continued to receive Disciplinary Reports through 2002. **Exs. C; G**.

12.      The combination of all of these repeated disciplinary problems resulted in the plaintiff's continued confinement in Phase I of the Administrative Segregation program at Northern from March 30, 2001 until April 18, 2003.   **Exs. G; H, housing cards.**

13.      While the plaintiff claims he remained in Phase I through November 7, 2003, his housing card indicates that he was release to Phase II on April 18, 2003. **Exs. G; H.**

14.     Northern was at the time in question and is now the designated restrictive housing facility for the Connecticut Department of Correction, managing those inmates who have demonstrated a serious inability to adjust to confinement in prison and pose a serious threat to the safety and security of a correctional facility.  **Exs. D Northern website description; G.**

15.     Placement in the Administrative Segregation Program at Northern both in 1999 and since then comes after a hearing, and the decision of the Hearing Officer may be appealed. **Exs. E, Administrative Segregation description; G.**

16.     Since 1999, the Administrative Segregation Program has consisted of a three phase program.  **Exs. E AS description; G.**  The Administrative Segregation Program "operates on the basic assumption that inmates who engage in aggressive, violent, disruptive behavior, or who pose an imminent risk … require a highly structured and secure environment."  **Exs. E; F; G**.

17.     In Phase I, which at the time lasted for at least six months if an inmate was discipline free, or longer if not, inmates are allowed very little time out of their cells.  **Exs. E; F; G**.

18.     Meals are eaten in the cells; inmates are restricted to three showers and five hours of recreation per week.  **Exs. E; F; G**.  Phase I inmates are precluded from any work assignments. **Exs. E; F; G**.

19.     While he was housed in Phase I of the Administrative Segregation program at Northern, the plaintiff was housed in Units One West and One East.  **Exs. G; H.**  While in Phase I, the plaintiff shared a cell with another inmate.  **Ex. G.**

20.     The size of the double cell that the plaintiff shared while in Phase I was approximately 8 by 10 feet, containing nearly 80 square feet.   **Ex. G.**  The cell contained two narrow beds one over the other, and a toilet.  **Ex. G.**

21.     Recreation in Phase I was and is provided for one hour per day five days per week, but is entirely voluntary.  **Ex. G.**

22.     It was the policy at Northern up until April of 2003 that inmates in Phase I of the Administrative Segregation program, no matter the length of time they had been in Phase I, were required to participate recreation in full restraints for the entire duration of their stay in Phase I. **Ex. G.**

23.     This is still the policy for inmates who have initially been placed in Phase I of the Administrative Segregation program at Northern, although the policy has been changed so that the rule regarding recreating in restraints *may* be relaxed after 30 days under certain conditions. **Ex. G.**

24.     For his one hour of recreation five days per week, a Phase I inmate is escorted in full restraints into an outdoor recreation area surrounded by a chain link fence.  **Ex. G.**  The inmate remained in full restraints for the duration of the hour, and then was escorted back to his cell.  **Ex. G.**

25.     The inmate is free to walk and move about the recreation area in the fresh air, and inmates recreating in this manner usually spend most of the time walking around.  **Ex. G.**  The recreation yard is approximately 20 by 20 feet.  **Ex. G.**

26.     Full restraints within the Connecticut Department of Correction includes handcuffs behind the back, leg irons, and a tether chain from the leg irons to the handcuffs.  **Ex. G.**

27.     While the restricted conditions of recreation for a Phase I Administrative Segregation inmate are a far cry from the basketball, television, volleyball and other indoor and outdoor recreational activities available to Connecticut's general population inmates at the time and currently, these measures were considered necessary due to the security threat posed by Phase I inmates given their behavior resulting in placement in Phase I.  **Ex. G.**

28.     Inmates who have shown a propensity for violence against correctional staff or other inmates within a correctional setting have been can be ingenious in their destructiveness.  **Ex. G.**

29.     They can hold trap doors open while unrestrained, they can swing handcuffs around after the first one is applied to one hand, and they refuse to re-cuff, among other things, all of which can disrupt the daily routine of a facility.  **Ex. G.**

30.     Thus, the defendants do not dispute that during the time period in question, inmates in Phase I of the Administrative Segregation were required to recreate in restraints for reasons of safety and security.  **Ex. G.**

31.     Inmates in Phase I Administrative Segregation both now and during the time in question are not, however, restrained during the time that they spend inside their cell.  **Ex. G.**

32.     The cells at Northern are large enough to accommodate calisthenics such as sit-ups, push-ups, jumping and running in place.  **Ex.G.**

33.     The cells at Northern are large enough to accommodate calisthenics such as sit-ups, push-ups, jumping and running in place.  **Ex.G.**

34.     The policy of recreating Phase I Administrative Segregation inmates at Northern in restraints while they could do more intensive calisthenics in their cell accommodated both the inmates' needs for fresh air, walking, and time out of their cell while allowing the inmates' needs

for more vigorous exercise, if they chose to engage in it, to be accomplished within the confines of their cell. **Ex. G.**

35. The plaintiff alleges that he fell in the recreation unit on May 4, 2001, two months after he vigorously assaulted his cellmate with a razor and an adaptor in a sock, causing the cellmate serious damage. **Ex. B.**.

36. Staff at Northern have searched the Incident Reports on file for the months of April and May 2001 and found no incident report related to the plaintiff's claims of an injury in the recreation yard. **Ex. G.**

37. There is a Medical Incident Report and a nurse's note for the plaintiff for that date completed by Nurse Hill in the medical unit. **Ex. J, Health Records, p. 1163; Ex. K Hill Aff.** The Medical Incident Report has a version of events that differs from the plaintiff's allegations in his complaint. **Ex. J 1163.**

38. The incident report does not indicate that the plaintiff fell, but rather states, "Reports feeling light-headed—had to sit down bumped head hurt R [right] shoulder and R knee. Hx [history] NIDDM [non-insulin dependent diabetes] Hx [history] HTN [hypertension]—I/M [inmate] out a REC yard." **Exs. J 1163; K, Nurse Hill Affidavit.**

39. He also claims he slid down the wall and hurt the right side of his body trying to get up. **Exs. J 1162; K.**

40. While the diagnosis on the Medical Incident Report states, "High Risk for Injury" this diagnosis was made *after* the plaintiff presented with a bump on his head and as a non-insulin dependent diabetic, and in no way meant that custodial staff or anyone else within the Department should have prevented the plaintiff from injuring himself or attending recreation. **Ex. J 1163; K.**

