UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

LLOYD GEORGE MORGAN, JR.         :
                                 :          PRISONER
v.                               :     Case No. 3:01CV1107(CFD)
                                 :
GOVERNOR JOHN G. ROWLAND, et al. :

**RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff Lloyd George Morgan, Jr. ("Morgan") is currently confined at the Cheshire Correctional Institution in Cheshire Connecticut. He brings this civil rights action pro se challenging various aspects of his confinement at the Northern Correctional Institution in Somers, Connecticut ("Northern"). In his second amended complaint, Morgan asserts two claims, denial of the opportunity for meaningful exercise and violation of his right to privacy during psychiatric interviews. The remaining defendants, Armstrong, Matos, Myers, Coates, Lajoie, Whidden, Chaplin, Hensley and Lateer, have filed a motion for summary judgment.[1]

---

[1] The named defendants in the second amended complaint are John J. Armstrong, Peter M. Matos, Larry J. Myers, Thomas Coates, Michael P. Lajoie, Christine M. Whidden, Dr. Paul M. Chaplin, Dr. Ronald Hensley and Thomas Lateer, improperly identified as Latier. All defendants are named in their individual and official capacities.

On May 3, 2002, the court dismissed all claims against the following defendants who had been included in the original complaint: University of Connecticut John Dempsey Medical Health Center; Director Ed Presante; Chief Public Defender Gerard A. Smyth; Deputy Chief Public Defender Susan O. Storey; Supervisor of Special Public Defenders Preston Tisdale; Temmy Ann Pieszak; Public Defender Douglas Ovian; and Special Public Defender Robert Pickering. In addition, the court dismissed all claims for damages against all defendants in their official capacities and directed Morgan to file an amended complaint.

When Morgan filed his first amended complaint, he omitted as defendants the following who had been included in the original complaint: Social Worker Latear; Nurse Nancy Hill; Supervising Nurse Patricia Wollenhaupt; Correctional Officer Wilbur L. Strozier; Correctional Officer Josefiaki; Correctional Officer Cox; Captain Jeffrey Adger; Mail Handler Murphy; Counselor James Perkins; Correctional Officer Melbourne; Correctional Officer Badeau; Correctional Officer Daniel Polonis; Correctional Officer Zina; Lieutenant Olgesbey; Lieutenant Loubier, Jr.; Lieutenant Robert J. Knapp; Administrative Captain Venton; Complex I Warden

Armstrong is the former Connecticut Correction Commissioner and Matos is the former Deputy Commissioner. Myers was warden at Northern. Coates, Whidden and Lajoie had been majors in the Connecticut Correction Department assigned to Northern, and Chaplin, Hensley and Lateer were mental health professionals at Northern. For the reasons that follow, defendants' motion is granted.

---

Brian K. Murphy; Correctional Officer Howell; Nurse Tom Magiera; Mental Health Psychologist John Doe; Disciplinary Investigator Correctional Treatment Officer Vadnais; Correctional Officer Chambers; Correctional Officer Sidoti; Correctional Officer Wesley Collins; Lieutenant Kendricks; Lieutenant Wayne Corriveau; Major of Programs and Treatment Neal Kearney; Major of Administrative Policies Steve Fry; Warden Mark W. Strange; Correctional Officer R. Flores; Correctional Officer Atkins; Lieutenant Buttrick; Complex II Warden Hector L. Rodriguez; Counselor Kurtz; Counselor Baker; Counselor Ray Waldon; Counselor Stacy L. Smith; Counselor Jay Schuder; Counselor Supervisor Jane Doe; Disciplinary Investigator Correctional Officer J. Cahill; Disciplinary Investigator Correctional Officer Jones; Disciplinary Hearing Officer Lieutenant Meulemans; Lieutenant Emmanuel; Major of Treatment Donald Gilbert; Major of Operations Henry Lojkuck; Major Michael Carter; Warden Peter J. Murphy; Deputy Commissioner of Programs and Treatment Jack Tokarz; Warden Mary M. Johnson; Correctional Officer Goodhall; Captain Michael Zacharewicz; Warden James E. Huckabey; and Operation Major Richard Matos. Thus, any claims against these individuals have been withdrawn.