41.     This was Nurse Hill's professional nursing diagnosis and it meant that the plaintiff's blood pressure was elevated and that his blood sugar should be checked.  **Ex. K.**

42.     The phrase "high risk for injury" did not mean anything about the fact that plaintiff now claims to have fallen in the recreation yard.  **Ex. K.**

43.     Nurse Hills's medical plan based on the diagnosis was for the plaintiff to be assessed by A.P.R.N. for front-cuff status to address the plaintiff's claims that he should be cuffed in front.  **Exs. K; 1162.**

44.     Nurse Hills's medical plan based on the diagnosis was for the plaintiff to be assessed by A.P.R.N. for front-cuff status to address the plaintiff's claims that he should be cuffed in front.  **Exs. K; 1162.**

45.     There is no indication whatsoever that any of the named defendants or any correctional staff at all had any notice that the plaintiff was at high risk for injury prior to his fall. Indeed, as noted above, recreation is voluntary, and the plaintiff could have stated without any repercussions that he did not wish to participate in recreation that day if he were feeling ill.  **Ex. G.**

46.     There is no indication in the Medical Incident Report that the plaintiff complained that his handcuffs were too tight and that he was sitting down in the recreation yard in an effort to ease pressure on his wrists.  **Ex. J 1163.**

47.     Had the plaintiff complained of soreness to his wrists, Nurse Hill would have indicated that in the Medical Incident Report. **Ex. K.**

48.     There is no indication that the plaintiff complained of pain or pressure or anything having to do his wrists.  **Ex. J 1163; K.**  The plaintiff received ice and was told that he would have to sign-up for sick call for any further treatment.  **Ex. J 1163; K.**

49.     Nurse Hill tested the plaintiff's blood sugar and at this time it was within normal limits. **Ex. J 1163; K.**

50.     At this time, Nurse Hill, the nurse on duty, indicated that the plaintiff would be followed up through a doctor or APRN visit as the plaintiff was at this point indicating that he thought he should be hand-cuffed in the front for his recreation periods. **Ex. J 1216; K.**

51.     Four days later the plaintiff claimed to have a dizzy episode requiring an Emergency Sick Call visit again with Nurse Hill. **Ex. J 1161; K.** Nurse Hill noted at this time that the plaintiff had "No S/S [signs or symptoms] of hypoglycemia [low blood sugar]." **Ex. J 1161; K.**

52.     The nurse on duty further noted that the patient would not allow a "FS" [full screening secondary] to an officer in the screening room and that the plaintiff was "insisting on discussing other medical issues at this time." **Ex. J 1161; K.**

53.     Nurse Hill instructed the plaintiff that "E.S.C. [emergency sick call] was for emergent reasons only." **Ex. J 1161; K.**

54.     The nurse did not refuse the plaintiff all one-to-one interface with medical staff, but rather, noted that the plan discussed with the inmate was "I/M [inmate] to use regular RN sick call procedure for nurse/pt [patient] 1:1 consult R/T [related to] health issues/concerns." **Ex. J 1161; K.**

55.     On this date the plaintiff refused to have his blood sugar monitored. **Ex. J 1161; K.**

56.     On May 8, 2004, the plaintiff also claimed he had chest pains, but I reviewed his history and it was clear the plaintiff had recently had a normal E.K.G. and reported that his chest pains stopped when medical staff was present. **Ex. J 1162; K.**

57. About a month later, the plaintiff was seen in the medical unit by Dr. Germain Bianchi and his request for hand-cuffing in the front was considered. **Exs. J 1156; I Dr. Blanchette Affidavit.**

58. On June 14, 2001, Dr. Bianchi noted that the plaintiff's reported symptom was that he "fell down last month … since then pain R shoulder and R knee." **Exs. J 1156; I.**

59. **.** Dr. Bianchi then stated, "*Mr. Morgan has <u>no obvious interest</u> in diagnostic work-up or treatment for these injuries.  He only requests special permission to be handcuffed in front instead of in back at recreation.*" **Exs. J 1156 (underline by doctor); I.**

60. Dr. Bianchi also noted, "He also states he has back pain on + off.  He has no interest in workup but only requests 'proper mattress'". **Exs. J 1153; I.**

61. As for the plaintiff's reported shoulder pain, the doctor noted that the "pt [patient] appears comfortable c/ [with] palpated shoulder." **Exs. J 1153; I.**

62. As for the right knee, the doctor again noted the plaintiff to be overstating his condition, stating, "<u>No</u> swelling full ROM full extension full flexion no obvious pathology." **Exs. J 1153; I.**

63. The doctor's diagnosis of all of plaintiff's complaints on June 14, 2001 was a common and unrelated diagnosis supported by an objective x-ray, "mild degenerataive disease in low back." **Exs. J 1153; I.**

64. The doctor denied the plaintiff his request for a pass to wear handcuffs in the front. **Exs. J 1153; I.**

65. The medical records for the time period in question show that the plaintiff was seen in the medical unit nearly weekly, all without any adverse consequences to his health from recreating in restraints or otherwise. **Ex. K.**

66.     When Nurse Hill toured the units at Northern, she noted several times that the plaintiff was often eating junk food containing high fat and high sugar content purchased at commissary. **Ex. K.** She would verbally instruct him to stop eating such foods. **Ex. K.**

67.     The plaintiff behavior was non-compliant with regard to controlling his health issues, and his blood sugar extremely high on several occasions in 1999, before his admission to Northern in March of 2000. **Exs. J 1123; K.**

68.     The plaintiff behavior was non-compliant with regard to controlling his health issues, and his blood sugar extremely high on several occasions in 1999, before his admission to Northern in March of 2000. **Exs. J 1123; K.**

69.     Dr. Pawlowski further noted that the plaintiff exhibited no overt psychotic behavior. **Exs. J 1180; I.**

70.     He further noted that the plaintiff made no request for psychotropic medication and had no apparent need for it. **Exs. J 1180; I.** Dr. Hensley concluded that the plaintiff was antisocial and manipulative. **Exs. J 1180; I.**