     On January 5, 2005, Morgan filed a second amended complaint. He omitted as defendants the following persons who had been included in the first amended complaint: Governor John G. Rowland, Director of Offender Classification Fred Levesque, Unit Manager Captain Maurice Butler, Unit Manager Captain William Fanenuff, Correctional Officer Koske, Correctional Officer Curtis, Health Service Administrator Pamela B. Shea, Health Services Administrator Bryan Castle, Warden John Tarascio, Special Deputy Sheriff Captain Helberg, Special Deputy Sheriff Lieutenant Erik Johnson, Special Deputy Sheriff Jimmy Delvalle and Special Deputy Sheriff Diaz. The court also considers all claims against these defendant withdrawn.

     The second amended complaint includes only two claims, denial of the opportunity for meaningful exercise and violation of Morgan's right to privacy by the disclosure of personal mental health information to other inmates and non-medical correctional staff. Thus, all claims against the remaining defendants for violation of rights protected under 42 U.S.C. §§ 1981, 1982, 1985 and 1986, Title II of the Americans with Disabilities Act and under 42 U.S.C. § 1983 for failure to protect Morgan from harm, denial of a safe program and protective custody, use of excessive force, retaliation and reprisal also are withdrawn.

I.      Standard of Review

In a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. See Rule 56(c), Fed. R. Civ. P.; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); White v. ABCO Engineering Corp., 221 F.3d 293, 300 (2d Cir. 2000). A court must grant summary judgment "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact....'" Miner v. Glen Falls, 999 F.2d 655, 661 (2d Cir. 1993) (citation omitted). A dispute regarding a material fact is genuine "'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir.) (quoting Anderson, 477 U.S. at 248), cert. denied, 506 U.S. 965 (1992). When a motion for summary judgment is supported by documentary evidence and sworn affidavits, the nonmoving party must present "significant probative evidence to create a genuine issue of material fact." Soto v. Meachum, Civ. No. B-90-270 (WWE), 1991 WL 218481, at *6 (D. Conn. Aug. 28, 1991). The court "resolve[s] all ambiguities and draw[s] all permissible factual inferences in favor of the party against whom summary judgment is sought." Patterson v. County of Oneida, NY, 375 F.3d 206, 218 (2d Cir. 2004). A party may not create a genuine issue of material fact by resting on the "mere allegations or denials" contained in his pleadings. Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995).

Where one party is proceeding pro se, the court reads the pro se party's papers liberally and interprets them to raise the strongest arguments suggested therein. See Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994). Despite this liberal interpretation, however, a "bald assertion,"

unsupported by evidence, cannot overcome a properly supported motion for summary judgment. Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir. 1991).

II.   Facts[2]

Morgan's most recent period of confinement by the State of Connecticut Correction Department began in 1999. He currently is serving a twenty year sentence with an expected release date of January 4, 2020. On March 30, 2001, Morgan assaulted his cellmate at the MacDougall Correctional Institution by throwing hot water and baby oil onto the inmate's face, cutting his face with a razor and striking him in the head by swinging a sock containing an electrical adaptor. As a result of this assault, Morgan was criminally prosecuted and also transferred to Northern.