71.     The plaintiff alleges in his complaint that the fact that he needed to recreate in restraints at Northern "exacerbated" his numerous health problems, including his obesity, high blood pressure, diabetes and other problems. There is no objective information contained in the plaintiff's health record, however, to support this claim. **Ex. I.**

72.     To the contrary, medical records indicate that the plaintiff lost 16 pounds between March of 2002 and April of 2002, during the time period in question. **Ex. J 362.**

73.     The plaintiff has a long history of chronic obesity which did not get worse during the time he was at Northern in Phase I of Administrative Segregation. For example, on January 7, 2000, over a year before entering Northern, the plaintiff's weight was 230 pounds. **Ex. J 941.**

74.    One month later, the plaintiff was the same weight he was at Northern, 247 pounds.  **Ex. J 940.**

75.    The plaintiff had previously complained of an injury to his right shoulder in October of 1999.  **Ex. J 954, 946.**  The plaintiff claimed that his cuffs were too tight, and that he injured his right shoulder when his shoulder hit a steel door in a truck.  **Ex. J 954, 946.**

76.    At this point, plaintiff claimed, "The sheriffs put the cuffs on too tight and I hurt my shoulder in the van on the way."  **Ex. J 954, 946.**

77.    The plaintiff did not mention this previous injury when he arrived at Northern and claimed to be hurt in the recreation yard in an incident no one witnessed.  **Exs J; K.**

78.    Moreover, there is sufficient room in an 8 by 10 foot double cell with narrow beds over each other to perform exercises or calisthenics such as jumping, running in place, push-ups or sit-ups.  **Ex. I.**

79.    In addition to in-cell exercise, the plaintiff was allowed to walk about, albeit in leg-irons, for 5 hours per week.  **Ex. G.**

80.    Despite the plaintiff's allegations, the provision of mental health services at Northern is professional and complex and involves far more than cell door visits.  **Exs. N; L; M.**

81.    All inmates admitted to Northern were at the time in question are screened and evaluated by mental health staff within 24 hours. **Exs. L; M; N.**

82.    For those inmates in need of mental health services, a treatment plan is and was at the time promptly developed and put into place.  **Exs. L; M; N.**

83.    When necessary as part of a treatment plan or for an acute need, one-on-one visits with a mental health professional are provided.  **Exs. L; M; N.**

84.     Inmates arriving at Northern were and are routinely oriented to Northern's mental health services upon admission to Northern.  **Ex. N.**

85.     Inmates were and are advised that if they need mental health services they are to write a request to the mental health staff and they would be scheduled to be seen based upon the nature of their request.  **Ex. N.**

86.     Inmates are also advised that if they had any thoughts of self harm or a reaction to medication, they should immediately advise staff that they had a mental health emergency.  **Ex. N.**

87.     In addition, the Northern Correctional Institution Inmate Handbook in effect at the time explained Northern's system for the provision of mental health care, noting that one-on-one counseling was available and noting how inmates could access mental health services.  **Ex. O, Portions of Inmate Handbook.**

88.     Typically, in institutional settings, psychiatrists such as the defendant Dr. Hensley see patients when medication needs to be prescribed.  **Ex. M.**

89.     A psychiatrist typically monitors a patient's condition through the case manager's and psychologist's notes and discussions as well as through the psychiatrist's own physical observations during tours.  **Ex. M.**

90.     Clinicians at Northern, such as psychologists and Psychiatric Social Workers, frequently refer inmates to the Supervising Psychiatrist, Dr. Hensley, even when the patient does not have any active psychiatric issues.  **Ex. M.**

91.     These clinicians, such as the defendants Dr. Chaplin and Mr. Lateer, err on the side of referring inmates to the Supervising Psychiatrist even if the inmate may not need his help.  **Ex. M.**

92.    All the units in NCI were toured once a day and then later during the time period in question and currently are toured twice a day either by a mental health social worker, nurse clinician, psychiatric nurse, or psychologist.  **Exs. L; M; N.**

93.    In addition, the inmates at Northern on medication for mental health reasons are seen monthly.  **Exs. L; M; N.**

94.    The purpose of the tour is to determine if there are any acute mental health needs not otherwise being addressed.  **Exs. L; M; N.**

95.    During the time period in question, Northern had several social workers on staff, who regularly addressed the mental health needs of inmates.  **Ex. L.**

96.    When such as a psychologist or a mental health professional acting as a clinician refer an inmate to the Supervising Psychiatrist, Dr. Hensley, he first reviews the inmate's health services record.  **Ex. M.**

97.    He then discusses the inmate with the inmate's case manager who is most times a psychiatric social worker.  **Ex. M.**  Then the Supervising Psychiatrist, Dr. Hensley, has the inmate brought to the medical unit for a visit.  **Ex. M.**

98.    Dr. Hensley does a visual assessment as the inmate is being brought in the unit to see if the inmate looks despondent.  **Ex. M.**

99.    Dr. Hensley checks to see if the inmate's hygiene is appropriate, if his eye contact is good, and whether his speech is coherent.  **Ex. M.**   Dr. Hensley then speaks with the inmate with his case manager present, as happened with the plaintiff in this case, as set forth below.  **Ex. M.**

100.    As of 2001, Dr. Hensley had worked with Psychiatric Social Worker Tom Lateer for approximately 3 years.  **Ex. M.**  Psychiatric Social Worker Tom Lateer worked directly with inmate Morgan during the time in question.  **Ex. N.**

101.    It is and was Dr. Hensley's opinion that Mr. Lateer has a superior ability in assessing patients.  **Ex. M.**

102.    When the defendants Dr. Chaplin and Psychiatric Social Worker Lateer toured the housing units at Northern during the time in question, if an inmate came to his door and stated that he needed to speak with them, they would do a visual assessment to see if the inmate was crying or otherwise looked despondent.  **Exs. L; N.**

103.    They would check to see if the inmate's hygiene was appropriate, if his eye contact was good, and whether his speech was coherent.  **Exs. L; N.**  If all of these looked appropriate, they would ask the inmate, generally, why he needed to speak to them.  **Exs. L; N.**

104.    If the inmate indicated he did not want to say what his issue was on the tier, defendants Dr. Chaplin or Mr. Lateer would tell the inmate he could either slip them a note through the door or send them an inmate request.  **Exs.  L; N.**