   A.   Recreation Claim

Northern is the designated restrictive housing facility for the Connecticut Department of Correction. Most of the inmates confined at Northern have demonstrated an inability to adjust to confinement in prison and pose a threat to the safety and security of a correctional facility. The Administrative Segregation Program at Northern consists of three phases. Inmates remain in Phase I, the most restrictive phase, for a minimum of six months and until they are disciplinary-report free for a designated time. While in Phase I, Morgan received eight disciplinary reports,

---

[2] The facts are taken from defendants' Rule 56(a)1 Statement [doc. #195-3] and the exhibits attached to their memorandum [doc. #195-1]. On August 24, 2005, the court issued a notice [doc. #196] informing Morgan of his obligation to respond to the motion for summary judgment and of the contents of a proper response. The court granted Morgan an extension of time, until November 28, 2005, to file his response. Morgan has filed memoranda in opposition to defendants' motion but did not file a Rule 56(a)2 Statement. Accordingly, defendants' facts are deemed admitted. See D. Conn. L. Civ. R. 56(a)1 ("All material facts set forth in said statement will be deemed admitted unless controverted by the statement required to be served by the opposing party in accordance with Rule 56(a)2.")

including reports for threats, "security tampering" and "interfering with safety and security." As a result, he remained in Phase I from March 30, 2001, until April 18, 2003.

Inmates in Phase I participate in voluntary recreation for one hour per day, five days per week. Prior to April 2003, all Phase I inmates, regardless of how long they had been confined in Phase I, were required to participate in recreation in full restraints, which consist of handcuffs behind the back, leg irons and a tether chain from the leg irons to the handcuffs. The current policy still requires Phase I inmates to recreate in full restraints, but provides that the policy may be relaxed after 30 days. Phase I inmates who choose to participate in recreation are escorted to an outdoor area, approximately 20' x 20', surrounded by a chain link fence. Inmates generally spend the recreation period walking around the recreation yard.

Phase I inmates are not restrained while in their cells. A double cell, approximately 8' x 10', containing two narrow beds, one over the other, and a toilet, is large enough to permit an inmate to perform calisthenics such as sit-ups, push-ups, jumping and running in place.

In addition to challenging the use of restraints on him while he was exercising during his stay in Phase I at Northern, Morgan alleges that the restraints caused him to fall in the recreation yard on May 4, 2001. A search of Department of Correction records reveals that no correctional staff member completed an incident report for the alleged fall. Department policy required that any inmate injury or health episode be reported in writing.

Medical staff did complete a medical incident report on May 4, 2001. The report states that Morgan felt light-headed and had to sit down. While doing so, he bumped his head and hurt his right shoulder and knee. There is no suggestion in the medical incident report that Morgan

complained to medical staff, as he now alleges, that his wrists were sore because handcuffs were too tight and that he was trying to sit down to relieve the pressure on his wrists.

On June 14, 2001, plaintiff was seen by a prison physician. Morgan was not interested in obtaining examination or treatment for the injuries allegedly suffered in the prior fall. The doctor also denied plaintiff's request for an order that he be handcuffed in front during exercise.

During the time Morgan was in Phase I, he was seen in the medical department almost weekly. The medical records do not indicate that Morgan suffered any adverse health consequences from the requirement that he exercise in the outdoor area in full restraints. Although Morgan has a history of chronic obesity, he lost sixteen pounds during the period he was confined in Phase I.

B.  Psychiatric Services Claim

Inmates transferred to Northern are also screened and evaluated by mental health staff within twenty-four hours of their arrival. If an inmate needs mental health care, a treatment plan is developed and implemented. The treatment plan may include one-on-one visits by inmates with mental health professionals. All inmates are advised that if they need mental health services, they should submit a written request to mental health staff. Mental health staff then will arrange for an inmate to be interviewed by a mental health professional. If an inmate has a mental health emergency, he may contact custodial staff who then will inform the mental health staff.

A psychologist, psychiatric social worker or mental heath nurse toured each unit at Northern at least once a day during the period in question. The tour is intended to determine whether any inmate has an acute mental health need that is not otherwise being addressed.

Mental health clinicians regularly refer inmates to the supervising psychiatrist, defendant Hensley. When an inmate is referred, Hensley reviews the inmate's health records and discusses the inmate with the inmate's case manager, often a psychiatric social worker. Hensley then schedules a visit with the inmate, during which he visually assesses and speaks with the inmate.