104.    During their tours they would also look at the overall condition of an inmate's cell to see if he was using personal property such as magazines, paper and pens, a chess set, a walkman, or anything indicating that his mind was active.  **Exs. L; N.**

105.    During their tours they would also look at the overall condition of an inmate's cell to see if he was using personal property such as magazines, paper and pens, a chess set, a walkman, or anything indicating that his mind was active.  **Exs. L; N.**

106.    If an inmate's cell was completely disordered, they would be concerned that the inmate could possibly be in psychiatric distress and would take appropriate action.  **Exs. L; N.**

14

107.     They would monitor such an inmate closely, checking on the inmate daily and attempting to speak with him.  **Exs. L; N.**

108.     If an inmate's cell suddenly appeared disordered or remained disordered, they would in all likelihood arrange quickly for a one on one meeting with the inmate out of his cell. **Exs. L; N.**

109.     Lateer and Chaplin did not immediately pull inmates out of their cells to discuss mental health issues every time they approached their cell doors during their tours.  **Exs. L; N.**

110.     If Lateer or Chaplin did this it would have been an extremely poor use of limited psychology time and could have even have endangered other inmate lives.  **Exs. L; N.**

111.     As importantly, they would have been unable to complete their tour of the entire facility and would have been hampered in their ability to check in on other inmates who may have been having a mental health crisis or issue.  **Exs. L; N.**

112.     In addition, many times when inmates refused to tell Dr. Chaplin or Mr. Lateer why they needed to speak with me, either generally, or in writing, and looked fine, the inmate would often use the individual time to complain about institutional issues such as showers, commissary, visiting, disciplinary reports, or other issues more appropriately addressed to the custody staff. **Exs. L; N.**

113.     This would take time away from other inmates who had mental health concerns or issues that needed their help. **Exs. L; N.**

114.     In addition, periodically, Dr. Chaplin and Psychiatric Social Worker Lateer would both stop in front of each inmate's cell and ask them how they were doing.  **Exs. L; N.**  Most of the time, an inmate would indicate that he was fine.  **Exs. L; N.**

15

115.    Chaplin and Lateer would attempt to engage the inmate in general conversation that had nothing to do with their mental health issues to evaluate whether they were delusional, psychotic or depressed.  **Exs. L; N.**

116.    If the inmate refused to converse when approached in this way, Chaplin and Lateer would monitor the inmate's dealings with other staff or other inmates.   **Exs. L; N.**

117.    If, either in a conversation with Chaplin, Lateer, staff, or another inmate, an inmate was unable to maintain eye contact, carry on a conversation and/or stated things that did not make sense were inappropriate, Chaplin and/or Lateer would pull the inmate out of his cell for a more in depth evaluation.  **Exs. L; N.**

118.    In the professional opinions of Dr. Chaplin and Mr. Lateer, there is no reason to pull an inmate out of his cell when his affect is good, he has good eye contact, and is in no distress.  **Exs. L; N.**

119.    Mr. Morgan was seen on the day of his arrival at Northern, on March 30, 2001 by a psychiatric social worker who developed a mental health treatment plan for him within two weeks of his arrival.  **Exs. L; M; N.**

120.    Based on his history and current care and medication status, it was determined that the mental health treatment plan for the plaintiff need not include regularly scheduled one-on-one counseling sessions, but that the plaintiff would be regularly monitored by mental health staff within the facility through tours and cell door visits and seen on an "as needed" basis.  **Exs. L; M; N.**

121.    Mr. Morgan exhibited that he understood the procedure explained to all inmates for seeking mental health care.  **Exs. L; M; N.  O**n January 29, 2003, Mr. Morgan sent Dr.

Chaplin an inmate request form stating that he needed a single cell and transfer to Garner.  **Ex. L.**

122.    In accordance with their general practice of checking in with inmates, both Dr. Chaplin and Psychiatric Social Worker Lateer stopped in front of Mr. Morgan's cell regularly to see how he was doing.  **Exs. L; N.**

123.    They observed Mr. Morgan in his cell and had general discussions with him in front of his cell.  **Exs. L; N.**

124.    If Mr. Morgan had ever looked distressed, if his speech pattern changed significantly, if his speech was incoherent, if his thoughts were not connected or otherwise disturbed, if he was tearful, unkempt, dirty, or if his otherwise neat and orderly cell suddenly became disorganized, both Dr. Chaplin and Psychiatric Social Worker Lateer would not have hesitated to have seen Mr. Morgan one-on-one  or made sure someone saw him one on one as soon as possible.  **Exs. L; N.**

125.    On July 26, 2001, Dr. Chaplin evaluated Mr. Morgan and noted that his hygiene was okay, his mood was normal, his affect was appropriate, his speech was normal, his attention and concentration was normal, his memory was grossly intact, his thought processes were normal, he had no hallucinations, no obsessions, no compulsions, no phobias, had no suicidal ideation, no homicidal ideation, and was not currently on psychiatric medication.  **Ex. L.**

126.    Dr. Chaplin also noted that Mr. Morgan looked fine and stated that he was okay.  **Ex. L.**

127.    On August 17, 2001, Dr. Chaplin saw Mr. Morgan who asked to be evaluated  by Dr. Hensley, but Morgan reported no change in his symptoms.  **Ex. L.**  Mr. Morgan did not look depressed and denied suicidal ideation strongly and credibly.  **Ex. L.**

128.    In addition, Dr. Chaplin noted that Mr. Morgan was not psychotic, not paranoid and his cognitive function was within acceptable limits.  **Ex. L.**

129.    On August 31, 2001, Dr. Chaplin evaluated Mr. Morgan and noted that his hygiene was okay, his mood was normal, his affect was appropriate, his speech was normal, his attention and concentration were normal, his memory was grossly intact, his thought processes were normal, he had no hallucinations, no obsessions, no compulsions, no phobias, had no suicidal ideation, no homicidal ideation, and was not currently on psychiatric medication.  **Ex. L.**  Dr. Chaplin noted that Mr. Morgan was doing well at Northern.  **Ex. L.**

130.    On September 6, 2001, Psychiatric Social Worker Kevin Power saw Mr. Morgan with Nurse Badura.  **Ex. L.**.  Mr. Morgan stated that they put another inmate in his cell who he tried to help but now the inmate said Morgan was trying to rape him.  **Ex. L**.