Defendant Lateer, a psychiatric social worker, worked with Morgan while he was confined in Phase I of administrative segregation at Northern. Lateer often toured the housing units with defendant psychologist Chaplin. They would stop at each cell and speak to the inmates. Even when the inmate reported that he had no health or psychiatric issues, they would engage him in general conversation to evaluate whether the inmate was delusional, psychotic or depressed. If an inmate refused to converse, they would then monitor the inmate's dealings with staff and other inmates. If any inmate acted in a way they considered inappropriate, the inmate would be removed from his cell for a more thorough evaluation.

If an inmate approached his cell door and wished to speak to Lateer or Chaplin, they visually assessed the inmate to determine whether the inmate was in apparent distress. If not, they would ask the inmate why he wished to speak to them. If the inmate did not want to state his concerns in that setting, defendants Lateer and Chaplin would tell the inmate to pass them a note through the door or submit an inmate request. If the inmate appeared to be in psychiatric distress, they would monitor that inmate and, if needed, quickly arrange for a one-on-one out-of-cell meeting. All inmates were not taken from their cells for immediate one-on-one meetings, however. Doing so would prevent defendants Lateer and Chaplin from completing their tours of the housing units and could have prevented them from identifying other inmates in psychiatric distress.

Prior to his transfer to Northern, Morgan was examined by a psychologist who found Morgan to be "manipulative, but exhibiting no overt psychotic behavior." Upon his arrival at Northern on March 30, 2001, a psychiatric social worker saw Morgan and developed a mental health treatment plan. The social worker determined that Morgan did not require regularly scheduled one-on-one counseling sessions. Instead, he would be monitored by mental health staff through unit tours and cell door visits and seen on an "as needed" basis.

Defendants Chaplin and Lateer regularly stopped at Morgan's cell to assess his condition, consistent with their general practice. They observed him in his cell and had conversations with him in front of his cell. Morgan did not appear depressed or psychotic. He appeared "stable, pleasant and conversational." In addition to the daily observations, Morgan was seen and evaluated in meetings held outside his cell seventeen times between July 26, 2001, and May 2, 2003.[3] During all of these evaluations, Morgan appeared to be "doing well." He was not psychotic, paranoid or depressed.

Morgan also requested several other sessions with mental health staff. At these meetings, Morgan attempted to address custody concerns or to convince mental health staff to order that he be confined in a single cell. On December 3, 2001, Morgan threatened to commit suicide unless he was transferred to a single cell. Defendant Chaplin met with Morgan, who then denied any intention to commit suicide and agreed to return to his cell. On December 7, 2001, psychiatric nurse Wooven responded to Morgan's request for individual mental health treatment. Morgan

---

[3]Defendant Chaplin, a psychologist, evaluated Morgan on July 26, 2001, August 17, 2001, August 31, 2001, September 24, 2001, December 26, 2001, February 1, 2002, April 25, 2002, May 14, 2002, June 24, 2002, July 1, 2002, July 26, 2002, October 2, 2002 and March 16, 2003. Psychiatric social worker Kevin Power evaluated Morgan on September 6, 2001, March 15, 2003, April 9, 2003 and May 2, 2003.

told her that he was depressed because other inmates and correctional staff thought he was a sexual predator and "hated him." He then told her that he had no intention to commit suicide; he just needed to "vent."

On December 12, 2001, Morgan again requested mental health treatment. When psychiatric social worker Powers arrived at his cell, Morgan had no mental health issues to discuss. He reported the custodial staff had denied him additional bed sheets and he wanted Powers to document this in his mental health records. Morgan also requested names of certain custodial officers so he could add them to a lawsuit.

On August 14, 2002, Morgan put a piece of white cloth around his neck in an attempt to be removed from his cell. When a custody official told Morgan that they would deploy chemical agents, Morgan removed the cloth. He was then admitted to the infirmary. Morgan stated that he had no intention of hurting himself; he only wanted a "change of environment." Morgan agreed not to hurt himself and agreed to be placed on in-cell restraints status because this would enable him to change his current cell.