131.    Mr. Morgan stated that he loved the inmate like a friend but now the inmate was saying he tried to rape him.  **Ex. L.**  Mr. Power noted that Mr. Morgan had situational anxiety but denied any suicidal intent or planning.  **Ex. L.**

132.    Mr. Morgan agreed to call mental health and allow their intervention if he felt unsafe at any time.  **Ex. L.**

133.    On September 24, 2001, Dr. Chaplin evaluated Mr. Morgan and noted that his hygiene was okay, his mood was normal, his affect was appropriate, his speech was normal, his attention and concentration were normal, his memory was grossly intact, his thought processes were normal, he had no hallucinations, no obsessions, no compulsions, no phobias, had no suicidal ideation, no homicidal ideation, and was not currently on psychiatric medication.  **Ex. L.**

134.    Dr. Chaplin noted that overall Mr. Morgan seemed fine, was not depressed and not psychotic. **Ex. L.** Dr. Chaplin also reported that Mr. Morgan had multiple custody complaints as usual. **Ex. L.**

135.    On December 3, 2001, Dr. Chaplin received a call from Mr. Morgan's unit manager that he was threatening to commit suicide unless he received a different *single* cell. **Ex. L.** The plaintiff was on a three person tier and apparently did not like this. **Ex. L.** Dr. Chaplin noted that fortunately the issue was resolved when Mr. Morgan agreed to go back to his cell and denied being suicidal. **Ex. L.**

136.    On December 7, 2001, psychiatric nurse clinician Irene Woolven received a call that Mr. Morgan wanted mental health treatment. **Ex. L.** Ms. Woolven went to Mr. Morgan's cell where he reported that he was considering self harm and could not speak where others could hear him. **Ex. L.**

137.    Ms. Woolven then met one on one with Mr. Morgan in a medical screening room where he indicated he was depressed because the other inmates and the correctional officers hated him because they believed he was a sexual predator. **Ex. L.**

138.    Mr. Morgan also indicated he was worried how his family would react if the rape charges went to court. **Ex. L.** Mr. Morgan told Ms. Woolven he just needed to vent and denied suicidal and homicidal ideations. **Ex. L.**

139.    On December 12, 2001, Psychiatric Social Worker Kevin Power was advised that Mr. Morgan wanted to see mental health staff. **Ex. L.**

140.    When Power arrived at Mr. Morgan's cell, Mr. Morgan began complaining that he needed more sheets, that custody was depriving him of his constitutional rights, that he

wanted mental health to document this in his chart, and he wanted Mr. Power to provide him with the names of custody staff in his housing unit so he could add them to his lawsuit. **Ex. L.**

141.    Mr. Power noted that Mr. Morgan was calm and well organized, with no signs of distress. **Ex. L.** After Mr. Power explained to Mr. Morgan that if he had such concerns, he should speak with custody supervisors, Mr. Morgan became very hostile and verbally abusive stating, "Fuck you mother fucker. I'm going to fuck you too! I 'm going to sue your fucking ass off, mother fucker. Fuck you. Get the fuck out of here, mother fucker!" **Ex. L.**

142.    Mr. Morgan's concerns were clearly institutionally/litigation related, not ones that required mental health intervention. **Ex. L.** Mr. Power noted that Mr. Morgan's actions were consistent with antisocial traits and that there was no evidence of psychiatric disturbance. **Ex. L.**

143.    It was very clear that Mr. Morgan misused the mental health referral system in a manipulative, anti-social fashion for litigious reasons. **Ex. L.**

144.    On December 26, 2002, Dr. Chaplin evaluated Mr. Morgan and noted that his hygiene was okay, his mood was normal, his affect was appropriate, his speech was normal, his attention and concentration were normal, his memory was grossly intact, his thought processes were normal, he had no hallucinations, no obsessions, no compulsions, no phobias, had no suicidal ideation, no homicidal ideation, and was not currently on psychiatric medication. **Ex. L.**

145.    Dr. Chaplin noted that Mr. Morgan was polite and reading when seen. **Ex. L.** Dr. Chaplin further noted that he continued to present as guarded but was not overtly psychotic or depressed. **Ex. L.**

146.    Mr. Morgan also told Dr. Chaplin he keeps active with his Court work. **Ex. L.** It was Dr. Chaplin's opinion that Mr. Morgan was doing well at NCI. **Ex. L.**. Dr. Chaplin also

reported that Mr. Morgan had not asked much of mental health staff at Northern and did not need much from the mental health staff at that time.  **Ex. L.**

147.    On February 1, 2002, Dr. Chaplin evaluated Mr. Morgan and noted that his hygiene was okay, his mood was normal, his affect was appropriate, his speech was normal, his attention and concentration were normal, his memory was grossly intact, his thought processes were normal, he had no hallucinations, no obsessions, no compulsions, no phobias, had no suicidal ideation, no homicidal ideation, and was not currently on psychiatric medication.  **Ex. L.**  Dr. Chaplin further noted that Mr. Morgan looked fine and stated that he was okay.  **Ex. L.**

148.    On April 25, 2002, Dr. Chaplin evaluated Mr. Morgan and noted that his hygiene was okay, his mood was normal, his affect was appropriate, his speech was normal, his attention and concentration were normal, his memory was grossly intact, his thought processes were normal, he had no hallucinations, no obsessions, no compulsions, no phobias, had no suicidal ideation, no homicidal ideation, and was not currently on psychiatric medication.  **Ex. L.**  Dr. Chaplin also noted that he presented with no major mental disorder and was not in psychiatric distress.  **Ex. L.**

149.    On May 14, 2002, Dr. Chaplin saw Mr. Morgan after custodial staff asked Dr. Chaplin to see him.  **Ex. L.**  Mr. Morgan was named and identified as having a homosexual relationship with another inmate in a newspaper article.  **Ex. L.**

150.    Mr. Morgan told Dr. Chaplin he was okay but was embarrassed by the article. **Ex. L.** Mr. Morgan stated however the he was close to his family, would not do anything to hurt them and thus would not hurt himself.  **Ex. L.**

21

151.    Mr. Morgan did request a phone call to his family, which Dr. Chaplin passed on to the Unit Manager.  **Ex. L.**  Mr. Morgan seemed quite serious but there was no major mental disorder evident.  **Ex. L.**