On October 3, 2002, defendant Chaplin provided Morgan a written response to Morgan's request for a single cell. Defendant Chaplin told Morgan that he did not qualify for a single cell for mental health reasons. Rather, Morgan's stable mental condition indicated that he would do well sharing a cell with another inmate.

In March 2003, Morgan told psychiatric social worker Powers that he needed a single cell because of threats against him. He provided no specific information regarding these threats, such as names of inmates who had threatened him. Morgan told Powers that he feared other inmates would request to be housed with him so they could hurt him. Powers reviewed Morgan's

housing history with him and found it contrary to Morgan's fears. For example, Morgan's last potential cellmate had refused the cell assignment because he thought Morgan was homosexual. The cellmate before that had stated that Morgan tried to rape him and insisted on a cell change. There was no evidence that any inmate requested to share a cell with Morgan.

III.  Discussion

Defendants move for summary judgment on the grounds that Morgan's request for a declaratory judgment is moot, that they were not deliberately indifferent to his needs through the application of the restraints policy to him, and did not violate Morgan's right to privacy. In addition, they contend that they are protected by qualified immunity.

A.  Claims for Declaratory Relief

Defendants argue that Morgan's claim for declaratory relief is moot because Morgan no longer is confined at Northern, but is now housed at the Cheshire Correctional Institution. Morgan does not address this argument in his memoranda in opposition to the motion for summary judgment.

The Second Circuit has held that an inmate's request for declaratory and injunctive relief against correctional staff or conditions of confinement at a particular correctional institution becomes moot when the inmate is discharged or transferred to a different correctional institution. See Mawhinney v. Henderson, 542 F.2d 1, 2 (2d Cir. 1976). See also Martin-Trigona v. Shiff, 702 F.2d 380, 386 (2d Cir. 1983) ("The hallmark of a moot case or controversy is that the relief sought can no longer be given or is no longer needed"). Other courts concur with this result. See, e.g., McAlpine v. Thompson, 187 F.3d 1213, 1215 (10th Cir. 1999) (noting that an inmate's claim for prospective injunctive relief regarding conditions of confinement is rendered moot

upon his release from confinement); Lavado v. Keohane, 992 F.2d 601, 605 (6th Cir. 1993) (holding that inmate's suit for declaratory judgment as to whether correctional officers violated his constitutional rights by opening his privileged mail outside his presence was rendered moot by inmate's release from prison); Martin v. Sargent, 780 F.2d 1334, 1337 (8th Cir. 1985) (holding that inmate's claims for injunctive and declaratory relief concerning prison conditions were moot where prisoner had been moved to another prison unit).

There is, however, an exception to this principle. The court may decide a claim that is moot where the claim is "'capable of repetition, yet evading review'" and the repetition will affect "the same complaining party." Altman v. Bedford Cent. Sch. Dist., 245 F.3d 49, 71 (2d Cir.) (quoting City of Los Angeles v. Lyons, 461 U.S. 95, 109 (1983) and Weinstein v. Bradford, 423 U.S. 147, 149 (1975) (per curiam)), cert denied sub nom. Debari v. Bedford Cent. Sch. Dist., 534 U.S. 837 (2001). In response to defendants' motion to dismiss, Morgan argued that he could be returned to Northern if he receives too many disciplinary reports. However, whether Morgan is transferred back to Northern depends, in part, on his conduct while at the Cheshire Correctional Institution. In addition, even if Morgan were returned to Northern, there is no evidence that he would not be able to file a motion or new action seeking appropriate relief. Thus, there is no evidence that his claim necessarily would evade review. The court concludes that the possibility of his return to Northern is too speculative to warrant continuation of these claims for such relief.

In addition, the declaratory relief requested is a statement that defendants have violated Morgan's constitutional rights. If Morgan were to prevail in this action, the court necessarily

would have to make that determination. Thus, the declaratory relief requested would add nothing to this action.