152.    On June 24, 2002, Dr. Chaplin evaluated Mr. Morgan and noted that his hygiene was okay, his mood was normal, his affect was appropriate, his speech was normal, his attention and concentration were normal, his memory was grossly intact, his thought processes were normal, he had no hallucinations, no obsessions, no compulsions, no phobias, had no suicidal ideation, no homicidal ideation, and was not currently on psychiatric medication.  **Ex. L.**

153.    On July 1, 2002, Dr. Chaplin evaluated Mr. Morgan and noted that his hygiene was okay, his mood was normal, his affect was appropriate, his speech was normal, his attention and concentration were normal, his memory was grossly intact, his thought processes were normal, he had no hallucinations, no obsessions, no compulsions, no phobias, had no suicidal ideation, no homicidal ideation, and was not currently on psychiatric medication.  **Ex. L.**

154.    Dr. Chaplin also noted that Mr. Morgan stated he did not want medication as he felt he was doing fine at Northern.  **Ex. L.**  Dr. Chaplin wrote that Mr. Morgan adjusted well to Northern from a mental health perspective, that he was in no psychiatric distress and wanted no mental health services.  **Ex. L.**  Dr. Chaplin did note that the plaintiff came across as a bit suspicious but was not delusional and not psychotic.  **Ex. L.**

155.    On July 26, 2002, Dr. Chaplin evaluated Mr. Morgan and noted that his hygiene was okay, his mood was normal, his affect was appropriate, his speech was normal, his attention and concentration were normal, his memory was grossly intact, his thought processes were normal, he had no hallucinations, no obsessions, no compulsions, no phobias, had no suicidal ideation, no homicidal ideation, and was not currently on psychiatric medication.  **Ex. L.**

156.    Dr. Chaplin noted that Mr. Morgan was doing well at Northern, his mental state was stable and there were no major mental disorders evident.  **Ex. L.**

157.    On August 14, 2002, Mr. Morgan was admitted to the infirmary after he put a piece of white cloth around his neck in order to be removed from his cell.  **Ex. L.**  When the plaintiff was told that custody would use a chemical agent, Mr. Morgan removed the white cloth and cuffed up and was brought to the infirmary.  **Ex. L.**

158.    Mr. Morgan admitted that he did not intend to hurt himself, but wanted to change his environment.  **Ex. L.**  He contracted for his safety, meaning he promised not to hurt himself and was happy to be placed on in-cell restraint status to change his environment i.e., his current cell.  **Ex. L.**

159.    Mr. Morgan was seen in his cell the next day on August 15, 2002, was noted by mental health staff to be sleeping.  **Ex. L.**   Mental health staff also noted that he was eating his meals.   **Ex. L.**

160.    On October 2, 2002, Dr. Chaplin evaluated Mr. Morgan and noted that his hygiene was okay, his mood was normal, his affect was appropriate, his speech was normal, his attention and concentration were normal, his memory was grossly intact, his thought processes were normal, he had no hallucinations, no obsessions, no compulsions, no phobias, had no suicidal ideation, no homicidal ideation, was not currently on psychiatric medication and did not want any such medication.   **Ex. L.**

161.    Mr. Morgan did state that he wanted a written response to his request for a single cell, stating that he needed a written response for his lawsuit.       **Ex. L.**

162.    On October 3, 2002 Dr. Chaplin sent Mr. Morgan the attached memo stating that he did not qualify for a single cell for mental health reasons.  **Ex. L.**   Dr. Chaplin indicated that

fortunately the plaintiff's stable mental condition suggested that he would do well sharing a cell with another inmate.  **Ex. L.**

163.    During the time he was at Northern from 2001-2003,  Mr. Morgan's main concern and primary focus with mental health staff was getting a single cell for what he claimed to be mental health reasons.  **Ex. L.**  Dr. Chaplin noted that while the plaintiff was a bit suspicious, he had no evident major mental disorder that mandated that he be given a single cell.  **Ex. L.**

164.    On March 15, 2003, Mr. Morgan was seen outside of his cell by a psychiatric social worker, Mr. Power, and at that time he stated he felt he was going to have a nervous breakdown.  **Ex. L.**  Mr. Morgan stated he was afraid other inmates would hurt him because they thought he was a homosexual rapist.  **Ex. L.**

165.    Mr. Morgan thought that inmates would try to get housed with him so they could hurt him.  **Ex. L.**  Mr. Power reviewed with Mr. Morgan, the last person refused to be housed with Mr. Morgan because he stated Mr. Morgan was gay.  **Ex. L.**  The cellmate prior to that insisted on leaving the cell, stating that Mr. Morgan tried to rape him.  **Ex. L.**

166.    Mr. Morgan told Mr. Power that he qualified for a single cell because of threats against him but refused to provide any information, including the names of the inmates who threatened him.  **Ex. L.**

167.    Mr. Power noted that Mr. Morgan presented in a calm and rational manner, was well organized in his thoughts and well spoken at time.  **Ex. L.**  Finally, Mr. Power noted that Mr. Morgan refused to sign a release for his records from Whiting Forensic Institute stating that he wanted to check with his attorney first to see how that would affect him.   **Ex. L.**

168.    Dr. Chaplin administered a Personality Assessment Inventory ("PAI") on March 16, 2003. **Ex. L.**  Dr. Chaplin noted that the PAI results suggested that Mr. Morgan tended to

24

over-report and exaggerate psychiatric symptoms and the test results could be considered invalid. **Ex. L.**

169.    Dr. Chaplin noted that, notwithstanding this, the interpretation of the report suggested that Mr. Morgan had significant issues with suspiciousness, distrust, tension and failures in close relationships.  **Ex. L.**  Dr. Chaplin noted that he was not psychotic, not schizophrenic, not manic and was probably not significantly depressed.  **Ex. L.**

170.    Dr. Chaplin did note that Mr. Morgan was somewhat socially isolated due to his mistrust of others and when under severe stress, Mr. Morgan may have brief psychotic episodes. **Ex. L.**

171.    Dr. Chaplin indicated that possible diagnoses include paranoid personality disorder, and antisocial personality disorder, acute stress disorder and polysubstance abuse.  **Ex. L.**

172.    On April 9, 2003, Mr. Morgan was seen outside of his cell in a one to one session with  Mr. Power who went over the results of the PAI with him.  **Ex. L.**  Mr. Morgan denied lying or exaggerating his symptoms but his primary concern continued to be paranoia, stating he always believes someone is after him.  **Ex. L.**