Defendants' motion for summary judgment is granted as to all claims for declaratory relief.

> B.   Challenge to Restraint Policy for Recreation[4]

Morgan challenges the requirement that inmates in Phase I at Northern exercise handcuffed behind their backs with shackles and a tether chain on the grounds that this policy violated his right to exercise and that, on May 4, 2001, the policy caused him to fall and injure himself. Defendants contend that Morgan's claim concerning recreational methods fails to allege unconstitutional conditions of confinement.

"It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." Helling v. McKinney, 509 U.S. 25, 31 (1993); see also Rhodes v. Chapman, 452 U.S. 337, 351 (1981). To state an Eighth Amendment claim, an inmate must allege facts demonstrating failure of prison officials to provide for inmates' "basic human needs - e.g., food, clothing, shelter, medical care, and reasonable safety." DeShaney v. Winnebago County Dept. of Social Servs., 489 U.S. 189, 200 (1989).

---

[4]On April 11, 2003, the Connecticut Civil Liberties Union Foundation ("CCLUF") sought permission to file an amicus brief on the issue of requiring prisoners to recreated in restraints. The motion was granted on June 12, 2003, and CCLUF filed its brief on June 27, 2003. The CCLUF has repeatedly refused all of Morgan's requests for assistance and has taken no other action in this case. The court has considered the amicus brief in conjunction with defendants' motion for summary judgment on this ground.

An inmate may prevail on an Eighth Amendment claim "only where he proves both an objective element–that the prison officials' transgression was 'sufficiently serious'–and a subjective element–that the officials acted, or omitted to act, with a 'sufficiently culpable state of mind,' i.e., with 'deliberate indifference to inmate health or safety.'" Phelps v. Kapnolas, 308 F.3d 180, 185 (2d Cir. 2002) (quoting Farmer v. Brennan, 511 U.S. 825, 834 (1994)). The objective element is satisfied where the inmate shows that the deprivation he alleges is sufficiently serious, i.e., that his confinement under the alleged conditions violates contemporary standards of decency. The subjective element requires the inmate to show that correctional officials were aware of and disregarded a substantial risk of serious harm. See id. at 185-86. Defendants "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and ... must also draw that inference." Farmer, 511 U.S. at 837.

Both the Supreme Court and the Court of Appeals for the Second Circuit have acknowledged that exercise is a basic human need that must be provided for inmates. See Wilson v. Seiter, 501 U.S. 294, 304-05 (1991); Williams v. Greifinger, 97 F.3d 699, 704 (2d Cir. 1996); Sostre v. McGinnis, 442 F.2d 178, 193 & n.25 (2d Cir. 1971). Also, restrictions on exercise should not be "routine." Restrictions must be limited to unusual circumstances or situations where restrictions are needed for disciplinary reasons. See Hope v. Pelzer, 536 U.S. 730, 737 (2002) (noting that penological concerns may be considered in reviewing an Eighth Amendment claim); Bell v. Wolfish, 441 U.S. 520, 547 (1979) ("prison administrators should be accorded wide-ranging deference in the adoption and execution of policies and practices that in

their judgment are needed to preserve internal order and discipline and to maintain institutional security").