173.    Mr. Morgan felt that the "gang bangers" felt he was a snitch and other inmates felt he was a homosexual rapist.  **Ex. L.**  It was noted that Mr. Morgan's fears were somewhat reality-based given that he was in prison.  **Ex. L.**

174.    Mr. Morgan was seen by Mr Power in 1 to 1 sessions, outside of his cell on May 2, 2003 who noted that he continued to do well in phase II and still had a single cell.  **Ex. L.** Mr. Morgan stated that he was still concerned that other inmates would try to harm him but stated that the major stated he would continue to have a single cell if at all possible.  **Ex. L.**

175.    Mr Power noted that Mr. Morgan continued to do well, was not depressed or psychotic and there was no follow up planned.  **Ex. L.**

176.    On May 4, 2003 psychiatric social worker Tom Lateer and a custody supervisor went to Mr. Morgan's cell to relay his family's message that his father had died.  **Ex. L.**  Mr. Lateer and the custody supervisor offered a telephone call to Mr. Morgan's sister and brother-in-law. **Ex. L.**

177.    It was noted that Mr. Morgan had some shock, and tears but was grieving within normal range.  **Ex. L.**  Mr. Lateer noted that he would monitor and follow up as needed.  **Ex. L.**

178.    On or about June 24, 2003, Mr. Morgan wrote a letter to Commissioner Lantz complaining that he had not received medical and mental health care at Northern.   **Ex. L.**   Dr. Bannish spoke to Mr. Morgan on July 9, 2003 and Mr. Morgan indicated he felt he needed a single cell and a transfer to Garner.  **Ex. L.**

179.    According to Mr. Morgan's records, he was seen by a psychiatrist at Cheshire Correctional Institution on December 8, 2003 requesting a single cell for mental health reasons. **Ex. L.** The psychiatrist indicated that it was up to custody if Mr. Morgan needed a single cell but that there was no mental health reason why one was needed.  **Ex. L.**

180.    Thomas Lateer is a Psychiatric Social Worker at Northern who worked a minimum of 40 hours per week when he was working.  **Ex. N.**  He would work a minimum of 5 days per week, and would tour all housing units a minimum of once a day during the time period in question. **Ex. N.**

181.    On March 30, 2001, the day of Mr. Morgan's arrival at Northern,  Lateer took a mental health history from Mr. Morgan, noting that according to Mr. Morgan, he was in Whiting

Forensic Institute in 1982, and received psychiatric treatment in the Hartford Community from 1988-1990.  **Ex. N.**

182.    Lateer also noted that Mr. Morgan was not on any psychotropic medication and denied the need for mental health services.  **Ex. N.**

183.    Lateer reviewed Mr. Morgan's history over the next fourteen days and noted that while his chart was voluminous, he had not been on medication since February 1995, when it was discontinued at his request.  **Ex. N.**

184.    Lateer also noted that he had an assault on DOC employee DR in 1996, that early in his prison experience received several disciplinary reports for assault or fighting but now received mostly threats disciplinary reports.  **Ex. N.**

185.    Lateer further noted there was a recent, alleged assault on a cellmate prior to his transfer to NCI.  **Ex. N.**  Thus it was Lateer's opinion based upon his review of his chart that Mr. Morgan probably had a character pathology of antisocial personality disorder but his behavior was, for the most part, under control.  **Ex. N.**

186.    On April 15, 2001, Latter again reviewed Mr. Morgan's health services record, specifically focusing on his history of suicide attempts.  **Ex. N.**  Lateer noted that according to his file, Morgan had two brief hunger strikes in 1996 and 1 incident of suicidal ideation in May 1996 after he received a disciplinary report then later denied feeling suicidal.  **Ex. N.**

187.    Lateer noted that at present the plaintiff's diagnosis seemed to primarily be an anti-social personality disorder with borderline traits who got paranoid when stressed.  **Ex. N.** Lateer completed his treatment plan which primarily provided that mental health staff would monitor Mr. Morgan during daily rounds and would see him one to one when the need arises. **Ex. N.**

188.    Lateer went to Mr. Morgan's cell on April 8, 2001 where Lateer observed him playing cards with his cellmate, exhibiting good personal grooming and a neat and orderly cell. **Ex. N.** Lateer also observed that Morgan spoke easily and coherently with an intact thought pattern. **Ex. N.** Mr. Morgan denied any current distress, did not appear anxious or depressed. **Ex. N.**

189.    On April 16, 2001, Lateer went to Mr. Morgan's cell after receiving an emergency mental health request initiated by him. **Ex. N.** Upon approaching his cell, Lateer heard Mr. Morgan in a congenial dialogue with other inmates. **Ex. N.**

190.    Upon Lateer's arrival at the plaintiff's cell, Mr. Morgan was friendly, polite and complimentary. **Ex. N.** Lateer noted that     plaintiff had a calm mood with a relaxed affect. **Ex. N.**

191.    Mr. Morgan told Lateer he wanted mental health staff to arrange for him to get a single cell and that he had increased stress due to the outside pending charges for sexual assault. **Ex. N.**

192.    On this occasion, Mr. Morgan tried several themes as to why he needed a single cell, stating he needed to be alone to sort things out, that he had a history of psychiatric issues, and made vague threats of self harm.    **Ex. N.**

193.    Lateer noted that Mr. Morgan was not in any distress, was not psychotic, an did not appear suspicious or paranoid. **Ex. N.** It was Lateer's opinion that Mr. Morgan was stable and merely attempting in an antisocial way to manipulate changes to his environment. **Ex. N.** Lateer told Mr. Morgan to speak with his unit manager to arrange a cell change move. **Ex. N.**

194.    On May 14, 2001, Lateer went to Mr. Morgan's cell to see how he was doing. **Ex. N.** Lateer noted that he was calm, stable, conversational, and was getting along with his new cellmate.  **Ex. N.**

195.    Lateer also noted that the plaintiff's personal grooming was good and that his cell was neat and orderly.  **Ex. N.**  Lateer noted that Mr. Morgan was not psychotic, no paranoia was evident, and he appeared stable.  **Ex. N.**