While courts have found that denial of all opportunity to exercise violates an inmate's constitutional rights, they have found no violation where the inmate has some opportunity for exercise, either in or outside of his cell.  See Sostre, 442 F.2d at 186, 193 & n.25 (noting that denial of all opportunity for exercise constitutes Eighth Amendment violation but distinguishing that case because plaintiff was afforded opportunity to exercise for one hour each day with four or five other prisoners in a small, enclosed yard); Williams v. Goord, 142 F. Supp. 2d 416, 428-29 (S.D.N.Y. 2001) (holding that defendants not entitled to qualified immunity if jury were to find that restraints deprived inmate of meaningful out-of-cell exercise and inmate not able to meaningfully exercise in his cell); Dawes v. Coughlin, 964 F. Supp. 652, (N.D.N.Y. 1997) (holding that requiring inmate to recreate in full restraints pursuant to restraint order issued for safety and security reasons did not violate inmate's Eighth Amendment rights; inmate was able to move around in recreation area), aff'd 159 F.3d 1346 (2d Cir. 1998); but see Delaney v. DeTella, 256 F.3d 679, 683-84 (7th Cir. 2001) (affirming denial of summary judgment where inmate was required to remain "in a cell the size of a phone booth" for six months with no out-of-cell recreation and ability to perform only limited calisthenics); Williams, 97 F.3d at 704 (holding that inmate should not be denied all out-of-cell exercise because he refused to take a tuberculosis test, not for safety or security reason).  Allen v. Sakai, 48 F.3d 1082, 1086-88 (9th Cir. 1995) (holding that denial of outdoor recreation was constitutional violation where denial was based on "logistical difficulties" and inmate was not determined to be safety risk); Mitchell v. Rice, 954 F.2d 187, 191-92 (4th Cir. 1992) (noting that court has never held that denial of out-of-cell

exercise is per se unconstitutional, but total or near-total denial of exercise or recreational opportunity is unconstitutional unless required for penological reasons); Martinez v. Fairman, No. 93 C 6225, 1995 WL 383072, at *5 (N.D. Ill. Jun. 22, 1995) (denying motion to dismiss because allegation that inmate was provided minimal time to exercise and was forced to wear shackles during exercise and for increasingly long periods when in his cell stated claim for cruel and unusual punishment).

Defendants have provided undisputed evidence describing the administrative segregation program at Northern. An inmate is transferred to the program only if his behavior poses a threat to institutional safety and security in the form of a threat to the security of the facility or to the staff or another inmate.

The Administrative Segregation Program is a three phase program. Phase I is the most restrictive. As inmates complete the program requirements, they are rewarded with fewer restrictions. Phase I lasts a minimum of six months. To progress to Phase II, inmates also are required to be free from Class A disciplinary reports for 120 days, Class B disciplinary reports for 90 days and Class C disciplinary reports for 60 days[5]. In Phase I, inmates are in full restraints whenever they leave their cells. At the time in question, inmates wore full restraints for recreation during the entire time they remained in Phase I. (See Defs.' Mem. Ex. F.)

Morgan was transferred to Northern after he was found guilty of institutional disciplinary charges and arrested for violently assaulting his cellmate. He remained in Phase I for longer than

---

[5] The different classes of disciplinary reports relate, generally, to the severity of the misconduct.

six months only because he received eight disciplinary reports while confined in Phase I. (See Defs.' Mem. Ex. B & C.)

Defendants also have provided the affidavit of Dr. Edward Blanchette (a Correctional physician), which states that there is sufficient room in the cells at Northern to enable inmates to exercise by performing calisthenics such as jumping, running in place, push-ups and sit-ups. (See Defs.' Mem. Ex. I at ¶ 7.) Morgan has provided no contrary evidence.

In addition, unlike the inmates in the decisions which found constitutional violations for recreational restrictions, Morgan was not denied all access to out-of-cell recreation. He had the opportunity to go to the recreation yard for five hours each week. Although he was in full restraints and could not exercise vigorously in the recreation yard, Morgan was able to walk about. Morgan was also not restrained in his cell. Although Morgan alleged that the lack of vigorous out-of-cell recreation exacerbated his medical conditions, he has provided no evidence to support this allegation.

Accordingly, the court concludes that Morgan has failed to meet his burden of demonstrating a genuine issue of material fact for trial regarding whether the requirement that he exercise in full restraints met the objective standard of violating contemporary standards of decency or the subjective standard that the defendants were aware of and disregarded a substantial risk of serious harm. Defendants' motion for summary judgment is granted on the claims regarding the requirement that Morgan exercise in full restraints while in Phase I of administrative segregation at Northern[6].