196.    On June 29, 2001, Lateer stopped at Mr. Morgan's cell door during rounds to assess his current mental state.  **Ex. N.**  Lateer noted that plaintiff was calm, had a stable affect, and a pleasant demeanor.  **Ex. N.**

197.    Mr. Morgan stated that he wanted intensive mental health therapy and medication. **Ex. N.**   When asked why, he stated only that he had a serious mental health history.  **Ex. N.**

198.    Lateer noted that Mr. Morgan did not have a cellmate, appeared stable, and that there were no signs or symptoms of psychosis, and no overt paranoia.  **Ex. N.**   His facial expression appropriately reflected his mood and was appropriate with his circumstances.  **Ex. N.**

199.    Lateer indicated that he would continue with Mr. Morgan's treatment plan and would monitor and follow up as needed.  **Ex. N.**

200.    On July 13, 2001, Lateer saw Mr. Morgan again.   **Ex. N.**  Lateer noted that the plaintiff's personal hygiene was good and his cell was neat and orderly.  **Ex. N.**  Lateer observed that the plaintiff had no cellmate, that his mood was calm and he had full affect.  **Ex. N.**

201.    Mr. Morgan asked to see Dr. Hensley but could not give Lateer a reason.  **Ex. N.** Lateer indicated that he would discuss this with Dr. Hensley.  **Ex. N.**

202.    On August 14, 2001, Lateer stopped at Mr. Morgan's cell.  **Ex. N.**  Lateer noted that the plaintiff had a new cellmate with whom he appeared to get along.  **Ex. N.**  Lateer also noted that the plaintiff had not received a disciplinary report for approximately 3 months.  **Ex. N.**

203.    Lateer observed that the plaintiff's mood was calm and he had a relaxed affect.  **Ex. N.**  Mr. Morgan was pleasant and conversational, and did not verbalize any mental health issues.  **Ex. N.**

204.    On August 16, 2001, Lateer discussed Mr. Morgan with Dr. Hensley and advised Hensley about Lateer's observations of Mr. Morgan which are set forth above.  **Ex. N.**   Dr. Hensley did not believe he needed to see Mr. Morgan.  **Ex. N.**

205.    On September 15, 2001, Lateer saw Mr. Morgan at his cell door and noted that he was pleasant and engaging with animated affect.  **Ex. N.**.  Mr. Morgan requested medication to sleep but did not appear tired.  **Ex. N.**  Lateer indicated that he would monitor his request for sleep medication further.  **Ex. N.**

206.    On September 26, 2001, Lateer saw Mr. Morgan in the medical examining room with the psychiatrist, Dr. Hensley.  **Exs. N; M.**  Mr. Morgan demanded that Lateer leave the room and then called Dr. Hensley "master" in a sarcastic tone.  **Exs. N; M.**

207.    Dr. Hensley terminated the session shortly after Mr. Morgan called him a racist.  **Exs. N; M.**

208.    On September 28, 2001, Lateer saw Mr. Morgan at his cell door.  **Ex. N.**  The plaintiff told Lateer that he filed a lawsuit against mental health staff a few months ago and that he named most mental health staff in it alleging that the staff won't treat him at Northern.  **Ex. N.**

209.    Lateer noted that Mr. Morgan was in no distress, his thought order was intact and goal directed.  **Ex. N.**  Lateer also noted that the plaintiff was not suspicious acting.  **Ex. N.**

210.    On November 8, 2001, Lateer saw Morgan during one of his regular mental health tours.  **Ex. N.**  Lateer noted that Mr. Morgan had good personal hygiene in a neatly ordered cell with a significant amount of personal property.  **Ex. N.**

211.    Lateer noted that Mr. Morgan was calm and relaxed with a smiling affect.  **Ex. N.** Mr. Morgan told Lateer he was okay and appeared stable.  **Ex. N.**

212.    On December 26, 2001, Dr. Hensley lowered Mr. Morgan's mental health classification score from a Mental Health 3 to a Mental Health 2 noting that Mr. Morgan's occasional suicide threat did not even rise to the level of malingering as he disavowed attempting suicide so quickly.  **Ex. L.**

213.    Moreover, it was Dr. Hensley's opinion that Mr. Morgan's behavior continued to be under control.  **Ex. L.**  Although the plaintiff had an irritable outburst with his new case manager on December 12, 2001 where he cursed at him, this did not suggest to Dr. Hensley that Mr. Morgan's behavior was out of control.   **Ex. L.**

214.    During the time period in question, and based on a review of the affidavits outlining the plaintiff's mental health records for the time period in question,  mental health staff charted over 32 assessments and/or interactions with the plaintiff which were additional to uncharted observations on tours or otherwise. **Exs. L; M; N.**

215.    As is evident from the facts set forth above, the plaintiff did receive appropriate mental health care despite a manipulative nature. **Exs. L; M; N.**

216.    He suffered no adverse mental health episode while at Northern, and was often reported to be doing quite well. **Exs. L; M; N.**  In fact, his only psychological upsets seemed to arise situationally, and he never was suicidal, never had disturbed thought, never required medication and never was psychotic or depressed. **Exs. L; M; N.**

31

217.    When one-on-one counseling was warranted, it was provided, and if it had been required on a regular basis, such counseling was available at Northern.  **Exs. L; M; N.**  Clearly, the plaintiff's claims of inadequate mental health care are without merit.

DEFENDANTS,
Governor John G. Rowland, et al.

RICHARD BLUMENTHAL
ATTORNEY GENERAL


BY:____/s/_____
　　　　Lynn D. Wittenbrink
　　　　Assistant Attorney General
　　　　Federal Bar No. ct08575
　　　　110 Sherman Street
　　　　Hartford, CT  06105
　　　　Telephone No. (860) 808-5450
　　　　Fax no. (860) 808-5591
　　　　lynn.wittenbrink@po.state.ct.us


## CERTIFICATION

I hereby certify that a copy of the foregoing was sent by first-class mail, postage prepaid to the following on this 19th day of August, 2005 to:

Lloyd George Morgan, Inmate No. 117796
Cheshire Correctional Institution
900 Highland Avenue
Cheshire, CT  06410

Annette M. Lamoreaux
CT Civil Liberties Union Foundation
32 Grand Street
Hartford, CT  06106

____/s/_____
　　　　Lynn D. Wittenbrink
　　　　Assistant Attorney General