---

[6]Morgan has also failed to raise a genuine issue of material fact concerning his fall on May 4, 2001 that could constitute an Eighth Amendment violation.

Further, even if Morgan were able to produce such evidence, defendants would be entitled to qualified immunity on this claim. The doctrine of qualified immunity "shields government officials from liability for damages on account of their performance of discretionary official functions 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Rodriguez v. Phillips, 66 F.3d 470, 475 (2d Cir. 1995) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).

> [I]f a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established. This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition.

Saucier v. Katz, 533 U.S. 194, 201 (2001).

At the time Morgan was confined in Phase I, the Second Circuit had determined that access to a small enclosed yard, open to the sky, with four or five other inmates for one hour each day was constitutional. See Sostre, 442 F.2d at 186, 193 & n.25. Although the Second Circuit had disapproved the denial of all out-of-cell recreation in general, the court had carved out an exception for safety or security reasons. See Williams, 97 F.3d at 704 (acknowledging safety exception to Eight Amendment right to exercise and holding that inmate should not be denied all out-of-cell exercise because he refused to take a tuberculosis test rather than for safety or security reason). Inmates, like Morgan, were transferred to the Administrative Segregation Phase Program for safety and security reasons. Thus, defendants reasonably could have understood the recreation policy to be in compliance with existing Second Circuit law. In addition, the Second Circuit had affirmed the decision of a district court that approved similar restrictions on recreation. See Dawes v. Coughlin, 964 F. Supp. 652 (N.D.N.Y. 1997) (holding that requiring

inmate to recreate in full restraints pursuant to restraint order issued for safety and security reasons did not violate inmate's Eighth Amendment rights; inmate was able to move around in recreation area), aff'd 159 F.3d 1346 (2d Cir. 1998). Thus, even if Morgan had shown that the conditions imposed during recreation violated his Eighth Amendment rights under current law, defendants would have been entitled to qualified immunity on this claim.

    C.    Violation of Right to Privacy

Morgan claims that defendants Chaplin, Hensley and Lateer have violated his Ninth Amendment right to privacy because mental health staff members require inmates to discuss mental health issues with staff through their cell doors.

Persons have a right to avoid disclosure of "personal matters" as a protected privacy interest. Whalen v. Rose, 429 U.S. 589, 599 (1977). The Second Circuit has extended this protection to prisoners. See Powell v. Schriver, 175 F.3d 107, 112 (2d Cir. 1999) (holding that prison officials must maintain the confidentiality of previously undisclosed medical information unless disclosure is "reasonably related to legitimate penological interests").

Morgan alleges that inmates must converse with mental health staff through the cell door, enabling other inmates and correctional staff to hear personal and confidential mental health information. In support of their motion for summary judgment, defendants have provided evidence showing that, although mental health staff members tour the housing units and speak with inmates through cell doors, inmates are not required to discuss confidential issues at that time. The inmates may submit written requests for treatment or pass a note to the mental health staff member touring the housing unit. Defendants also presented evidence showing that Morgan was evaluated in private outside of his cell on numerous occasions.

In opposition to the motion for summary judgment, Morgan has presented no evidence showing that he was required to divulge confidential information through his cell door instead of passing a note to the staff member or submitting a written request for mental health treatment. In addition, he has provided no evidence showing that any correctional officer or inmate overheard his alleged conversations with mental health staff.

The court concludes that Morgan has failed to meet his burden of demonstrating a genuine issue of material fact regarding violation of his right to privacy. Defendants' motion for summary judgment is granted as to the violation of privacy claim.

IV.    Conclusion

Defendants' Motion for summary judgment [**doc. #195**] is **GRANTED**. The Clerk is directed to enter judgment and close this case.

**SO ORDERED** this 17th day of March, 2006, at Hartford, Connecticut.

    /s/ CFD
CHRISTOPHER F. DRONEY
UNITED STATES DISTRICT JUDGE